

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
08/19/2019

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| SHALE SUPPORT GLOBAL HOLDINGS, | § Case No. 19-33884 (DRJ) |
| LLC, *et al.*,[1] | § |
| | § (Jointly Administered) |
| Debtors. | § |
| | § |

**FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364,
AND 507, BANKRUPTCY RULES 2002, 4001, 6004, AND 9014, AND LOCAL
RULE 4001-2 (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL
AND OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND
PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS,
(III) GRANTING ADEQUATE PROTECTION, AND (IV) <u>GRANTING RELATED
RELIEF</u>** (Docket No. 14)

Upon the motion (the "<u>Motion</u>") of the debtors and debtors-in-possession (collectively,

the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>"), pursuant  to

sections 105(a), 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e) and 507 of title 11 of

the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>"), and Rules 2002,

4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"),

seeking, among other things, entry of the interim order, entered on July 12, 2019 (the "<u>Interim</u>

<u>DIP Order</u>") and this final order (the "<u>Final DIP Order</u>"):

i. Authorizing the Debtors to obtain postpetition financing, consisting of senior

secured superpriority, multi-draw term loans (the "<u>DIP Loan(s)</u>", and together with all other

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Shale Support Global Holdings, LLC (5328); Shale Support Holdings, LLC (7814); Stanton Rail Yard, LLC (5976); Southton Rail Yard, LLC (8704); Drying Facility Assets Holding, LLC (6424); Shale Energy Support, LLC (8523); Mine Assets Holding, LLC (4401); and Wet Mine Assets Holding, LLC (2879).  The service address for Debtor Stanton Rail Yard, LLC is 32731 Egypt Lane, Magnolia, Texas 77354.  For the remainder of the Debtors, it is 600 Jefferson Street, Suite 602, Lafayette, Louisiana 70501.

*ACTIVE 45056424v5*

obligations under the DIP Loan Documents (as defined below), the "DIP Obligations") to be advanced and made available to the Debtors in the aggregate maximum principal amount of $16,600,000 (such amount, the "Committed Amount"; such facility, the "DIP Facility") from Providence Debt Fund III LP, Benefit Street Debt Fund IV LP, and Benefit Street Partners SMA LM LP (collectively, the "DIP Lenders"), as administered by BSP Agency, LLC (the "DIP Agent") consistent with the terms and conditions of the *Senior Secured, Super-Priority Debtor-In-Possession Credit and Security Agreement*, which is attached hereto as **Exhibit A** (with such changes or amendments, if any, as were or may be made with the agreement of the DIP Lenders prior to or as a result of the Final Hearing (as defined herein) and as amended, supplemented or otherwise modified from time to time in accordance with the terms and conditions set forth herein, the "DIP Credit Agreement"),[2] and the Approved Budget (as defined below and together with the DIP Credit Agreement and any other document or instrument executed and/or delivered in connection with the DIP Facility, the "DIP Loan Documents") (A) to pay certain costs, fees and expenses related to the Chapter 11 Cases as provided for in this Final Order; (B) to roll up and convert $6,600,000 (the "Roll-up Amount") of the Prepetition Term Loan (as defined below) into DIP Loans; and (C) to provide working capital and for other general corporate purposes of the Debtors;[3]

      ii.      Authorizing the Debtors to execute and enter into the DIP Loan Documents and to perform all such other and further acts as may be required in connection with the DIP Loan Documents, including the DIP Obligations, and all instruments, security agreements, assignments, pledges, mortgages, reaffirmations and other documents referred to therein or requested by the DIP Lenders to give effect to the terms thereof;

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement.

[3] The initial Approved Budget is attached as Exhibit C to the DIP Credit Agreement.

*ACTIVE 45056424v5*

iii.      Authorizing the Debtors to use proceeds of the DIP Facility as permitted in the DIP Loan Documents and in accordance with this Final DIP Order;

iv.      Authorizing the Debtors to grant, and granting superpriority administrative expense claims status pursuant to Bankruptcy Code § 364(c)(1) to the claims of the DIP Agent, for the benefit of the DIP Lenders in respect of the DIP Obligations;

v.      Granting liens on and security interests in the DIP Collateral (as defined herein) as follows: (a) pursuant to Bankruptcy Code §§ 364(c)(2) and (d), valid, perfected, enforceable and non-avoidable first priority priming liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors subject to Permitted Existing Liens (as defined in the DIP Credit Agreement), and (b) pursuant to Bankruptcy Code § 364(c)(3), valid, perfected, enforceable and non-avoidable second priority or other junior liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors that are subject only to Permitted Existing Liens, in each case on the terms set forth in the DIP Loan Documents;

vi.      Providing adequate protection to the Prepetition Term Loan Lenders and Siena (each as defined below) as set forth in this Final DIP Order;

vii.      Authorizing the Debtors to use Cash Collateral in which Siena or the Prepetition Term Loan Lenders (each as defined below) have an interest pursuant to any Prepetition Loan Document (as defined below) and granting adequate protection to the Prepetition Term Loan Lenders and Siena in connection therewith;

viii.      Vacating and modifying the automatic stay pursuant to Bankruptcy Code § 362 to the extent necessary to implement and effectuate the terms and provisions of this Final DIP Order and the DIP Loan Documents; and

3

ix.      Granting the Debtors such other and further relief as is just and equitable.

The Court having held an interim hearing on the Motion on July 12, 2019 (the "Interim Hearing"); the Court having considered all objections, if any, to the Motion; and upon the record made (a) by the Motion and the exhibits attached thereto; (b) the *Declaration of Richard J. Shinder in Support of Emergency Motion of Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2 (I) Authorizing the Debtors to Use Cash Collateral and Obtain Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, and (c) at the hearings constituting Final Hearing, and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND CONCLUDED THAT:**[4]

A.      On July 11, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to operate and maintain their businesses as debtors in possession pursuant to Bankruptcy Code §§ 107(a) and 1108.

B.      This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this case and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The Court has

---

[4]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  Pursuant to Bankruptcy Rule 7052, to the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  Statements made by the Court from the bench during the Final Hearing shall constitute additional conclusions of law and findings of fact, as appropriate.

authority to enter this Final DIP Order consistent with Article III of the United States Constitution.

C.       On July 12, 2019, this Court entered the Interim DIP Order authorizing draws of the DIP Loans on an interim basis in the amount of $3,000,000.

D.       On July 29, 2019, the United States Trustee for the Southern District of Texas appointed an Official Committee of Unsecured Creditors in the Chapter 11 Cases (the "Committee")

E.       Sufficient and adequate notice of the Motion and entry of this Final DIP Order has been given pursuant to Bankruptcy Code §§ 102(1) and 364(c) and (d) and Bankruptcy Rules 2002 and 4001(c) to all entities entitled thereto such that no other or further notice of the Motion or of the entry of this Final DIP Order need be provided to any entity.

F.       The Debtors hereby admit, stipulate and agree that (collectively, the "Debtors' Stipulations"):

(i)       The Prepetition Term Loan Agreement

1.  As of the Petition Date, the Debtors and the DIP Lenders, in their capacities as lenders (the "Prepetition Term Loan Lenders"), are parties to that Amended and Restated Credit Agreement, dated as of August 15, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Term Loan Agreement") and together with the other Loan Documents (as defined in the Prepetition Term Loan Agreement) the "Prepetition Term Loan Documents").   The Prepetition Term Loan Documents evidence and govern the obligations of the Debtors for principal, accrued and unpaid interest, fees, costs, expenses, indemnities and other amounts arising under the Prepetition Loan Documents (the "Prepetition Term Loan

5

Obligations"). The Prepetition Obligations to the Prepetition Term Loan Lenders are secured by first-priority liens and security interests (the "Prepetition Term Loan Liens") granted to BSP Agency, LLC (the "Prepetition Term Loan Agent"), as first-lien collateral agent for the benefit of itself and the Prepetition Term Loan Lenders, on the collateral described and defined in the Loan Documents for the Prepetition Term Loan (the "Prepetition Term Loan Collateral"), which includes cash collateral within the meaning of Bankruptcy Code § 363(a) ("Cash Collateral").

2. As of the Petition Date, the Debtors are liable for payment of the Prepetition Term Loan Obligations, and the Prepetition Term Loan Obligations shall be an allowed secured claim in an amount not less than $116,001,368.20 exclusive of accrued and accruing interest, costs, expenses, fees and other amounts owed to the Prepetition Term Loan Agent and Prepetition Term Loan Lenders.

3. The Debtors further acknowledge, agree and stipulate that: (i) the Prepetition Term Loan Obligations constitute legal, valid and binding obligations of the Debtors, enforceable in accordance with the terms of the Prepetition Term Loan Documents; (ii) no offsets, defenses or counterclaims to the Prepetition Term Loan Obligations exist, and no portion of the Prepetition Term Loan Obligations is subject to contest, objection, recoupment, defense, counterclaim, offset, avoidance, recharacterization, subordination or other claim, cause of action or challenge of any nature under the Bankruptcy Code, under applicable nonbankruptcy law or otherwise; (iii) the Prepetition Term Loan Liens are priority liens, subject only to the Permitted Existing Liens (as defined below); (iv) the Debtors do not have, and hereby release, and are forever barred from bringing any claims, counterclaims, causes of action, defenses or

*ACTIVE 45056424v5*

setoff rights relating to the Prepetition Term Loan Documents, the Prepetition Term Loan Liens, the Prepetition Term Loan Obligations or otherwise, against the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders and their respective affiliates, subsidiaries, agents, officers, directors, employees, advisors, consultants, predecessors in interest, successors and assigns.

4.   The acknowledgement of the Debtors of the Prepetition Term Loan Obligations and the rights, priorities and protections granted to the Prepetition Term Loan Agent for the benefit of itself and the Prepetition Term Loan Lenders pursuant to the Prepetition Term Loan Documents shall be deemed a timely filed proof of claim on behalf of the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders in these Chapter 11 Cases and neither the Prepetition Term Loan Agent nor the Prepetition Term Loan Lenders shall be required to file any additional proofs of claim with respect to the Prepetition Term Loan Obligations.

(ii)   The Siena Revolving Loan Agreement

1.   As of the Petition Date, certain of the Debtors and Siena Lending Group L.L.C. ("Siena"), are parties to that certain Loan and Security Agreement, dated as of February 28, 2018 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Siena Revolving Loan Agreement" and together with the other Loan Documents (as defined in the Siena Revolving Loan Agreement) the "Siena Loan Documents" and when taken together with the Prepetition Term Loan Documents, the "Prepetition Loan Documents").  The Siena Loan Documents evidence and govern the obligations of the Debtors for principal, accrued and unpaid interest, fees, costs, expenses, indemnities and other amounts arising under the Siena Loan Documents

7

(the "Prepetition Siena Obligations").  The Prepetition Siena Obligations to Siena are secured by first-priority liens and security interests (the "Siena Liens") granted to Siena on the collateral described and defined in the Siena Loan Documents (the "Siena Loan Collateral"), which includes cash collateral within the meaning of Bankruptcy Code § 363(a) ("Cash Collateral").  The Siena Liens, when taken together with the Prepetition Term Loan Liens are collectively referred to herein as the "Prepetition Liens," and the Prepetition Term Loan Lenders, when taken together with Siena are collectively referred to herein as the "Prepetition Lenders."

2.   As of the Petition Date, the Debtors are liable for payment of the Prepetition Siena Obligations, and the Prepetition Siena Obligations shall be an allowed secured claim in an amount not less than $11,600,357.76, exclusive of accrued and accruing interest, costs, expenses, fees and other amounts owed to the Siena which other amounts include amounts asserted, but not agreed upon by any other party, for Early Termination and Success Fees as defined in the Siena Loan Documents.

3.   The Debtors further acknowledge, agree and stipulate that: (i) the Prepetition Siena Obligations constitute legal, valid and binding obligations of the Debtors, enforceable in accordance with the terms of the Siena Loan Documents; (ii) no offsets, defenses or counterclaims to the Prepetition Siena Obligations exist, and no portion of the Prepetition Siena Obligations is subject to contest, objection, recoupment, defense, counterclaim, offset, avoidance, recharacterization, subordination or other claim, cause of action or challenge of any nature under the Bankruptcy Code, under applicable nonbankruptcy law or otherwise; (iii) the Siena Liens are priority liens, subject only to other Permitted Existing Liens; (iv) the Debtors do not have, and hereby release, and are

8

forever barred from bringing any claims, counterclaims, causes of action, defenses or setoff rights relating to the Siena Loan Documents, the Siena Liens, the Prepetition Siena Obligations or otherwise, against Siena and its affiliates, subsidiaries, agents, officers, directors, employees, advisors, consultants,  predecessors in interest, successors and assigns.

4.   The acknowledgement of the Debtors of the Prepetition Siena Obligations and the rights, priorities and protections granted to Siena pursuant to the Siena Loan Documents shall be deemed a timely filed proof of claim on behalf of Siena in these Chapter 11 Cases and Siena shall not be required to file any additional proofs of claim with respect to the Prepetition Siena Obligations.

G.      Prepetition Term Loan Agent, Prepetition Term Loan Lenders and Siena have consented to the terms of this Final DIP Order and are entitled to adequate protection as set forth herein pursuant to Bankruptcy Code §§ 361, 362, 363 and 364 for any diminution in the value of such interests in the Prepetition Term Loan Collateral and the Siena Loan Collateral respectively from and after the Petition Date.

H.      An immediate and ongoing need exists for the Debtors to use Cash Collateral and obtain the DIP Facility in order for the Debtors to pursue a chapter 11 plan of reorganization acceptable to Prepetition Term Loan Agent and Prepetition Term Loan Lenders (the "Plan") and maximize the value of their businesses and assets as debtors in possession under chapter 11 of the Bankruptcy Code through, among other things: the orderly continuation of the operation of their businesses; maintenance of business relationships with vendors, suppliers and customers; paying payroll obligations; satisfaction of other working capital and operational needs; and achieving the milestones and accomplishing the other acts necessary to be in a position to

ACTIVE 45056424v5

confirm and consummate the Plan.  The Debtors do not have sufficient available resources of working capital to operate their businesses in these Chapter 11 Cases in the ordinary course without the use of Cash Collateral and postpetition financing.  The Debtors' ability to maintain business relationships with vendors, to pay employees, and otherwise to fund operations is essential to the Debtors' viability and preservation of the going-concern value of their businesses and successful reorganization.

I.      The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense, and the Debtors are unable to obtain the postpetition financing that they need on terms more favorable than those provided in the DIP Credit Agreement.  Without limiting the foregoing, postpetition financing is not available to the Debtors without the Debtors granting to the DIP Agent, for the benefit of the DIP Lenders, the DIP Liens and the Super-Priority Claims (as defined below) provided under the DIP Credit Agreement and this Final DIP Order.

J.      The Debtors' use of Cash Collateral and the DIP Facility has been negotiated in good faith and at arms-length between the Debtors, Siena, the DIP Agent and the DIP Lenders. Any credit extended and loans made to the Debtors pursuant to the DIP Credit Agreement and this Final DIP Order shall be deemed to have been extended, issued, or made, as the case may be, in good faith as required by, and within the meaning of, Bankruptcy Code § 364(e), and the DIP Agent and the DIP Lenders are entitled to the protections of Bankruptcy Code § 364(e).

K.      The conversion or roll-up of the Roll-up Amount into the DIP Loan is compensation for, in consideration of, and solely for account of, the agreement of the Prepetition Term Loan Lenders to fund amounts under the DIP Credit Agreement, not as payments under, adequate protection for, or otherwise on account of the Prepetition Term Loans.

L.     The use of cash collateral and extension of credit under the DIP Facility is fair and reasonable and reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  The DIP Agent and the DIP Lenders have provided fair, adequate, and sufficient consideration that constitutes reasonably equivalent value for the DIP Liens conveyed to, and the rights, protections, and benefits obtained by, the DIP Agent and the DIP Lenders under this Final DIP Order and under the DIP Loan Documents.

M.     Entry of this Final DIP Order is in the best interests of the Debtors' estates and creditors because its implementation, among other things, will allow for the continued availability to the Debtors of working capital to use cash collateral and to borrow up to $16,600,000 on a final basis to avoid immediate and irreparable harm and will enhance the Debtors' prospects for a successful reorganization.

N.     The DIP Lenders are willing to provide the DIP Facility to the Debtors, but only upon the terms and conditions set forth in the DIP Loan Documents and this Final DIP Order. Absent entry of this Final DIP Order, the DIP Lenders would not provide the DIP Facility and Siena and the Prepetition Term Loan Lenders would not consent to the use of the Cash Collateral in which they hold an interest but for the terms and conditions set forth in this Final DIP Order.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT**:

1.     The Motion is GRANTED as set forth herein.

2.     Any objections to the Motion or to entry of this Final DIP Order that have not been withdrawn or otherwise resolved are hereby OVERRULED.

3.     The execution and delivery of the DIP Credit Agreement and other DIP Loan Documents by the Debtors is authorized and approved.  Further, the Debtors are expressly authorized and directed to (a) execute and deliver to the DIP Agent and/or the DIP Lenders, as

11

applicable, any other document of any kind required to be executed and delivered in connection with the DIP Credit Agreement and the other DIP Loan Documents; (b) take any action to carry out the intent and purpose of the DIP Credit Agreement and other DIP Loan Documents, including all such actions to create, protect, and perfect the DIP Liens in favor of the DIP Agent, and (c) comply with and perform all of the terms and conditions contained in the DIP Credit Agreement and other DIP Loan Documents.  Upon execution and delivery of the DIP Loan Documents and entry of this Final DIP Order, the DIP Loan Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto and their respective estates and any successor trustee, in accordance with the terms thereof.  No obligation, payment, transfer or grant of security under the DIP Loan Documents as approved under this Final DIP Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or applicable nonbankruptcy law, except to the extent this Order expressly provides otherwise.

4.     The Debtors are expressly authorized to borrow from the DIP Lenders the DIP Loans in the maximum principal amount not to exceed $16,600,000, on the terms and conditions set forth in the DIP Loan Documents and this Final DIP Order.

5.     The DIP Obligations are subject to (i) a Facility Fee (as defined in the DIP Credit Agreement) of $200,000 and (ii) interest ("Interest") at the annual rate of 10.0% per annum. Accrued Interest earned shall be payable monthly in cash.  Principal and accrued, unpaid Interest will be payable at the Maturity Date (as defined below).  Upon the closing of the DIP Facility, the Facility Fee shall accrue to the benefit of the DIP Lenders and shall be fully earned and payable in cash at closing unless deferred by the DIP Lenders.  The fees and expenses relating to the DIP Facility, including the Facility Fee, are authorized and approved for payment without

12

further order of Court.  In addition to the Facility Fee, the Debtors are authorized and directed to pay the reasonable and documented costs and expenses of the DIP Agent and the DIP Lenders associated with the preparation, execution, delivery and administration of the DIP Loan Documents and any amendment or waiver with respect thereto, as well as proceedings before the Court relating to the DIP Facility (including the reasonable fees, disbursements and other charges of counsel, financial advisors and other professionals and advisors) (the "DIP Lender Expenses").  The DIP Agent and the DIP Lenders shall provide copies of their respective invoices reflecting their professional costs, fees, and expenses incurred in connection with the DIP Loan Documents (edited to delete any attorney-client communications, attorney work product, or other confidential information) to the Debtors, the United States Trustee and the Committee.  Any such party may object to the reasonableness of any such costs, fees, and expenses.  However, any such objection shall be forever waived and barred, and the Debtors shall promptly pay such invoiced DIP Lender Expenses, unless, within ten (10) calendar days of receipt of the invoice to which the objection relates or such later date as agreed to by the DIP Lenders: (1) the objection is served upon the DIP Lenders and their counsel; and (2) the objection describes with particularity the items or categories of fees, costs, and expenses that are the subject of the objection and provides the specific basis of the objection to each such item or category of fees, costs, and expenses.  To the extent such objection cannot be resolved, the objection shall be filed with the Court and set for a hearing. Any objection to the fees, costs, and expenses set forth on any such invoice shall be limited to the reasonableness or necessity of the particular items or categories of the fees, costs, and expenses which are the subject of such objection. The disallowance of any such fees and expenses shall not affect the DIP Lenders' right to collect such amounts from any person or entity other than the Debtors.

13

6.      The DIP Lender Expenses are not subject to the provisions of Bankruptcy Code §§ 327, 328, 329, 330, or 331 and will be paid pursuant to the DIP Credit Agreement without further order of this Court, except in the event the Court is required to adjudicate a dispute relating to payment of the DIP Lender Expenses.

7.      The Debtors are hereby authorized to use Cash Collateral and proceeds of the DIP Loans in accordance with the budget approved by the DIP Lenders and Siena (the "Approved Budget").  The initial Approved Budget is attached as Exhibit C to the DIP Credit Agreement. The Debtors shall provide (i) prior to 5:00 p.m. (prevailing Eastern time) on the fourth business day of the calendar week following the Petition Date and on such business day of every calendar week thereafter, an updated cash-flow projection covering the 9-week period after the week's end of the week in which such day occurs, in form and substance reasonably acceptable to the DIP Lenders and the Committee, (ii) prior to 5:00 p.m. (prevailing Eastern time) on the fourth business day of every calendar week following the Petition Date, a budget compliance report showing all variances by line-item on a week-by-week and cumulative basis from the amounts set forth in the Approved Budget for such period, together with a certification from the chief financial officer or chief restructuring officer of each of the Debtors, certifying that no deviation from the Approved Budget for such period in excess of the permitted deviations set forth in the DIP Credit Agreement has occurred, (iii) prior to 5:00 p.m. (prevailing Eastern time) on the fourth business day of the calendar week following the date hereof and continuing every week thereafter, a schedule of outstanding, unpaid accounts payable to trade creditors (the "Accounts Payable") and (iv) such other information (including access to the Debtors' books, records, personnel and advisors) as the DIP Lenders or the Committee may reasonably request.  The Approved Budget may be updated, modified or supplemented (with the consent of the DIP Agent

14

and the DIP Lenders and/or at the reasonable request of the DIP Lenders) from time to time, and each such updated, modified or supplemented budget shall be approved by, and in form and substance satisfactory to, the DIP Lenders and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, that during the fifth (5th) week of the initial Approved Budget (and the fifth (5th) week of each successive Approved Budget thereafter), the Debtors shall submit a budget for the next successive nine-week period to the DIP Lenders, which budget shall be in form and substance acceptable to the DIP Lenders, and approved by the DIP Lenders; provided, further, that in the event that the DIP Lenders cannot, while acting in good faith, agree as to an updated, modified or supplemented budget, the most recent Approved Budget shall remain in effect.  The reports described in this paragraph shall (i) be delivered to Siena in the same form at the same time as they are delivered to the DIP Lenders, and (ii) be in addition to the reports required by the Siena Loan Documents which shall also be delivered to the DIP Agent on behalf of the DIP Lenders.

8.    Subject to the Carve-Out, the Debtors are authorized and directed to deposit all Cash Proceeds, regardless of the source of such Cash Proceeds, necessary to make any payment when due of any amounts payable under the Approved Budget under the DIP Loan Documents that is now or hereafter in the Debtors' possession or under its control with the DIP Agent in accordance with Section 2.4(e) of the DIP Credit Agreement.  The DIP Agent shall thereafter apply such Cash Proceeds against the DIP Obligations to the extent then due and owing.  As used herein, "Cash Proceeds" means Cash Collateral and other cash coming into the possession or control of the Debtors, including arising from the collection or other conversion to cash of the DIP Collateral, including cash from the sale of inventory and the collection of accounts

15

receivable, tax refunds, deposits subject to setoff, and insurance proceeds. For the avoidance of doubt, the Debtors shall maintain in the bank account designated in the DIP Credit Agreement any Cash Proceeds not utilized to repay the DIP Obligations then due and owing and the Debtors shall be authorized to use such excess Cash Proceeds consistent with the Approved Budget.

9.      Without further order of the Court, upon an Event of Default (as defined in the DIP Credit Agreement), and three business days' notice to the Debtors, the Committee and the Office of the United States Trustee, the DIP Agent (acting at the direction of the DIP Lenders) may direct the Debtors to (or the DIP Lenders may directly) instruct all account debtors of future accounts receivable included in the DIP Collateral to make payments directly into accounts satisfactory to the DIP Lenders; in which event, all such Cash Proceeds shall be applied in accordance with the DIP Loan Documents (subject to the replacement liens granted to Siena in connection with the use of its Cash Collateral). The Debtors, the Committee, and the Office of the United States Trustee shall be entitled to request an accounting of any such application upon reasonable written notice.

10.      The DIP Agent (acting at the direction of the DIP Lenders) is authorized to collect upon, convert to Cash Proceeds, and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into its possession or under their control which constitute DIP Collateral or proceeds of DIP Collateral, subject to the provisions hereof.

11.      Subject to the Carve-Out, the Debtors will not use or seek to use Cash Proceeds, unless the Debtors obtain an order of the Court approving such use and: (i) the DIP Lenders and Siena have consented to such order; or (ii) at the time of the entry of such an order, there are no DIP Obligations outstanding, and no obligation of the DIP Lenders to extend additional DIP Loans.

16

12.     As security for the DIP Obligations, and as provided in the DIP Loan Documents and this Final DIP Order, the DIP Agent, for the benefit of the DIP Lenders, shall have (effective and continuing, without the necessity of the execution, filing, and/or recordation of mortgages, security agreements, control agreements, patent security agreements, trademarks security agreements, pledge agreements, financing statements, or otherwise) (a) pursuant to Bankruptcy Code §§ 364(c)(2), 364(c)(3) and 364(d)(1), valid, binding, fully perfected, enforceable and non-avoidable first-priority priming liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors that is not otherwise subject to the Permitted Existing Liens (as defined below), including, but not limited to, the Prepetition Term Loan Collateral, and the chapter 5 causes of action (collectively, "Avoidance Actions")* or the proceeds thereof and any and all rents, issues, products, offspring, proceeds and profits generated by any item of such collateral, without the necessity of any further action of any kind or nature by the DIP Lenders in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits (collectively, the "DIP Collateral"); provided, however the DIP Collateral shall not include Avoidance Actions or the proceeds thereof against the DIP Lenders and their respective affiliates, subsidiaries, officers, directors, managers, principals, members, employees, agents, and advisory board members; and (b) pursuant to Bankruptcy Code § 364(c)(3), valid, perfected, enforceable and non-avoidable second-priority or other junior liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors that are subject to valid and properly-perfected, non-avoidable liens and security interests in existence as of the Petition Date (including for avoidance of doubt the Siena Liens) other than the Prepetition Term Loan Liens (the "Permitted Existing Liens") and any and all rents, issues, products, offspring,

---

* The Avoidance Actions shall be considered "collateral of last resort" such that the DIP Agent and the DIP Lenders shall use reasonably commercial efforts to satisfy or repay the DIP Loans first from all other DIP Collateral (as defined herein) before applying proceeds of the Avoidance Actions to the obligations under the DIP Loans.

proceeds and profits generated by any item of such collateral, without the necessity of any further action of any kind or nature by the DIP Lenders in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits (together, the "<u>DIP Liens</u>").  The DIP Liens are senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates, subject only to (x) the Carve-Out (as defined below), and (y) the Permitted Existing Liens.

13.     This Final DIP Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the DIP Liens granted herein, effective as of the Petition Date, without any further action by Debtors or DIP Agent and without the execution, filing or recordation of any financing statements, security agreements, mortgages, certificates or other agreements, documents or instruments.  Notwithstanding the foregoing, the Debtors shall execute and deliver to the DIP Agent such financing statements, mortgages, instruments, certificates, agreements and other documents as the DIP Agent may reasonably request from time to time to provide further evidence of the perfection of the DIP Liens, and any such documents filed by the DIP Agent shall be deemed filed as of the Petition Date.

14.     In accordance with Bankruptcy Code § 364(c)(1), to the extent the DIP Liens do not satisfy the DIP Obligations, the DIP Obligations shall constitute claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), or 726 (to the extent permitted by law), and/or 364(c)(1), and any other provision of the Bankruptcy Code (other than Bankruptcy Code §506(c)), and shall at all times be senior to the rights of the Debtors, any chapter 11 trustee, any chapter 7 trustee or any other creditor in the these chapter 11 cases (the

18

"Super-Priority Claims"); provided, however, that the Super-Priority Claims shall be subject to the Carve-Out and the Permitted Existing Liens and shall not be payable from Avoidance Actions and the proceeds thereof.

15.     Pursuant to Bankruptcy Code §§ 361, 363(e) and 364(d), as adequate protection of the interests of (a) the Prepetition Term Loan Lenders in the Prepetition Term Loan Collateral and solely to the extent of any diminution in the value of the Prepetition Term Loan Collateral, and (b) Siena in the Siena Loan Collateral and solely to the extent of any diminution in the value of the Siena Loan Collateral, the Debtors hereby grant the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, and Siena the continuing valid, binding, enforceable, and perfected postpetition replacement security interests in and liens on the DIP Collateral to the same extent, validity and priority of the liens and security interests of the Prepetition Term Loan Lenders and Siena pursuant to the Prepetition Loan Documents including, without limitation, that certain Intercreditor Agreement, dated as of February 28, 2018, by and between the Prepetition Term Loan Agent and Siena (as amended, modified or supplemented, the "Intercreditor Agreement" and such perfected postpetition adequate protection replacement liens, the "Senior Adequate Protection Liens").  The Senior Adequate Protection Liens: (1) are and shall be in addition to the Prepetition Term Loan Liens and the Siena Liens; (2) are and shall be properly perfected, valid and  enforceable liens without any further action by Debtors or Prepetition Term Loan Agent and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; (3) shall be subject only to the DIP Liens, the Carve-Out and Permitted Existing Liens; and (4) shall remain in full force and effect notwithstanding any subsequent conversion or dismissal of the Chapter 11 Cases.  Notwithstanding the foregoing, the Debtors are authorized to and shall execute and

19

deliver to the Prepetition Term Loan Agent such financing statements, mortgages, instruments and other documents as the Prepetition Term Loan Agent may reasonably request from time to time to provide further evidence of the perfection of the Senior Adequate Protection Liens.  If and to the extent the adequate protection of the interests of Prepetition Term Loan Agent and Prepetition Term Loan Lenders, on the one hand, or of Siena, on the other hand, in the DIP Collateral granted pursuant to this Order proves insufficient, the Prepetition Term Loan Agent and Prepetition Term Loan Lenders, or Siena, shall have, in each such case, an allowed claim under Bankruptcy Code § 507(b), subject to the Super-Priority Claims and the Carve-Out, in the amount of any such insufficiency, with priority over: (1) all costs and expenses of administration of the Chapter 11 Cases (other than DIP Agent's and DIP Lenders' claims under Bankruptcy Code § 364) that are incurred under any provision of the Bankruptcy Code; and (2) the claims of any other party in interest under Bankruptcy Code § 507(b) (the "Senior Adequate Protection Super-Priority Claims"); provided, however, that the Senior Adequate Protection Super-Priority Claims and Senior Adequate Protection Liens shall exclude the Avoidance Actions and the proceeds thereof.

16.     In addition to the foregoing Senior Adequate Protection Liens and Senior Adequate Protection Super-Priority Claims, Siena shall be entitled to receive as further adequate protection of its interests, payment of interest at the non-default rate under the Siena Loan Documents when due thereunder and payment of its reasonable and documented fees and expenses, including, without limitation, reasonable attorneys' fees and expenses, incurred in connection with the Chapter 11 Cases; and

a.      If at any time during the Chapter 11 Cases, an Overadvance (as such term is defined in the Siena Revolving Loan Agreement) exists, Siena shall have the

20

right, to be exercised not more frequently than weekly, to (i) provide written notice thereof to the Debtors and the DIP Agent, and (ii) request that the Debtors in the first instance and only if the Debtors do not have sufficient funds, DIP Lenders fund an amount equal to such Overadvance into a cash collateral account identified by and established by, for the benefit and in the name of Siena (such notice and demand, a "Siena Cash Collateral Request" and such cash collateral account, the "Siena Cash Collateral Account").  No party shall be entitled to withdraw funds from or otherwise have access to the Siena Cash Collateral Account other than Siena.  Not later than three (3) business days after a Siena Cash Collateral Request is issued, to the extent that the Debtors have not previously fully funded such Siena Cash Collateral Request, each DIP Lender shall fund an Advance in an amount equal to its Applicable Percentage of the Overadvance into the Siena Cash Collateral Account by wire transfer.[5]  The DIP Lenders' obligations to fund the Advances required herein shall be irrevocable and unconditional notwithstanding any failure by the Debtors to satisfy any conditions to receiving Advances under this Final DIP Order or the DIP Loan Documents. Notwithstanding the foregoing, Siena shall not issue a Cash Collateral Request if the Overadvance is less than $50,000.  Not later than two (2) business days after Siena's demand therefor, the Debtors shall remit to the Siena Cash Collateral Account all funds currently on deposit in a cash collateral account for the benefit of Siena pursuant to the Interim DIP Order.

---

[5] For purposes of determining the amount of an Overadvance, funds on deposit in the Siena Cash Collateral Account shall be deemed to reduce the Revolving Loans (as such term is defined in the Siena Revolving Loan Agreement) provided by Siena under the Siena Revolving Loan Agreement.

21

b.      If at any time during the Chapter 11 Cases, the funds on deposit in the Siena Cash Collateral Account, exceed the amount required to reduce any Overadvance to zero dollars (such excess funds, the "Excess Cash Collateral"), Siena shall provide prompt notice to the Debtors and the DIP Agent and the DIP Agent shall have the right, on behalf of the DIP Lenders, to provide written notice to Siena requesting that Siena remit the Excess Cash Collateral in accordance with the DIP Agent's written instructions (such request, an "ECC Request").  The ECC Request shall direct Siena to return Excess Cash Collateral first to the Debtors in accordance with the wire instructions set forth in the ECC Request up to the aggregate amount of all Overadvances paid into the Siena Cash Collateral Account by the Debtors that have not been repaid at the time of the ECC Request and in the amount specified in the ECC Request, and second, to the extent any Excess Cash Collateral remains after satisfying, in full, all Overadvances funded into the Siena Cash Collateral Account by the Debtors, to the DIP Lender's per the DIP Agent's instructions set forth in the ECC Request; provided further, however, that to the extent there exists any Overadvances funded by the Debtors, whether in whole or in part, in the Siena Cash Collateral Account, the Debtors shall have the right **to** direct the DIP Agent to issue an ECC Request**,** and the DIP Agent shall promptly issue such ECC Request in accordance with this Section 16.b.  Siena shall have no responsibility for determining the amount of the Excess Cash Collateral that is deemed funded by the Debtors and shall be entitled to rely on the information set forth in the

22

ECC Request without further inquiry.  Not later than three (3) business days after an ECC Request is issued, Siena shall remit the Excess Cash Collateral as set forth in the ECC Request.  Notwithstanding the foregoing, neither the Debtors nor the DIP Agent shall issue an ECC Request if the Excess Cash Collateral is less than $100,000.

c.      Not later than the second business day of each week, the Debtors shall provide to Siena, the Committee, and the DIP Agent a certificate detailing the Borrowing Base (as such term is defined in the Siena Revolving Loan Agreement) with information through the last day of the immediately preceding week, together with such other information as Siena may reasonably require in order to determine the amount of the Overadvance (if any) and the Borrowing Base (which shall include the items set forth in Section 5.15(c) of the Siena Revolving Loan Agreement.

d.      The Siena Cash Collateral Account is for the sole benefit of Siena and no other party (including, without limitation, the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders) shall have an interest therein or shall be entitled to an interest therein.  Siena shall have a perfected security interest in and right of setoff against the Siena Cash Collateral Account under Bankruptcy Code §364 to secure the full and timely payment of the Prepetition Siena Obligations.

e.      Nothing in this Final DIP Order shall limit or restrict Siena's right or ability to establish "Reserves" (as such term is defined in the Siena Revolving Loan Agreement) against the Borrowing Base solely for any liens or other

*ACTIVE 45056424v5*

encumbrances that could prime the Siena Liens; it being understood that Siena shall not have the right to establish or impose any other Reserves while this Final DIP Order remains in full force and effect.

f.      Siena shall be entitled at all times to exercise its inspection and examination rights as set forth in the Siena Revolving Loan Agreement (the "Siena Inspection Rights").

g.      Siena shall have the right to seek relief from the automatic stay in the Chapter 11 Cases in order to apply the Siena Cash Collateral to the Obligations and to exercise such other of its rights and remedies upon the occurrence of any of the following events:

(a)      The Debtors' failure to make interest payments at the non-default rate of interest as set forth in the Siena Revolving Loan Agreement;

(b)      The DIP Lenders fail to fully and timely fund the Siena Cash Collateral Account in accordance with this paragraph 16;

(c)      The Debtors restrict, delay or otherwise impair the Siena Inspection Rights or otherwise fail to cooperate with Siena in any manner in furtherance of Siena's exercise of the Siena Inspection Rights; or

(d)      The DIP Lenders' commitment under the DIP Facility is terminated for any reason.

h.      Upon three (3) business days prior notice to the Debtors, DIP Agent, the Office of the United States Trustee, and the Committee, Siena shall have the right to seek relief from the automatic stay in the Chapter 11 Cases to apply

*ACTIVE 45056424v5*

the Siena Cash Collateral to the Obligations and to exercise such other of its
rights and remedies upon the occurrence of any of the following events:

(a)      The Debtors fail to timely provide Siena with the reporting and
other information required pursuant to this paragraph 16;

(b)      The Debtors fail to maintain the Collateral included in the
Borrowing Base in accordance with the requirements of the Siena
Revolving Loan Agreement; or

(c)      The Debtors fail to comply with any term of this Final DIP Order
as such term pertains to Siena.

17.     Siena shall provide copies of its invoices reflecting attorneys' fees and expenses
incurred in connection with the Chapter 11 Cases ("Siena Expenses") (edited to delete any
attorney-client communications, attorney work product, or other confidential information) to the
Debtors, the United States Trustee and the Committee.  Any such party may object to the
reasonableness of any such costs, fees, and expenses.  However, any such objection shall be
forever waived and barred, and the Debtors shall promptly pay such invoiced Siena Expenses,
unless, within ten (10) calendar days of receipt of the invoice to which the objection relates or
such later date as agreed to by Siena: (1) the objection is served on Siena and its counsel; and (2)
the objection describes with particularity the items or categories of fees, costs, and expenses that
are the subject of the objection and provides the specific basis of the objection to each such item
or category of fees, costs, and expenses.  To the extent such objection cannot be resolved, the
objection shall be filed with the Court and set for a hearing. Any objection to the fees, costs, and
expenses set forth on any such invoice shall be limited to the reasonableness or necessity of the
particular items or categories of the fees, costs, and expenses which are the subject of such

25

objection. The disallowance of any such fees and expenses shall not affect Siena's right to collect such amounts from any person or entity other than the Debtors.

18.     While any portion of the DIP Obligations remains unpaid or any of the DIP Loan Documents remains in effect, the Debtors shall not seek entry of any order approving or authorizing (under Bankruptcy Code §§ 105 or 364, or otherwise) (a) the granting of any lien or security interest in any of the DIP Collateral in favor of any party other than the DIP Agent or the DIP Lenders or (b) the obtaining of credit or the incurring of indebtedness that is entitled to superpriority administrative status, in either case *pari passu* with or superior to that granted to the DIP Agent or the DIP Lenders pursuant to this Final DIP Order, unless, in connection with any transaction cited in clause (a) or (b) of this Paragraph, such request by the Debtors seeks to authorize and direct that the full amount of the DIP Obligations shall first be paid indefeasibly and in full from the proceeds of the DIP Collateral (subject to satisfaction of the Permitted Existing Liens).

19.     The DIP Agent's and the DIP Lenders' liens, claims and security interests in the DIP Collateral and their Super-Priority Claim, and the Prepetition Term Loan Agent's and Prepetition Lenders' liens, claims and security interests in the Prepetition Collateral, the Senior Adequate Protection Liens, and the Senior Adequate Protection Super-Priority Claim, shall, in each instance, be subject only to the Permitted Existing Liens and the right to payment of the following (the "Carve-Out"):

      a.   All reasonable fees and expenses up to $150,000 incurred by a trustee appointed under Bankruptcy Code § 726(b)

      b.   Statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6);

26

c.   Fees payable to the Clerk of this Court;

d.   Subject to the terms and conditions of this Final DIP Order, (i) the unpaid outstanding reasonable fees and expenses actually incurred on or after the Petition Date and prior to the Carve-Out Trigger Date (as defined below), and approved and allowed by a final order of the Court pursuant to Bankruptcy Code §§ 326, 328, 330 or 331 by attorneys, accountants and other professionals retained by the Debtors and any Committee under Bankruptcy Code § 327 or 1103(a) (collectively, the "Professionals"), in an amount not to exceed the amounts set forth for each such Professional (on a Professional-by-Professional basis) for the periods prior to the Carve-Out Trigger Date in the Approved Budget, and (ii) the reasonable fees and expenses actually incurred, and approved and allowed by a final order of the Court pursuant to Bankruptcy Code §§ 326, 328, 330 or 331 of the Bankruptcy Code, by the Professionals after the Carve-Out Trigger Date in an aggregate sum not to exceed $1,000,000 (the "Professional Carve-Out Cap").  The "Carve-Out Trigger Date" means the date when written notice is provided by the DIP Agent to the Debtors and their lead counsel, the United States Trustee and lead counsel to the Committee identifying an Event of Default.

Any payment made after the Carve-Out Trigger Date (in respect of fees and expenses incurred after the Carve-Out Trigger Date) shall reduce the Professional Carve-Out Cap on a dollar-for-dollar basis.  Following the occurrence of the Carve-Out Trigger Date, fees and expenses in the amount specified in the Approved Budget for the Professionals may be funded to a trust account of the Debtors' counsel and distributed to such Professionals once such fees and expenses are allowed by the Bankruptcy Court.  Notwithstanding the foregoing, none of the Carve-Out, proceeds from the DIP Facility or Cash Collateral may be used (i) to investigate (other than by a

27

Committee, subject to a cap of $50,000, and further subject to the limitations set forth in Paragraph 20 of this Final DIP Order) or challenge in any respect the validity, perfection priority, extent or enforceability of the Prepetition Loan Documents or the Prepetition Liens; (ii) to delay, challenge or impede any rights of the DIP Agent and DIP Lenders under any of the DIP Loan Documents or this Final DIP Order; or (iii) to pursue claims or causes of action of any kind against the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, Siena or the Prepetition Term Loan Lenders in their respective capacities as agents or lenders under any of the DIP Loan Documents or the Prepetition Loan Documents, as the case may be.

20.    None of the DIP Loans, proceeds thereof, or the DIP Collateral, including the Cash Collateral may be used to fund, directly or indirectly, any effort to: (a) object to or contest in any manner, or raise any defenses to the validity, perfection, priority, or enforceability of (i) the DIP Obligations owing to the DIP Lenders or the DIP Liens in favor of the DIP Lenders securing such DIP Obligations, (ii) the Prepetition Term Loan Obligations or the Prepetition Term Loan Liens, or (iii) the Siena Loan Obligations or the Siena Liens; or (b) assert any claims or causes of action of any type against the (i) DIP Lenders or DIP Agent, (ii) Prepetition Term Loan Lenders or Prepetition Term Loan Agent, or (iii) Siena including, without limitation, any avoidance actions under Chapter 5 of the Bankruptcy Code, or any claim or cause of action under (i) the DIP Facility against the DIP Lenders or DIP Agent, (ii) the Prepetition Term Loan Agreement against the Prepetition Term Loan Agent or the Prepetition Term Loan Lenders, or (iii) the Siena Loan against Siena.

21.    Any action, claim or defense (hereinafter, an "Prepetition Debt Objection") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, subordination, disgorgement,  cure, reinstatement or claim

28

of any kind: (a) the existence, validity, nonavoidability, priority or amount of the Prepetition Term Loan Obligations or the Prepetition Siena Obligations, or (b) the extent, legality, validity, priority, perfection, nonavoidability or enforceability of the Prepetition Term Loan Liens or the Siena Liens, shall be filed with the Court (x) if a Committee is appointed by the United States Trustee, by such Committee within ninety (90) days from the date of appointment of the Committee, or (y) by any other party in interest with requisite standing within seventy five (75) days from the date of entry of the Interim DIP Order (July 12, 2019), in each of clauses (x) and (y) as may be extended, in writing, respectively by (1) the Prepetition Term Loan Agent (at the direction of the Prepetition Term Loan Lenders in their sole discretion) in respect of the Prepetition Term Loan Obligations; or (2) Siena in respect of the Prepetition Siena Obligations (in each case, the "Challenge Deadline").  Notwithstanding the foregoing, if a chapter 7 or 11 trustee is appointed prior to the expiration of the Challenge Deadline, he or she shall have until the later of the expiration of the Challenge Deadline or thirty (30) days from the date of appointment to assert a Prepetition Debt Objection, subject to extension by the Court for cause. The Debtors' Stipulations shall be binding upon the Debtors' estates and all parties in interest except to the extent any Prepetition Debt Objection is timely filed and successfully pursued.  If no Prepetition Debt Objection is timely filed, or if a Prepetition Debt Objection is timely filed but denied, with respect to either or both of the Prepetition Term Loan and the Siena Loan (a) the Prepetition Term Loan Obligations and/or the Prepetition Siena Obligations, as applicable, shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, avoidance, subordination, deduction, cure, reinstatement or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and the Prepetition Term Loan Liens and/or the Siena Liens as applicable, shall be deemed legal, valid, perfected,

29

enforceable, and non-avoidable for all purposes and of first and senior priority, subject to only the other Permitted Existing Liens, the Carve-Out and the DIP Liens, and (b) the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders and each of their agents, officers, directors, employees, attorneys, professionals, successors, and assigns shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the Prepetition Loan Documents and shall not be subject to any further objection or challenge by any party at any time.

22.     It shall constitute an Event of Default in respect of the DIP Loan Documents if the Debtors do not comply with the following milestones (the "Case Milestones"):

   a.    On the Petition Date, the Debtors shall file the DIP Financing Motion, which motion shall be in form and substance acceptable to the DIP Agent and the DIP Lenders;

   b.    Not later than three (3) Business Days after the Petition Date, the Debtors shall obtain entry of the Interim DIP Order, in form and substance acceptable to the DIP Agent and the DIP Lenders, in their reasonable discretion, approving the DIP Facility on an interim basis;

   c.    Not later than 35 days after the Petition Date, the Debtors shall obtain entry of an order of the Bankruptcy Court, in form and substance acceptable to the DIP Agent and the DIP Lenders, in their reasonable discretion, approving the DIP Facility on a final basis (the "Final DIP Order"), which milestone has been waived by agreement of the DIP Agent, on behalf of the DIP Lenders, pursuant to this Final DIP Order, notwithstanding anything to the contrary herein or the Interim DIP Order;

30

d.      Not later than August 19, 2019, the Debtors shall file with the Bankruptcy Court the Plan and an accompanying disclosure statement acceptable to the DIP Agent and the DIP Lenders (the "Disclosure Statement");

e.      Not later than September 20, 2019, the Bankruptcy Court shall enter an order approving the Disclosure Statement for solicitation of the Plan;

f.      Not later than October 29, 2019, the Bankruptcy Court shall enter an order confirming the Plan (the "Confirmation Order"); and

g.      Not later than November 4, 2019, the Plan shall become effective.

23.    The DIP Facility shall terminate and the DIP Loans and all other DIP Obligations shall mature and be due and owing, upon the DIP Agent's and the DIP Lenders' election, at the earliest to occur of (such date, the "Maturity Date"): (a) the date on which the DIP Agent provides written notice to the Debtors, counsel to Siena, counsel to the Committee, the Office of the United States Trustee and counsel for any official committee of the occurrence of an Event of Default under the DIP Facility; (b) the date of the acceleration of any outstanding extension of credit under the DIP Facility; (c) the effective date of a confirmed plan in any of the Chapter 11 Cases; (d) the entry of an order converting any of the Chapter 11 Cases to a case or cases under chapter 7 of the Bankruptcy Code; (e) the entry of an order dismissing any of the Chapter 11 Cases; (f) the entry of an order appointing a chapter 11 trustee or an examiner with expanded powers in any of the Chapter 11 Cases; (g) the failure to comply with any of the Case Milestones; (h) the date of the commencement of the Final Hearing, if this Final DIP Order is modified at the Final Hearing in a manner unacceptable to the DIP Agent or the DIP Lenders, in their sole discretion, and (i) 180 days after the Petition Date.  Written notice of the occurrence of

the Maturity Date shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Committee, Siena, and the Office of the United States Trustee.

24.     The DIP Agent, the DIP Lenders, Siena, the Prepetition Term Loan Agent and/or the Prepetition Term Loan Lenders may not repossess, foreclose or seize any DIP Collateral without delivering to the attorneys for each of the Debtors, the United States Trustee, and the Committee, and filing with the Bankruptcy Court a notice of the occurrence of the Maturity Date.  At any time after the fifth business day after the delivery and filing of such notice (the "Maturity Notice Date Period"), unless the Bankruptcy Court extends such deadline, the DIP Agent, the DIP Lenders, Siena, the Prepetition Term Loan Agent and/or the Prepetition Term Loan Lenders shall have automatic and immediate relief from the automatic stay with respect to the DIP Collateral (without regard to the passage of time provided for in Fed. R. Bankr. P. 4001(a)(3)), and shall be entitled to exercise all rights and remedies available to them under the DIP Loan Documents, the Prepetition Loan Documents or applicable law as may otherwise be applicable.  The United States Trustee, the Committee, or the Debtors may challenge the actions sought by the DIP Agent, the DIP Lenders, Siena, and/or the Prepetition Term Loan Lenders or the occurrence of the Maturity Date prior to conclusion of the Maturity Date Notice Period.

25.     The Debtors shall indemnify and hold harmless the DIP Agent and the DIP Lenders, and each of their respective partners, members, officers, directors, employees, affiliates, successors, assigns, agents, counsel and other advisors (collectively, the "Indemnified Parties") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of, or in connection with the preparation for a defense of, any investigation, litigation or

proceeding arising out of, related to or in connection with (a) the DIP Facility, the transactions contemplated thereby and in the DIP Loan Documents, and any use made or proposed to be made with the proceeds thereof and (b) the Chapter 11 Cases.

26.    The automatic stay imposed by Bankruptcy Code § 362(a) is hereby modified, to the extent necessary, to implement and effectuate the terms and conditions of this Final DIP Order.

27.    The Debtors are authorized to perform all acts and execute and comply with the terms of such other documents, instruments, and agreements in addition to the DIP Loan Documents, as the DIP Lenders may reasonably require, as evidence of and for the protection of the DIP Obligations, or which otherwise may be deemed reasonably necessary by the DIP Lenders to effectuate the terms and conditions of this Final DIP Order and the DIP Loan Documents. The Debtors and the DIP Lenders are hereby authorized to implement, in accordance with the terms of the DIP Loan Documents, any non-material modifications of the DIP Loan Documents without further order of this Court.

28.    Upon the indefeasible payment in full in cash, and the termination of, the DIP Facility, the Debtors shall execute and deliver in favor of the DIP Agent and the DIP Lenders a valid and binding termination and release agreement, in form and substance reasonably acceptable to the DIP Agent and the DIP Lenders.

29.    Upon the entry of this Final DIP Order, except for the Carve-Out, neither the Debtors nor any estate representative (including any trustee) will invoke or seek to invoke the surcharge provisions of Bankruptcy Code §506(c), the enhancement of collateral provisions of Bankruptcy Code §552 (including, without limitation, the "equities-of-the-case" exception under Bankruptcy Code §552(b)) or any other legal or equitable doctrine on the DIP Agent, the DIP

33

Lenders or any of the DIP Collateral for the benefit of any party in interest, including any Debtor, the Committee, any trustee, or any professionals engaged by any of the foregoing.

30.      By executing the DIP Loan Documents or taking any actions pursuant to this Final DIP Order or the Final DIP Order, neither Siena nor the DIP Lenders shall: (1) be deemed to be in control of the operations or liquidation of the Debtors; or (2) be deemed to be acting as a "responsible person" with respect to the operation, management, or liquidation of the Debtors.

31.      Neither the DIP Lenders nor the Prepetition Lenders shall be subject to the equitable doctrine of marshaling or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Term Loan Collateral or the Siena Collateral, as applicable subject only to the limitations with respect to the Avoidance Actions as set forth in the footnote identified in paragraph 12 hereof.

32.      None of Siena, the DIP Agent, DIP Lenders nor the Prepetition Lenders shall be required to file any proof of claim in the Chapter 11 Cases for any claim under the DIP Loan Documents or the Prepetition Loan Documents, as applicable, or for any claim allowed herein.

33.      Unless the DIP Lenders consent thereto, no order shall be entered confirming a plan in these Chapter 11 Cases unless such order provides for the indefeasible and final payment of the DIP Obligations in full in cash on the earlier of: (1) the effective date thereof; and (2) the Maturity Date.

34.      The DIP Agent's or DIP Lenders' failure, at any time or times hereafter, to require strict performance by the Debtors (or by any trustee) of any provision of this Order or the DIP Loan Documents shall not waive, affect, or diminish any right of the DIP Agent or DIP Lenders thereafter to demand strict compliance and performance therewith.  No delay on the part of the DIP Agent or DIP Lenders in the exercise of any right or remedy under this Order, the DIP

Loan Documents, the Bankruptcy Code, or applicable nonbankruptcy law shall preclude any other or further exercise of any right or remedy.  None of the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, nor Siena shall be deemed to have suspended or waived any of their rights or remedies under this Final DIP Order, the DIP Loan Documents, the Prepetition Loan Documents, the Bankruptcy Code, or applicable nonbankruptcy law unless such suspension or waiver is in writing, signed by a duly authorized officer of such party, and directed to the Debtors.

35.     Any stay, modification, reversal, or vacation of this Final DIP Order shall not affect the validity and enforceability of any DIP Obligations of the Debtors to the DIP Agent and the DIP Lenders incurred pursuant to this Final DIP Order or the validity, priority, or enforceability of any of the DIP Liens and Super-Priority Claims granted to the DIP Agent and the DIP Lenders and the Senior Adequate Protection Liens under this Final DIP Order. Notwithstanding any such stay, modification, reversal, or vacation, all DIP Liens and Super-Priority Claims granted under this Final DIP Order, the DIP Loans made pursuant to this Final DIP Order in respect of the DIP Credit Agreement, and all DIP Obligations incurred by the Debtors pursuant hereto and pursuant to the terms of the DIP Loan Documents prior to the effective date of any such stay, modification, reversal, or vacation shall be governed in all respects by the original provisions of this Final DIP Order, and the DIP Agent and the DIP Lenders shall be entitled to all the rights, privileges, and benefits, including, without limitation, the DIP Liens, and priorities granted herein with respect to all such DIP Obligations.

36.     The provisions of this Final DIP Order and any actions taken pursuant hereto shall survive entry of any order that may be entered (a) confirming any plan of reorganization in the Chapter 11 Cases (and, to the extent not satisfied in full, the DIP Obligations shall not be

35

discharged by the entry of any such order, notwithstanding Bankruptcy Code § 1141(d)); (b) converting the Chapter 11 Cases to chapter 7 cases; (c) appointing a chapter 11 trustee, or (d) dismissing the Chapter 11 Cases.  The terms and provisions of this Final DIP Order as well as the Super-Priority Claims and DIP Liens granted pursuant to this Final DIP Order and the DIP Loan Documents shall continue in full force and effect notwithstanding the entry of such order, and such Super-Priority Claims, DIP Liens, and any adequate protection liens shall maintain their priority as provided by this Final DIP Order until all of the DIP Obligations are paid indefeasibly and in full.

37.      The provisions of this Final DIP Order shall be binding on and inure to the benefit of Siena, the DIP Agent, the DIP Lenders, the Debtors, and their respective successors and assigns, including any trustee appointed or elected in the Chapter 11 Cases, whether under chapter 11 or chapter 7.

38.      If there is any inconsistency between the terms of the DIP Loan Documents and the provisions of this Final DIP Order, the provisions of this Final DIP Order shall control to the extent of such inconsistency.

39.      Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final DIP Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this Final DIP Order; and any stay of the effectiveness of this Final DIP Order that might otherwise apply is hereby waived for cause shown.

40.      The Court has and will retain jurisdiction to enforce this Final DIP Order according to its terms.

*ACTIVE 45056424v5*

41.     Nothing in the Final Order shall be deemed to waive Siena's rights to seek payment of any fees described in the Siena Loan Documents, including collection fees, collateral monitoring fees, incoming and outgoing wire fees, success fee, or early-termination fee or prejudice the right of any party to oppose payment of any such fees.

**Signed:  August 16, 2019**

_____

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

**EXHIBIT A**

**DIP Credit Agreement**

SENIOR SECURED, SUPER-PRIORITY
DEBTOR IN POSSESSION CREDIT AND SECURITY AGREEMENT

by and between:

SHALE SUPPORT GLOBAL HOLDINGS, LLC
SHALE SUPPORT HOLDINGS, LLC
STANTON RAIL YARD LLC
MINE ASSETS HOLDING, LLC
SOUTHTON RAIL YARD, LLC
DRYING FACILITY ASSETS HOLDING, LLC
WET MINE ASSETS HOLDING, LLC
SHALE ENERGY SUPPORT, LLC

as Borrowers and Debtors and Debtors in Possession

and

BSP AGENCY LLC, as DIP Agent

and

LANDMARK WALL SMA L.P.
BENEFIT STREET PARTNERS SMA-C L.P.
BENEFIT STREET PARTNERS SMA LM LP
BENEFIT STREET PARTNERS DEBT FUND IV L.P
PROVIDENCE DEBT FUND III MASTER (NON-US) L.P.
SEI ENERGY DEBT FUND, LP
PROVIDENCE DEBT FUND III L.P.
BENEFIT STREET PARTNERS DEBT FUND IV MASTER (NON-US) L.P.

as DIP Lenders

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ............................................................................... 2
Section 1.1    Definitions.................................................................................. 2
Section 1.2    Other Definitional Terms; Rules of Interpretation............................. 13
ARTICLE II AMOUNT AND TERMS OF THE CREDIT FACILITY ...................................... 14
Section 2.1    Advances.................................................................................... 14
Section 2.2    Evidence of Debt.......................................................................... 14
Section 2.3    Notice and Manner of Borrowing ...................................................... 14
Section 2.4    Interest; Facility Fee; Payments Generally; Application of Payments; Usury . 15
Section 2.5    Time for Principal and Interest Payments; Payment on Non-Business Days ... 16
Section 2.6    Voluntary Prepayment .................................................................... 16
Section 2.7    Reserved.................................................................................... 16
Section 2.8    Use of Proceeds........................................................................... 17
Section 2.9    Single Loan ................................................................................ 17
Section 2.10   Grants, Rights and Remedies .......................................................... 17
Section 2.11   Perfection.................................................................................. 17
Section 2.12   Waiver of Any Priming Rights ......................................................... 17
Section 2.13   Waiver of Claims to Surcharge ........................................................ 18
Section 2.14   Joint and Several Liability of Borrowers ............................................ 18
ARTICLE III SECURITY INTEREST; SETOFF.......................................................... 20
Section 3.1    Grant of Security Interest .............................................................. 20
Section 3.2    Lien Perfection; Further Assurances.................................................. 20
Section 3.3    Superpriority Administrative Expense Claim ........................................ 21
Section 3.4    Notification of Account Debtors and Other Obligors................................ 21
Section 3.5    Assignment of Insurance................................................................. 21
Section 3.6    License ..................................................................................... 22
Section 3.7    Setoff....................................................................................... 22
Section 3.8    Agent Appointed Attorney-in-Fact ................................................... 22
Section 3.9    Collateral................................................................................... 22
Section 3.10   Survival..................................................................................... 22
ARTICLE IV CONDITIONS OF LENDING ............................................................... 23
Section 4.1    Conditions Precedent to Initial Advances............................................ 23
Section 4.2    Conditions Precedent to All Advances ............................................... 25

ARTICLE V REPRESENTATIONS AND WARRANTIES ....................................................... 26

Section 5.1    Existence and Power; Chief Executive Office ................................................. 26

Section 5.2    Authorization of Borrowing; No Conflict as to Law or Agreements ............... 26

Section 5.3    Binding Agreement ........................................................................................... 26

Section 5.4    Subsidiaries ...................................................................................................... 26

Section 5.5    Litigation .......................................................................................................... 26

Section 5.6    Regulation U ..................................................................................................... 27

Section 5.7    Titles and Liens ................................................................................................ 27

Section 5.8    Intellectual Property Rights ............................................................................. 27

Section 5.9    Real Property .................................................................................................... 28

Section 5.10   Indebtedness ..................................................................................................... 28

Section 5.11   Deposit Accounts and Securities Accounts ...................................................... 28

Section 5.12   Complete Disclosure ........................................................................................ 28

Section 5.13   Leases ................................................................................................................ 28

Section 5.14   Material Contracts ............................................................................................ 29

Section 5.15   Environmental Condition ................................................................................. 29

Section 5.16   Employee Benefits ............................................................................................ 29

Section 5.17   Fraudulent Transfer .......................................................................................... 29

Section 5.18   No Material Adverse Effect .............................................................................. 29

Section 5.19   Compliance with Laws ..................................................................................... 29

Section 5.20   U.S.A. Patriot Act ............................................................................................ 30

Section 5.21   OFAC ............................................................................................................... 30

Section 5.22   Approved Budget .............................................................................................. 30

Section 5.23   Financing Orders .............................................................................................. 30

Section 5.24   Super-Priority Claims ....................................................................................... 30

ARTICLE VI COVENANTS ............................................................................................................ 31

Section 6.1    Reporting Requirements ................................................................................... 31

Section 6.2    Permitted Existing Liens; Financing Statements ............................................. 32

Section 6.3    Indebtedness ..................................................................................................... 33

Section 6.4    Books and Records; Collateral Examination, Inspection and Appraisals ........ 34

Section 6.5    Compliance with Laws ..................................................................................... 34

Section 6.6    Payment of Taxes and Other Claims ................................................................ 34

Section 6.7    Maintenance of Properties and Intellectual Property ....................................... 35

Section 6.8    Formation of Subsidiaries ................................................................................ 35

Section 6.9      Further Assurances.............................................................................. 35

Section 6.10     Staffing................................................................................................ 35

Section 6.11     Material Contracts............................................................................... 36

Section 6.12     Insurance ............................................................................................ 36

Section 6.13     Preservation of Existence.................................................................... 36

Section 6.14     Delivery of Instruments ...................................................................... 36

Section 6.15     Sale or Transfer of Assets ................................................................... 36

Section 6.16     Consolidation and Merger; Asset Acquisitions ................................. 36

Section 6.17     Place of Business; Name...................................................................... 36

Section 6.18     Performance by the Agent ................................................................... 37

Section 6.19     Financing Orders; Administrative Priority; Lien Priority; Payment of Claims 37

Section 6.20     Budget Compliance.............................................................................. 38

Section 6.21     Milestones ........................................................................................... 38

ARTICLE VII EVENTS OF DEFAULT, RIGHTS AND REMEDIES ........................... 38

Section 7.1      Events of Default ................................................................................. 38

Section 7.2      Rights and Remedies............................................................................ 41

ARTICLE VIII AGENT ...................................................................................................... 43

Section 8.1      Appointment, Authority and Duties of Agent..................................... 43

Section 8.2      Action Upon Default............................................................................ 44

Section 8.3      Ratable Sharing.................................................................................... 45

Section 8.4      Indemnification.................................................................................... 45

Section 8.6      Resignation; Successor Agent.............................................................. 46

Section 8.7      Due Diligence and Non-Reliance ........................................................ 46

Section 8.8      Titles .................................................................................................... 46

Section 8.9      No Third-Party Beneficiaries............................................................... 46

ARTICLE IX MISCELLANEOUS ..................................................................................... 46

Section 9.1      No Waiver; Cumulative Remedies; Compliance with Laws ............... 47

Section 9.2      Amendments, Etc................................................................................. 47

Section 9.3      Notices ................................................................................................. 47

Section 9.4      Further Documents............................................................................... 48

Section 9.5      Costs and Expenses.............................................................................. 48

Section 9.6      Indemnity ............................................................................................. 49

Section 9.7      Execution in Counterparts; Facsimile and PDF Execution................. 49

Section 9.8      Binding Effect; Assignment; Complete Agreement; Sharing Information; Confidentiality.................................................................................... 50

Section 9.9    Severability of Provisions ................................................................. 50

Section 9.10   Headings ...................................................................................... 50

Section 9.11   Election of Remedies ..................................................................... 50

Section 9.12   Governing Law; Jurisdiction, Venue ................................................. 51

Section 9.13   Agent and Lenders as Party-in-Interest............................................. 51

Section 9.14   Waiver of Right to Obtain Alternative Financing............................... 51

Section 9.15   Releases......................................................................................... 52

**SENIOR SECURED, SUPER-PRIORITY**
**DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT**

THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT (the "Agreement") is made and entered into as of July 12, 2019, by and among (i) SHALE SUPPORT GLOBAL HOLDINGS, LLC, a Delaware limited liability company ("Company"), (ii) SHALE SUPPORT HOLDINGS, LLC, a Delaware limited liability company ("Holdings"), (iii) STANTON RAIL YARD LLC, a Texas limited liability company ("Stanton"), (iv) MINE ASSETS HOLDING, LLC, a Delaware limited liability company ("MAH"), (v) SOUTHON RAIL YARD, LLC, a Louisiana limited liability company ("SRY"), (vi) DRYING FACILITY ASSETS HOLDING, LLC, a Delaware limited liability company ("DFAH"), (vii) WET MINE ASSETS HOLDING, LLC, a Delaware limited liability company ("WMAH"), and (viii) SHALE ENERGY SUPPORT, LLC, a Delaware limited liability company ("SES" and each of the foregoing a "Borrower" and, collectively, the "Borrowers"), (iv) the financial institutions party hereto from time to time as lenders and their respective successors and permitted assigns (each a "Lender" and, collectively, the "Lenders") and (v) BSP AGENCY, LLC ("BSP"), as the administrative agent and the collateral agent for each of the Lenders (in such capacity and together with its successors and assigns, the "Agent"). Each of the Borrowers, the Lenders and the Agent is a "Party" and collectively they are the "Parties" to this Agreement.

**RECITALS**

WHEREAS, on July [9], 2018 (the "Petition Date"), the Borrowers commenced jointly administered voluntary cases under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") (each a "Case" and, collectively, the "Cases");

WHEREAS, as of the Petition Date, the Debtors, the Prepetition Term Loan Lenders (as defined below) are parties to that certain Amended and Restated Credit Agreement, dated as of August 15, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Term Loan Agreement"), pursuant to which the Prepetition Term Loan Lenders provided financing to the Debtors and the obligations under which were secured by security interests in the Prepetition Collateral (as defined below);

WHEREAS, since the Petition Date, the Borrowers have continued, and intend to continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Borrowers need financing in order to fund their respective business operations during the course of the Cases and have asked the Lenders to make loans and advances to the Borrowers in a principal amount not to exceed $16,600,000 in the aggregate pursuant to sections 364(c) and 364(d) of the Bankruptcy Code which shall consist of the Roll-up Amount (as defined herein) plus an Initial Advance in the amount of $3,000,000, and further Advances in an aggregate amount of $7,000,000 to be made in multiple Advances in accordance with the Approved Budget;

1

WHEREAS, the Lenders are willing to extend credit to the Borrowers, subject to the terms and conditions set forth herein, in the other Loan Documents, and the proposed orders of the Bankruptcy Court approving the proposed financing, and in accordance with sections 364(c) and 364(d) of the Bankruptcy Code, including that all of the Obligations (i) are secured by Liens on the Collateral granted by the Borrowers, subject in priority only to certain Permitted Existing Liens and the Carve-Out, as hereinafter provided, and (ii) constitute allowed superpriority administrative expense claims pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code, subject in priority only to the Carve-Out, in each case as set forth herein and in the Interim DIP Order and the Final DIP Order, as applicable; and

WHEREAS, the Borrowers have agreed to provide such collateral security, superpriority claims and adequate protection, subject to the approval of the Bankruptcy Court.

NOW THEREFORE, in consideration of the premises, the mutual benefits to be derived from this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  Except as otherwise expressly provided in this Agreement, the following terms shall have the meanings given them in this Section:

"Advances" has the meaning ascribed to it in Section 2.1.

"Agent" has the meaning ascribed to it in the Recitals to this Agreement.

"Agent Indemnitees" means the Agent and its officers, directors, employees, affiliates, agents and attorneys.

"Agent Professionals" has the meaning ascribed to it in Section 8.1(c).

"Agreement" means this Senior Secured, Super-Priority Debtor-in-Possession Credit and Security Agreement, as it may be amended, modified or supplemented from time to time in accordance with the terms hereof.

"Applicable Law" means all laws, rules, regulations and governmental guidelines applicable to the Person or matter in question, including statutory law, common law and equitable principles, as well as provisions of constitutions, treaties, statutes, rules, regulations, orders and decrees of Governmental Authorities.

"Applicable Percentage" means with respect to any Lender at any time, the percentage (carried out to the twelfth (12) decimal place) of the aggregate amount of Commitments represented by such Lender's Commitment at such time; provided that if the Commitments have been terminated pursuant to the terms hereof, then the Applicable Percentage of each Lender

shall be determined based upon the Applicable Percentage of such Lender immediately prior to such termination and after giving effect to any subsequent assignments made pursuant to the terms hereof.

"Approved Budget" means a rolling 13-week cash flow budget, an initial form of which is attached hereto as Exhibit C, prepared by CRO and approved by the Borrowers, on a consolidated and consolidating basis, showing projected weekly cash receipts and cash disbursements for the Borrowers, in form and substance acceptable to Lenders, which shall be updated in accordance with Section 6.1(d).

"Avoidance Actions" means any and all actions to avoid or recover a transfer of property of a Borrower's bankruptcy estate or an interest of a Borrower in property, which such Borrower, a trustee, debtor in possession or other appropriate party in interest may assert on behalf of such Borrower's estate under Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of Section 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code or under any other similar applicable federal, state or common law, and any and all other causes of action, grievances, arbitrations, actions, suits, demands, demand letters, claims, complaints, notices of non-compliance or violation, enforcement actions, investigations or proceedings that such Borrower may assert under Chapter 5 of the Bankruptcy Code or any similar Applicable Law.

"Bankruptcy Code" has the meaning ascribed to it in the Recitals to this Agreement.

"Bankruptcy Court" has the meaning ascribed to it in the Recitals to this Agreement.

"Benefit Plan" means a (i) "defined benefit plan" (as defined in section 3(35) of ERISA) for which a Borrower or any ERISA Affiliate has been an "employer" (as defined in section 3(5) of ERISA) within the past six years and (ii) any other healthcare, pension, multiemployer benefit, welfare or similar plans or obligations of a Borrower maintained for any of its employees, offices or directors.

"Books and Records" means all books (financial and otherwise), records (financial and otherwise), contracts, licenses, insurance policies, environmental audits, business plans, files, computer files, computer discs and other data and software storage and media devices, accounting books and records, financial statements (actual and pro forma), filings with Governmental Authorities, and any and all records and instruments relating to the Collateral or otherwise necessary or helpful in the collection thereof or the realization thereupon.

"Borrower" and "Borrowers" have the meaning ascribed to them in the Preamble.

"BSP" has the meaning ascribed to it in the Recitals to this Agreement.

"Business Day" means a day on which the Federal Reserve Bank of New York is open for business.

"Capital Leases" means any lease of property which, in accordance with GAAP, is required to be capitalized on the lessee's balance sheet.

"Carve-Out" has the meaning ascribed to it in the Financing Orders.

"Case" has the meaning ascribed to it in the Recitals to this Agreement.

"Cash Collateral" means cash collateral within the meaning of Bankruptcy Code § 363(a).

"Claim" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.

"Closing Date" means the date upon which all of the conditions set forth in Section 4.1 have been satisfied or waived by the Lenders in writing.

"Collateral" means, collectively, all of the right, title, and interest in and to pre and post-petition property and assets of each Borrower's estate, whether now existing or owned or hereafter arising or acquired, regardless of where located, including, without limitation, all real and personal property, leasehold interests, receivables (including accounts receivable and notes receivable), General Intangibles and payment intangibles, contract rights, commercial tort claims, causes of action of whatever nature (including Avoidance Actions) and the proceeds thereof, intellectual property and Intellectual Property Rights, insurance proceeds, insurance premium refunds, tax refunds, deposits and deposit accounts (and all funds therein), securities accounts, commodities accounts, goods, Inventory, machinery and Equipment, goodwill and Investment Property, and all cash, cash equivalents, and non-cash proceeds of the foregoing, including, without limitation, (1) the Collateral (as such term is defined in the Prepetition Term Loan Agreement), (2) all property of any Borrower in which a Lien is granted to the Agent under the Financing Orders, all other property that is subject to any Lien in favor of Agent or any sub-agent for the benefit of Lenders pursuant to any Security Document, and (3) all of the proceeds (as such term is defined in the UCC) and products, whether tangible or intangible, of any of the foregoing, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing; provided that (a) the Collateral shall not include Avoidance Actions or the proceeds thereof prior to the entry of the Final DIP Order and (b) the Collateral shall not include the Excluded Accounts.

"Commitment" means, as to each Lender, its obligation to make Advances to Borrowers pursuant to Section 2.1, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.1 under the caption "Commitment," (inclusive of such Lender's share of the Roll-up Amount) as such amount may be adjusted from time to time in accordance with this Agreement.  "Commitments" means the aggregate Commitments of all Lenders.

"Committee" means any official committee of unsecured creditors appointed by the United States Trustee in relation to any of the Cases.

"<u>Constituent Documents</u>" means (x) with respect to a Borrower that is a corporation, the charter or certificate or articles of incorporate and the bylaws of such Borrower and (y) with respect to a Borrower that is a limited liability company, the certificate or articles of formation or organization and the operating agreement or the limited liability company agreement (or similar agreement) of such Borrower.

"<u>CRO</u>" means that chief restructuring officer of the Company appointed pursuant to that certain engagement letter, dated as of July __, 2019 and effective as of July __, 2019, between the Company and Alvarez & Marsal, LLC.

"<u>Debtors</u>" means the Borrowers.

"<u>Default</u>" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"<u>Default Period</u>" means any period of time beginning on the day an Event of Default occurs and ending on the date identified by the Lenders in writing as the date that such Event of Default has been cured or waived.

"<u>Deposit Account</u>" means any deposit account (as that term is defined in the UCC), including the Designated Account.

"<u>Designated Account</u>" means the Deposit Accounts of the Borrowers identified on <u>Schedule 5.12</u>.

"<u>Designated Account Bank</u>" has the meaning specified in <u>Schedule 5.12</u>.

"<u>DFAH Lease</u>" means that certain Lease Agreement, dated as of December 21, 2011, between JT Property Ventures, LLC, as successor to M2 Group, LLC, as successor to AHG Solutions, LLC and DFAH, as successor to Alliance Consulting Group, LLC, as the same may be amended or modified through the date hereof.

"<u>DIP Financing Motion</u>" means the motion of Borrowers filed with the Bankruptcy Court seeking approval of this Agreement, the other Loan Documents, the financing and other transactions provided for herein, and entry of the Financing Orders.

"<u>Dollars</u>" or "<u>$</u>" means lawful currency of the United States of America.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"<u>ERISA Affiliate</u>" means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of a Borrower under IRC section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of a Borrower under IRC section 414(c), (c) solely for purposes of section 302 of ERISA and section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which a Borrower is a member under IRC section 414(m), or (d) solely for purposes of section 302 of ERISA and section 412 of the IRC, any

Person subject to ERISA that is a party to an arrangement with a Borrower and whose employees are aggregated with the employees of a Borrower under IRC section 414(o).

"<u>Environmental Law</u>" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on the Borrower, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"<u>Equipment</u>" has the meaning ascribed to such term under the UCC.

"<u>Event of Default</u>" has the meaning ascribed to it in <u>Section 7.1</u>.

"<u>Excluded Accounts</u>" means any Deposit Accounts existing as of the date hereof and held with First Commercial Bank; <u>provided</u> that each Excluded Account shall only be an Excluded Account for so long as all amounts in such Excluded Account are posted in favor of the Mississippi Department of Environmental Quality in connection with the mining permits of WMAH.

"<u>Final DIP Order</u>" means a Final Order entered by the Bankruptcy Court in the Cases pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code approving this Agreement and the other Loan Documents and the making of the Advances in an amount not to exceed the Commitments (taking into account the Roll-up Amounts), authorizing on a final basis the incurrence by the Borrowers of permanent post-petition secured and superpriority indebtedness in accordance with this Agreement, authorizing the use of cash collateral, granting Liens and providing superpriority administrative expense status, authorizing conversion of the Roll-up Amounts, granting adequate protection, and modifying the automatic stay, to be entered on the docket of the Cases within thirty-five (35) days of the Petition Date, which order shall be in substantially the form of the Interim DIP Order (with only such modifications thereto as are necessary to convert the Interim DIP Order to a Final Order and such other modifications as are satisfactory in form and substance to the Agent and Lenders in their reasonable discretion).

"<u>Final DIP Order Entry Date</u>" means the date on which the Bankruptcy Court enters the Final DIP Order in the Cases.

"<u>Final Hearing</u>" means a hearing held by the Bankruptcy Court regarding the approval of the Final DIP Order.

"<u>Final Order</u>" means an order, judgment, ruling or other decree (or any revision, modification or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court as may have jurisdiction over any proceeding in connection with the Cases for the purpose of such proceeding, which order, judgment, ruling or other decree has not been reversed, vacated, stayed, modified or amended and as to which (i) no appeal, petition for review, reargument, rehearing, reconsideration or certiorari has been taken and is pending and the time for the filing of any such appeal, petition for review, reargument, rehearing, reconsideration or certiorari has expired, or (ii) such appeal or petition has been heard and

dismissed or resolved and the time to further appeal or petition has expired with no further appeal or petition pending.

"Financing Orders" means the Interim DIP Order, the Final DIP Order and such other interim, final, permanent and/or supplemental orders entered by the Bankruptcy Court after notice pursuant to Section 364 of the Bankruptcy Code relating thereto or authorizing the granting of credit by the Agent and the Lenders to the Borrowers.

"Frac Sand" means, collectively, 20/40 API quality sand, 30/50 API quality sand, 40/70 API quality sand, 100 mesh API quality sand, and other sand products as defined by market conditions and otherwise acceptable to the Lenders.

"GAAP" means generally accepted accounting principles in the United States, applied on a basis consistent with the accounting practices applied in the Borrowers' prior audited financial statements.

"General Intangibles" has the meaning ascribed to such term under the UCC.

"Governmental Authorities" means any federal, state, local, provincial, municipal, foreign or other government or governmental department, agency, authority, body, commission, bureau, court, tribunal, instrumentality, political subdivision, central bank, corporation, regulatory or self-regulatory organization or other entity or officer exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions for any government or governmental, judicial, investigative, regulatory or self-regulatory authority.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Indebtedness" means (a) all obligations for borrowed money, including, without limitation, the Obligations, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person, (g) the principal

balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing products, or (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Indemnified Liabilities" has the meaning ascribed to it in Section 9.6.

"Indemnitees" has the meaning ascribed to it in Section 9.6.

"Infringement" or "Infringing", when used with respect to Intellectual Property Rights, means any infringement or other violation of Intellectual Property Rights.

"Intellectual Property Rights" means all actual or prospective rights arising in connection with any intellectual property or other proprietary rights, including all rights arising in connection with copyrights, copyright applications and all tangible and intangible property embodying the copyrights, patents, patent applications and registrations, unpatented inventions (whether or not patentable), industrial design applications and registered industrial designs, service marks, service mark applications, trade dress, trade secrets, trademarks, trademark applications, trade names, know-how and other proprietary information, internet domain names, designs or mask works, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing), indicia and other source and/or business identifiers, license agreements related to any of the foregoing and income therefrom, books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing, the right to sue for all past, present and future infringements of any of the foregoing, all other intellectual property, and all common law and other rights throughout the world in and to all of the foregoing.

"Interim DIP Order" means an interim order entered by the Bankruptcy Court in the Cases pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code approving this Agreement and the other Loan Documents, and authorizing on an interim basis the incurrence by the Borrowers of post-petition secured and superpriority indebtedness in accordance with this Agreement, authorizing the use of cash collateral, granting Liens and providing superpriority administrative expense status, granting adequate protection, and modifying the automatic stay, to be entered on the docket of the Cases within three (3) days of the Petition Date, which order shall be in the form attached to the DIP Financing Motion or otherwise in form and substance satisfactory to the Agent and the Lenders in their reasonable discretion.

"Interim DIP Order Entry Date" means the date on which the Bankruptcy Court enters the Interim DIP Order in the Cases.

"Inventory" has the meaning ascribed to such term under the UCC.

"Investment Property" has the meaning ascribed to such term under the UCC.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"Leased Real Property" has the meaning ascribed to it in Section 5.10.

"Lender" has the meaning ascribed to it in the Preamble.

"Licensed Intellectual Property" has the meaning ascribed to it in Section 5.9(b).

"Lien" means any security interest, mortgage, deed of trust, pledge, lien, charge, encumbrance, title retention agreement or analogous instrument or device, including the interest of each lessor under any capitalized lease and the interest of any bondsman under any payment or performance bond, in, of or on any assets or properties of a Person, whether now owned or subsequently acquired, and whether arising by agreement or operation of law.

"Loan Documents" means this Agreement, the Notes, the Interim DIP Order, the Final DIP Order, the Security Documents and every other agreement, note, document, contract or instrument to which the Borrowers now or in the future may be a party with the Agent or any Lender solely in its capacity as the Agent or a Lender under this Agreement.

"Material Adverse Effect" means any of the following:

      (a)      A material adverse effect on the business, operations, results of operations, assets, liabilities or financial condition of the Borrowers taken as a whole;

      (b)      A material adverse effect on the ability of a Borrower to perform its payment obligations under any of the Loan Documents to which it is a party; or

      (c)      A material adverse effect on the ability of the Agent or the Lenders to enforce the Obligations or to realize the intended benefits of the Security Documents, including a material adverse effect on the validity or enforceability of any Loan Documents, or on the status, existence, perfection, priority (subject to Permitted Existing Liens and Permitted Encumbrances) or enforceability of any Lien securing payment or performance of the Obligations;

provided that changes, events, effects or circumstances which, directly or indirectly, to the extent that relate to or result from the following, shall be excluded from the determination of a Material Adverse Effect: (i) the filing of the Cases (and any defaults or claims under pre-petition agreements so long as the exercise of remedies as a result of such defaults or claims are stayed under the Bankruptcy Code or such agreements are voided or invalidated by the Bankruptcy Court); (ii) any litigation or claim threatened or initiated by creditors of the Borrowers against the Borrowers or any of their officers or directors, in each case, arising out of the filing of the Cases or the transactions contemplated thereby; and (iii) the existence of any claims or liability from the period prior to the commencement of the Cases, which is unsecured and junior in priority to the Obligations.

"Material Contract" means (a) any contract or agreement, written or oral, of any Borrower, that is not a contract to sell Frac Sand and involves monetary liability of or to any such Person in an amount in excess of $1,000,000 per annum, (b) any contract or agreement, written or oral, of any Borrower, that is a contract to sell Frac Sand and involves monetary liability of or to any such Person in an amount in excess of $2,000,000 per annum, (c) the DFAH Lease and (d) any other contract or agreement of any Borrower, the breach, non-performance, cancellation or failure to renew of which could reasonably be expected to have Material Adverse Effect.

"Material Lease" means each lease to which the Borrower is a party, the breach, non-performance, cancellation or failure to renew of which could reasonably be expected to have Material Adverse Effect.

"Maturity Date" the earliest of (i) the date on which the Agent (acting at the written direction of the Lenders) provides written notice to the Borrowers, counsel for the Parties and counsel for any Committee of the occurrence of any Event of Default, (ii) the date of acceleration of the Obligations under Section 7.2, (iii) the effective date of a confirmed plan of reorganization or liquidation in the Cases, (iv) the entry of an order converting any of the Cases to a case or cases under Chapter 7 of the Bankruptcy Code, (v) the entry of an order dismissing any of the Cases, (vi) the entry of an order appointing a chapter 11 trustee or examiner with expanded powers in any of the Cases, (vii) the failure of the Borrowers to obtain entry of the Interim DIP Order within three (3) Business Days following the Petition Date, (viii) the failure of the Borrowers to obtain entry of the Final DIP Order within thirty (30) days following the Petition Date, (ix) the date of the commencement of the Final Hearing, or (x) the date that is 180 days following the Petition Date.

"Maximum Advance Amount" means (a) prior to the Final DIP Order Entry Date, $3,000,000 and (b) from and after the Final DIP Order Entry Date, an aggregate amount of $7,000,000 to be made in multiple Advances not to exceed availability or amounts required for any three-week period plus the Roll-up Amount which will be deemed to be an Advance upon entry of the Final DIP Order.

"Milestones" has the meaning ascribed to it in Section 6.21.

"Note" means the Secured Promissory Note executed by the Borrowers and payable to the order of a Lender in an amount equal to the Applicable Percentage of such Lender's Commitment, which shall be substantially in the form of Exhibit A attached hereto, as the same may be renewed and amended from time to time, and all replacements thereto.

"Notice of Borrowing" has the meaning ascribed to it in Section 2.3.

"Obligations" means each and every debt, liability and obligation of every type and description which the Borrowers may now or at any time hereafter owe to the Agent and the Lenders under the Loan Documents, including, without limitation, all Advances, Indebtedness, fees (including the Facility Fee), costs and expenses of the Agent and Lenders payable pursuant the Loan Documents, and other obligations hereunder and under the Loan Documents, whether such debt, liability or obligation now exists or is hereafter created or incurred, whether it arises in

a transaction involving the Agent or any Lender alone or in a transaction involving other creditors of the Borrowers, and whether it is direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or sole, joint, several or joint and several.

"OFAC" has the meaning ascribed to it in Section 6.5(b).

"Owned Intellectual Property" has the meaning ascribed to it in Section 5.9(a).

"Owned Real Property" has the meaning ascribed to it in Section 5.10.

"Party" and "Parties" have the meanings ascribed to them in the Preamble.

"Permitted Encumbrances" means:

(a) Liens imposed by law for taxes that are not yet due or are being contested in good faith and by appropriate proceedings diligently conducted, if adequate segregated reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(b) carriers', warehousemens's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; and

(e) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrowers;

provided, that the term "Permitted Encumbrances" shall not include any Lien secured Indebtedness.

"Permitted Existing Lien" and "Permitted Existing Liens" means those Liens permitted in Sections 6.2(a)(i), (a)(ii) and those Liens set forth on Schedule 6.2.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Petition Date" has the meaning ascribed to it in the Recitals to this Agreement.

"Prepetition Agent" means BSP, in its capacity as administrative agent for the benefit of the Prepetition Term Loan Lenders.

"Prepetition Collateral" means the collateral described and defined in the Prepetition Loan Documents, which includes Cash Collateral, as applicable.

"Prepetition Liens" means the first priority liens and security interests granted to the Prepetition Agent for the benefit of the Prepetition Term Loan Lenders by certain of the Prepetition Loan Documents to secure the Prepetition Obligations to the Prepetition Term Loan Lenders.

"Prepetition Loan Documents" means the "Loan Documents" as described and defined in the Prepetition Term Loan Agreement.

"Prepetition Obligations" means obligations of the Debtors for unpaid principal, accrued and unpaid interest, fees, costs, expenses, indemnities and other amounts arising under the Prepetition Loan Documents.

"Prepetition Term Loan Agreement" has the meaning set forth in the Recitals.

"Prepetition Term Loan Lenders" means the financial institutions from time to time parties to the Prepetition Term Loan Agreement as lenders.

"Preamble" means the first paragraph of this Agreement.

"Principal Office" means the principal office of Agent, presently located in [New York, New York,] or such address as may be designated in writing by the Agent from time to time.

"Real Property" means any estates or interests in real property now owned or hereafter acquired by a Borrower and the improvements thereto.

"Roll-up Amount" means the portion of the Prepetition Obligations in an amount equal to $6,600,000 to be converted into the loans hereunder.

"Sand Reserves" means (a) at any particular time, the estimated quantities of sand and gravel (including Frac Sand) that geological and engineering data demonstrate with reasonable certainty to be recoverable in future years under then existing economic and operating conditions (i.e., prices and costs as of the date the estimate is made) and (b) any fee mineral interests, term mineral interests, leases, subleases, farm-outs, royalties, overriding royalties, net profit interests, carried interests, production payments and similar mineral interests, and all unsevered and unextracted sand and gravel in, under, or attributable to the properties described in the foregoing clause (a).

"Secured Parties" means collectively, the Agent and the Lenders.

"Security Documents" means, collectively, this Agreement and any other Loan Document delivered to the Agent from time to time to secure the Obligations and perfect the Security Interest or any other security interest created thereby.

"Security Interest" has the meaning ascribed to it in Section 3.1.

"Siena" means Siena Lending Group LLC.

"Siena Revolving Loan Agreement" means the Loan and Security Agreement, dated as of February 28, 2018, between Siena Lending Group LLC, as the lender, SES and SRY, as the borrowers and Holdings, WMAH, DFAH and MAH as the other loan parties party thereto (as amended, amended and restated, supplemented or otherwise modified from time to time).

"Subsidiary" means any Person of which more than fifty percent (50%) of the outstanding ownership interests having general voting power under ordinary circumstances to elect a majority of the board of directors or the equivalent of such Person, regardless of whether or not at the time ownership interests of any other class or classes shall have or might have voting power by reason of the happening of any contingency, is at the time directly or indirectly owned by a Borrower, by a Borrower and one or more other Subsidiaries, or by one or more other Subsidiaries.

"Super-Priority Claims" has the meaning ascribed to it in Section 3.3.

"UCC" means the Uniform Commercial Code in effect in the state designated in this Agreement as the state whose laws shall govern this Agreement, or in any other state whose laws are held to govern this Agreement or any portion of this Agreement.

"U.S.A. Patriot Act" has the meaning ascribed to it in Section 5.21.

        Section 1.2      Other Definitional Terms; Rules of Interpretation. The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP. All terms defined in the UCC and not otherwise defined herein have the meanings assigned to them in the UCC. References herein to Articles, Sections, subsections, Exhibits, Schedules and the like are to Articles, Sections and subsections of, or Exhibits or Schedules attached to, this Agreement unless otherwise expressly provided. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". Unless the context in which used herein otherwise clearly requires, "or" has the inclusive meaning represented by the phrase "and/or". Defined terms include in the singular number the plural and in the plural number the singular. Reference to any agreement (including the Loan Documents), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof (and, if applicable, in accordance with the terms hereof and the other Loan Documents), except where otherwise explicitly provided, and reference to any promissory note includes any promissory note which is an extension or renewal thereof or a substitute or replacement therefor. Reference to any law, rule, regulation, order, decree, requirement, policy, guideline, directive or interpretation means as amended,

modified, codified, replaced or reenacted, in whole or in part, and in effect on the determination date, including rules and regulations promulgated thereunder.

## ARTICLE II

## AMOUNT AND TERMS OF THE CREDIT FACILITY

Section 2.1    Advances.  Each Lender severally agrees, subject to the terms and conditions of this Agreement and the Financing Orders, to make advances (the "Advances") to the Borrowers as follows, in each case provided that all applicable conditions set forth in Article IV are satisfied:

(i) upon the Interim DIP Order Entry Date, the Lenders shall make one or more initial Advances in an aggregate amount not to exceed $3,000,000 (collectively, the "Initial Advance"); and

(ii) from the Final DIP Order Entry Date to and until (but not including) the Maturity Date, the Lenders shall make subsequent Advances in an aggregate amount not to exceed such Lender's Commitment, which shall not be requested or made more frequently than every 21 days from the date of the prior Advance, beginning as of the Petition Date and shall not exceed the amount necessary for the next 21 days (when taking into consideration the cash-on-hand at the Borrowers) subject to the Approved Budget and less the amount of any reserve that may be imposed in the Lenders' reasonable discretion up to the amount of the Carve-Out; provided that the aggregate amount of all Advances to be made by the Lenders hereunder shall not exceed the Maximum Advance Amount at any time.  Advances shall only be used by the Borrowers to make disbursements in accordance with Section 2.8 hereof.  Advances shall be made upon delivery of a Notice of Borrowing by the Borrowers in accordance with Section 2.3.  Each Advance, or any portion thereof, once repaid, may not be reborrowed.

Section 2.2    Evidence of Debt.  The Advances made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Agent in the ordinary course of business; provided that such Lender or the Agent may, in addition, request that such Advances be evidenced by the Notes.  The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of the amount of the Advances made to Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of Borrowers hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by the Lenders and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.

Section 2.3    Notice and Manner of Borrowing.

(a)    Whenever the Borrowers desire to obtain an Advance hereunder, which shall not occur more frequently than one Advance every 21 days and shall not exceed the amount necessary for the next 21-day period, the Borrowers shall give written notice to the Agent and the Lenders in the form attached hereto as Exhibit B (a "Notice of Borrowing") not later than 12:00 p.m. Noon, New York City time, on the date that is three (3) Business Days before the day on which the requested Advance is to be made.

14

Except as agreed to by the Agent (acting at the written direction of the Lenders), requests for Advances may not be made more than once in any consecutive twenty-one (21) day period. Each Notice of Borrowing shall specify (i) the requested date of such borrowing (which shall be a Business Day), (ii) the principal amount of Advance to be borrowed, (iii) the expenses in the Approved Budget to be funded by such Advance and (iv) the applicable wire instructions of the account to which the proceeds are to be disbursed. Each Advance shall be in an aggregate principal amount that is (i) not less than $500,000 or (ii) equal to the remaining available balance of the applicable Commitments.

(b)     Following receipt of a Notice of Borrowing, the Agent shall promptly notify each Lender of the amount of the Advance. Each Lender shall thereafter make an amount equal to its Applicable Percentage of the Advance available to the Agent not later than 1:00 p.m., New York City time, on the Business Day specified in the Notice of Borrowing. Subject to the terms and conditions in this Agreement, including Section 4.1, the Agent shall make all such requested funds received by the Agent available to the applicable Borrower by wire transfer in accordance with instructions of the Borrowers provided to the Agent and reasonably acceptable to the Lenders. All of the Advances shall be secured by the Collateral.

Section 2.4     Interest; Facility Fee; Payments Generally; Application of Payments; Usury.

(a)     Interest. The principal amount of the Advances shall bear interest at the rate of ten percent (10.0%) per annum and shall be calculated based on a year of 360 days for the actual number of days elapsed (including the first day but excluding the last day); provided that, from and after the occurrence of any Event of Default and during its continuance, the interest rate with respect to all Advances shall be twelve percent (12.0%) per annum.

(b)     Facility Fee. On the Closing Date, the Borrowers shall pay to each Lender its pro-rata share of a facility fee equal to $200,000 on the Closing Date (the "Facility Fee"), which such Facility Fee shall be earned, due and payable in full in cash on the Closing Date.

(c)     Payments Generally. All payments of principal, interest, and other amounts to be made by Borrowers under this Agreement or any other Loan Document shall be made to the Agent for the account of the Agent or the pro rata accounts of the applicable Lenders, as applicable, at the Principal Office in Dollars and immediately available funds, without setoff, deduction, or counterclaim, and free and clear of all taxes at the time and in the manner provided herein. Payments by check or draft shall not constitute payment in immediately available funds until the required amount is actually received by the Agent in full. Payments in immediately available funds received by the Agent in the place designated for payment on a Business Day prior to 12:00 p.m., New York City time at such place of payment shall be credited prior to the close of business on the Business Day received, while payments received by the Agent on a day other than a Business Day or after 12:00 p.m., New York City time on a Business Day may, in the Agent's discretion, not be credited until the next succeeding Business Day.

(d) <u>Application of Payments</u>.  Any payments required to be made by the Borrowers under this Agreement or any other Loan Documents shall be applied to the Obligations on the first Business Day after receipt by the Agent.  Except as expressly provided herein to the contrary, all payments on the Obligations under this Agreement or any other Loan Document shall be applied in the following order of priority: (i) the payment or reimbursement of any expenses, costs or obligations (other than the principal amount of the Advances and interest thereon) for which the Borrowers shall be obligated or the Agent or any Lender shall be entitled pursuant to the provisions of this Agreement, the Financing Orders, and the Notes; (ii) the payment of accrued but unpaid interest thereon then due and owing; and (iii) the payment of all or any portion of the principal balance then due and owing as directed by the Agent (acting at the written direction of the Lenders).

(e) <u>Designated Account</u>.  The Borrowers agree to maintain the Designated Account with the Designated Account Bank and to (i) receive the proceeds of the Advances requested by Borrowers and made by Lenders hereunder in such Designated Account; and (ii) deposit all proceeds of the Collateral and all mandatory prepayments hereunder into such Designated Account, after which such sums shall be paid to Agent and Lenders when due to be applied in accordance with <u>Section 2.4(d)</u> and, upon such application, permanently reduce the Commitments in a like amount in accordance with <u>Section 2.4(d)</u>.  Payments shall be applied only to the Obligations then due and owing.  The Borrowers shall maintain any remaining funds in the Designated Account and such funds may be used by the Borrowers to make disbursements in accordance with the Approved Budget.

Section 2.5 <u>Time for Principal and Interest Payments; Payment on Non-Business Days</u>.

(a) <u>Time for Interest Payments</u>.  All accrued and unpaid interest shall be due and payable monthly in cash on the last Business Day of each month, commencing on July 31, 2019 until the Maturity Date.

(b) <u>Time for Principal Payment.</u>  The outstanding unpaid principal amount of all Advances, all accrued and unpaid interest thereon and the outstanding amount of all other Obligations shall be due and payable on the Maturity Date.

(c) <u>Payment on Non-Business Days</u>.  Whenever any payment to be made hereunder shall be stated to be due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest on the Advances hereunder.

Section 2.6 <u>Voluntary Prepayment</u>.  The Borrowers may prepay the Advances, in whole or in part, at any time upon at least two (2) Business Days' prior written notice delivered to the Agent.  Once repaid, Advances may not be reborrowed.

Section 2.7 <u>Reserved</u>.

Section 2.8     <u>Use of Proceeds</u>.  The Borrowers shall use the proceeds of Advances (a) to fund the operating expenses of the Borrowers, (b) for payment of the costs and expenses of the Cases, (c) to make payments to Siena in respect of Adequate Protection (as defined in the Interim DIP Order or Final DIP Order), as applicable, as authorized by the Bankruptcy Court in the applicable Financing Order,  and (d) for the payment of such other expenses as the Lenders shall reasonably agree and the Bankruptcy Court shall approve, in each case, limited to and in accordance with the Approved Budget or as may otherwise be consented to by the Lenders.  Except as specifically set forth in the Financing Orders, no proceeds of any Advance may be utilized to finance in any way professional fees, disbursements, costs, or expenses incurred by any person in connection with asserting, investigating, preparing, prosecuting, or joining in any claims, counterclaims, causes of action, contested matter, objection, defense or other proceeding, the purpose of which is to seek a judgment, order, declaration, or similar relief (i) against the Agent, any of the Lenders, or their respective counsel or advisors, on account of any claim arising on, before, or after the Petition Date, including, without limitation, a claim for lender liability or pursuant to Section 105 or chapter 5 of the Bankruptcy Code; (ii) invalidating, setting aside, avoiding, challenging, avoiding, subordinating, or raising any defenses to (A) any of the Obligations, and/or Liens under this Agreement or other Loan Documents, (B) any of the Prepetition Obligations and/or Prepetition Liens under the Prepetition Loan Documents; (iii) declaring any of the Loan Documents or Prepetition Loan Documents to be invalid, not binding or unenforceable in any respect; (iv) attempting to modify or restrict any of the rights or remedies granted to any of the Lenders under any of the Loan Documents, the Financing Orders, any other order of the Court, or Applicable Law; (v) paying any amount on account of any claims or equity interests arising before the commencement of the Cases unless such payments are approved by an order of the Bankruptcy Court; or (vi) after the occurrence and during the continuance of an Event of Default, paying any success, completion, back-end or similar fees.

Section 2.9     <u>Single Loan</u>.  All Advances to the Borrowers and all of the other Obligations of the Borrowers arising under this Agreement and the other Loan Documents shall constitute one general joint and several obligations of the Borrowers secured by all of the Collateral.

Section 2.10     <u>Grants, Rights and Remedies</u>.  The Liens, the Security Interest and the administrative priority granted pursuant to <u>Article III</u> may be independently granted by the Loan Documents.  This Agreement, the Interim DIP Order, the Final DIP Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Agent hereunder and thereunder are cumulative.

Section 2.11     <u>Perfection</u>.  The Liens and Security Interest securing the Obligations, as granted in <u>Article III</u>, shall be deemed valid and perfected by the entry of relevant Financing Orders; <u>provided</u> that the Borrowers hereby authorize, and the Agent is hereby permitted, but is not required, to file any financing statements, leasehold mortgages, security agreements, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Liens and Security Interest granted by or pursuant to this Agreement, the Final DIP Order or any other Loan Document.  Notwithstanding the foregoing, the Borrowers agree, promptly upon the request of the Agent (acting at the written direction of the Lenders), to take all actions to perfect a first priority Lien in all or any portion of the Collateral (subject to the Permitted Existing Liens and the Carve-Out).

Section 2.12     <u>Waiver of Any Priming Rights</u>.  Each Borrower agrees on behalf of itself and its bankruptcy estate, that for so long as any Obligations shall be outstanding, such Borrower and such Borrower's bankruptcy estate hereby irrevocably waive any right pursuant to Section 364(c) or 364(d) of the Bankruptcy Code or otherwise to grant any Lien or Security Interest of equal or

greater priority than the Liens and Security Interest securing the Obligations or to approve a Claim of equal or greater priority than the Obligations.

Section 2.13    Waiver of Claims to Surcharge.  Subject to entry of the Final Order, each Borrower and such Borrower's bankruptcy estate hereby waive any claims to surcharge the Collateral under Section 506(c) of the Bankruptcy Code.

Section 2.14    Joint and Several Liability of Borrowers.

(a)    Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Agent and the Lenders under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)    Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including any Obligations arising under this Section 2.14), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(c)    If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation until such time as all of the Obligations (other than contingent indemnification and reimbursement obligations in respect of which no claim for payment has been asserted) are paid in full.

(d)    The Obligations of each Borrower under the provisions of this Section 2.14 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity or enforceability of the provisions of this Agreement (other than this Section 2.14(d)) or any other circumstances whatsoever.

(e)    Except as otherwise expressly provided in this Agreement, each Borrower hereby waives (i) notice of acceptance of its joint and several liability, (ii) notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement (other than notices expressly provided for in this Agreement, (iii) notice of any action at any time taken or omitted by Agent or Lenders under or in respect of any of the Obligations, (iv) any requirement of diligence or to mitigate damages and (v) to the extent permitted by Applicable Law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement).  Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Agent or Lenders at any time or times in respect of any default by any Borrower in the performance or satisfaction of any

term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Agent or Lenders in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower.  Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of any Agent or Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.14 afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this Section 2.14, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this Section 2.14 shall not be discharged except by performance and then only to the extent of such performance.  The Obligations of each Borrower under this Section 2.14 shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any other Borrower or any Agent or Lender.

(f)     Each Borrower represents and warrants to Agent and Lenders that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations.  Each Borrower further represents and warrants to Agent and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents.  Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g)     The provisions of this Section 2.14 are made for the benefit of Agent, each Lender and their respective successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of Agent, any Lender, or any of their successors or assigns to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section 2.14 shall remain in effect until all of the Obligations (other than contingent indemnification and reimbursement obligations in respect of which no claim for payment has been asserted) shall have been paid in full or otherwise fully satisfied.  If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by Agent or any Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this Section 2.14 will forthwith be reinstated in effect, as though such payment had not been made.

(h)     Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made

by it to Agent or Lenders with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations (other than contingent indemnification and reimbursement obligations in respect of which no claim for payment has been asserted) have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to Agent or any Lender hereunder are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder, to the prior payment in full in cash of the Obligations (other than contingent indemnification and reimbursement obligations in respect of which no claim for payment has been asserted).

(i)      Each Borrower hereby agrees that after the occurrence and during the continuance of any Default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations (other than contingent indemnification and reimbursement obligations in respect of which no claim for payment has been asserted) shall have been paid in full in cash. If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for Agent, and such Borrower shall deliver any such amounts to Agent for application to the Obligations in accordance with the terms of this Agreement.

## ARTICLE III

## SECURITY INTEREST; SETOFF

Section 3.1      <u>Grant of Security Interest</u>.  Each Borrower hereby pledges, assigns and grants to the Agent for the benefit of the Secured Parties (i) in accordance with Sections 364(c)(2) and 364(d) of the Bankruptcy Code a valid, automatically properly perfected, enforceable and non-avoidable continuing first priority priming Lien and security interest (subject only to the Permitted Existing Liens and the Carve-Out), in such Borrower's Collateral, and (ii) in accordance with Section 364(c)(3) of the Bankruptcy Code, a valid, automatically properly perfected, enforceable and non-avoidable continuing second priority Lien and security interest in such Borrower's Collateral that is subject to a Permitted Existing Lien ((i) and (ii) collectively referred to as the "<u>Security Interest</u>"), as security for the payment and performance of the Obligations due hereunder.

Section 3.2      <u>Lien Perfection; Further Assurances</u>.  The Financing Orders shall be sufficient and conclusive evidence of the validity, perfection and priorities of the Agent's Liens upon the Collateral, without the necessity of filing or recording any financing statement, assignment, mortgage, leasehold mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of the Agent in and to the Collateral or to entitle the Agent to the priorities granted herein; <u>provided</u> that the Borrowers shall execute such instruments, assignments, mortgages, or documents as are necessary to perfect the Agent's Liens upon any of the Collateral and shall take such other action as may be reasonably required to perfect or to continue the perfection of the Agent's Liens upon the Collateral. Each Borrower hereby irrevocably authorizes the Agent at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of such Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of the State of New York, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of

the UCC of the State of New York, for the sufficiency or filing office acceptance of any financing statement or amendment. The Borrowers agree to furnish any such information to the Agent promptly upon request (acting at the written direction of the Lenders). The Borrowers also ratify their authorization for the Agent to have filed in any UCC jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof. No such filing or recordation shall be necessary or required in order to create or perfect any such Lien. At the Agent's request (acting at the written direction of the Lenders), the Borrowers shall also promptly execute or cause to be executed and shall deliver to the Agent any and all documents, instruments and agreements deemed necessary by the Agent (at the written direction of the Lenders) to give effect to or carry out the terms or intent of the Loan Documents hereunder.

           Section 3.3        <u>Superpriority Administrative Expense Claim</u>. Subject to and subordinate only to the Carve-Out, the Obligations of the Borrowers arising hereunder shall constitute allowed super-priority administrative claims in accordance with Sections 364(c)(1) and 507(b) of the Bankruptcy Code, which claims shall have priority in right of payment over any and all other obligations, liabilities and indebtedness of the Borrowers, now in existence or hereafter incurred by the Borrowers and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, Bankruptcy Code §§ 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), or 726 (to the extent permitted by Applicable Law), and/or 364(c)(1), and any other provision of the Bankruptcy Code (including, subject to entry of the Final DIP Order, section 506(c)) (the "<u>Super-Priority Claims</u>"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Borrowers and all proceeds thereof (excluding proceeds of Avoidance Actions until the Final DIP Order Entry Date).

           Section 3.4        <u>Notification of Account Debtors and Other Obligors</u>. The Agent (acting at the written request of the Lenders) may, at any time during a Default Period, notify any account debtor or other Person obligated to pay the amount due that such right to payment has been assigned or transferred to the Agent for security and shall be paid directly to the Agent. The Borrowers will join in giving such notice if the Agent so requests. At any time after the Borrowers or the Agent gives such notice to an account debtor or other obligor, the Agent may, but need not, in the Agent's name or in a Borrower's name, demand, sue for, collect or receive any money or property at any time payable or receivable on account of, or securing, any such right to payment, or grant any extension to, make any compromise or settlement with or otherwise agree to waive, modify, amend or change the obligations (including collateral obligations) of any such account debtor or other obligor. Upon the occurrence of an Event of Default and during the related Default Period, the Agent (at the written direction of the Lenders) may, in the Agent's name or in a Borrower's name, as such Borrower's agent and attorney-in-fact, notify the United States Postal Service for delivery of such Borrower's mail to any address designated by the Agent; <u>provided</u> that the Agent shall also notify such Borrower promptly after it provides such notice to the United States Postal Service, and/or otherwise intercept such Borrower's mail, and receive, open and dispose of such Borrower's mail, applying all Collateral as permitted under this Agreement and holding all other mail for such Borrower's account or forwarding such mail to such Borrower's last known address.

           Section 3.5        <u>Assignment of Insurance</u>. As additional security for the payment and performance of the Obligations, the Borrowers hereby assign to the Agent any and all monies (including proceeds of insurance and refunds of unearned premiums (except as may otherwise be provided in any premium finance agreement to which a Borrower is or may be a party) due or to become due under, and all other rights of the Borrowers with respect to, any and all policies of insurance now or at any time hereafter covering the Collateral or any evidence thereof or any business records or valuable papers pertaining thereto, and the Borrowers hereby direct the issuer of any such policy to pay all such

monies directly to the Agent. At any time, during a Default Period, the Agent (acting at the written direction of the Lenders) may (but need not), in the Agent's name or in a Borrower's name, execute and deliver proof of claim, receive all such monies, endorse checks and other instruments representing payment of such monies, and adjust, litigate, compromise or release any claim against the issuer of any such policy. During a Default Period, any monies received as payment for any loss under any insurance policy mentioned above (other than liability insurance policies), or as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid over to the Agent to be applied, at the option of the Lenders, either to the prepayment of the Obligations or shall be disbursed to the Borrowers under staged payment terms reasonably satisfactory to the Lenders for application to the cost of repairs, replacements, or restorations. Any such repairs, replacements, or restorations shall be effected with reasonable promptness and shall be of a value at least equal to the value of the items or property destroyed prior to such damage or destruction.

Section 3.6     License.  Subject to Section 7.2 hereof, without limiting the generality of any other Security Document, the Borrowers hereby grant to the Agent for so long as any Obligations remain outstanding hereunder a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property Rights of the Borrowers following an Event of Default for the sole and limited purpose of selling, licensing, leasing or otherwise disposing of any or all Collateral during any Default Period.

Section 3.7     Setoff.  During a Default Period, each of the Agent and the Lenders may at any time or from time to time, at its sole discretion and without demand and without notice to anyone, set off any liability owed to a Borrower by the Agent or any Lender, as applicable, whether or not due, against any outstanding Obligations that are due and payable under the Loan Documents.

Section 3.8     Agent Appointed Attorney-in-Fact.  Each Borrower hereby irrevocably designates, makes, constitutes and appoints the Agent such Borrower's attorney-in-fact, with full authority in the place and stead of such Borrower and in the name of such Borrower or otherwise, from time to time in the Agent's discretion, with or without notice to or the consent of such Borrower and at such Borrower's expense, to take any action and to execute any instrument which the Agent may deem necessary or advisable to accomplish the purposes of this Agreement.

Section 3.9     Collateral.  The Agent's duty of care with respect to Collateral in its possession (as imposed by Applicable Law) shall be deemed fulfilled if it exercises reasonable care in physically keeping such Collateral, or in the case of Collateral in the custody or possession of a bailee or other third Person, exercises reasonable care in the selection of the bailee or other third Person, and the Agent need not otherwise preserve, protect, insure or care for any Collateral. The Agent shall not be obligated to preserve any rights the Borrowers may have against prior parties, to realize on the Collateral at all or in any particular manner or order or to apply any cash proceeds of the Collateral in any particular order of application. The Agent has no obligation to clean up or otherwise prepare the Collateral for sale. Each Borrower waives any right it may have to require the Agent to pursue any third Person for any of the Obligations.

Section 3.10    Survival.  The Liens, lien priority, administrative priorities and other rights and remedies granted to the Agent pursuant to this Agreement, the Financing Orders and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Borrowers (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Cases, or by any other act or omission

whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)     except for the Permitted Existing Liens, no costs or expenses of administration that have been or may be incurred in the Cases or any conversion of the same or in any other proceedings related thereto, and no priority Claims, are or will be prior to or on a parity with any Claim of the Agent or the Lenders against the Borrowers in respect of any Obligations;

(b)     except for the Permitted Existing Liens, the Liens in favor of the Agent set forth in <u>Section 3.1</u> shall constitute valid and perfected priming first priority Liens and security interests and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)     the Liens in favor of the Agent set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Agent file or record financing statements, mortgages or otherwise perfect its Lien under applicable non-bankruptcy law.

## ARTICLE IV

## CONDITIONS OF LENDING

Section 4.1     <u>Conditions Precedent to Initial Advances</u>.  The Lenders' obligations to make the Initial Advance hereunder shall be subject to each of the following conditions precedent (the making of any Initial Advance by the Lenders being conclusively deemed to be its satisfaction or waiver of the conditions precedent contained in this Section 4.1):

(a)     The Agent shall have received all of the following, each properly executed by the appropriate party and in form and substance satisfactory to the Lenders:

(i)     This Agreement;

(ii)     The Notes (if requested);

(iii)     A Notice of Borrowing with respect to such Advance;

(iv)     The Approved Budget, in form and substance satisfactory to the Agent and the Lenders;

(v)     A Customer Identification Information form and such other forms and verification as the Lenders may need to comply with the U.S.A. Patriot Act;

(vi)     A copy of the Constituent Documents of each Borrower, which shall, to the extent applicable, be certified as of a recent date prior to the Closing Date by the appropriate Governmental Authority; and

(vii)   Such other documents as the Agent or the Lenders in their reasonable discretion may require including, for avoidance of doubt, all other Loan Documents;

(b)   The Borrowers shall have paid the reasonable, out-of-pocket expenses of the Agent and the Lenders associated with the preparation, execution, delivery and administration of this Agreement and the other Loan Documents (including the reasonable fees, disbursements and other charges of counsel) prior to the Petition Date and shall have provided retainers in the aggregate principal amount of $150,000 to the Agent's and the Lenders' professionals prior to the Petition Date;

(c)   The Borrowers shall represent to the Lenders that there are no defaults under any of their Material Contracts due to the action or inaction of the Borrowers occurring after the filing of the Cases, except based solely upon the commencement of the Cases or unpaid prepetition obligations;

(d)   The Bankruptcy Court shall have entered the Interim DIP Order, in form and substance satisfactory to the Lenders, in their reasonable discretion, within three (3) Business Days of the Petition Date, and such order shall be in full force and effect and shall not have been modified or amended (unless otherwise approved by the Lenders), reversed, stayed or appealed or subject to a motion for re-argument or reconsideration;

(e)   The Agent and the Lenders shall have received evidence, in form and substance reasonably satisfactory to the Lenders, that the Borrowers have obtained all requisite consents and approvals in connection with the filing of the Cases and the execution, delivery, and performance of this Agreement and the other Loan Documents;

(f)   No action, proceeding, investigation, regulation or legislation shall have been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby and thereby and which, in Lenders' reasonable judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents;

(g)   The Borrowers shall have filed the Cases in the Bankruptcy Court on or before July 9, 2019, and the Borrowers shall be debtors and debtors in possession under chapter 11 of the Bankruptcy Code;

(h)   All "first day" motions and applications shall have been filed, and all orders with respect thereto, and any other orders entered in the Cases prior to the Closing Date shall be in form and substance reasonably satisfactory to the Lenders;

(i)   All fees required to be paid on the Closing Date under this Agreement shall have been paid;

24

(j)     The aggregate cash balance in the Borrowers' bank accounts shall not exceed $1,000,000 plus the total aggregate amount of disbursements projected for the subsequent week; and

(k)     The Borrowers shall have timely and fully satisfied any and all applicable Milestones required to be satisfied under Section 6.21 on or prior to the date the Borrower requests the Initial Advance to be made.

Section 4.2     Conditions Precedent to All Advances.     The Lenders' obligations to make any Advance hereunder shall be subject to each of the following conditions precedent (the making of any Advance by the Lenders being conclusively deemed to be its satisfaction or waiver of the conditions precedent with respect to such Advance):

(a)     The representations and warranties of the Borrower contained in Article V shall be true and correct in all respects on and as of the date of such Advance as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all respects on and as of such specific date;

(b)     No Default or Event of Default shall have occurred and be continuing on the date of making of such Advance, nor shall either result from the making thereof;

(c)     (x) Prior to the Final DIP Order Entry Date, the Interim DIP Order shall have been entered and be in full force and effect and (y) on and after the Final DIP Order Entry Date, the Final DIP Order shall have been entered and be in full force and effect;

(d)     The Borrowers shall have timely and fully satisfied any and all applicable Milestones required to be satisfied under Section 6.21 on or prior to the date of the requested Advance.

(e)     The Agent shall have received a Notice of Borrowing with respect to such Advance.

(f)     The Approved Budget shall be in form and substance satisfactory to the Agent and the Lenders;

(g)     The Agent and the Lenders shall have received such other approvals or documents as the Agent and the Lenders may reasonably request;

(h)     No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against the Borrower or Lenders;

(i)     For any Advance other than the Initial Advance, the aggregate cash balance in the Borrowers' bank accounts shall not exceed $500,000 plus the total aggregate amount of disbursements projected for the subsequent week; and

(j)      The Lenders shall have received a certificate signed by the Borrowers' chief financial officer certifying the Borrowers' satisfaction of each of the foregoing conditions set forth in this Section 4.2 as of the date of each requested Advance.


# ARTICLE V

# REPRESENTATIONS AND WARRANTIES

The Borrowers jointly and severally represent and warrant to the Agent and the Lenders as follows:

Section 5.1      <u>Existence and Power; Chief Executive Office</u>.    Each Borrower is a corporation or limited liability company, as the case may be, duly incorporated or organized and validly existing under the laws of the jurisdiction of its incorporation or organization, and is duly licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary, except where failure so to be licensed or qualified would not have a Material Adverse Effect.  Each Borrower has all requisite power to conduct its business, to own its properties and to execute and deliver, and to perform all of its obligations under, the Loan Documents to which it is a party.

Section 5.2      <u>Authorization of Borrowing; No Conflict as to Law or Agreements</u>.  The execution, delivery and performance by each Borrower of the Loan Documents to which it is a party and the borrowings from time to time hereunder have been duly authorized by all necessary corporate or limited liability action on the part of such Borrower and do not and will not (i) require any authorization, consent or approval by, or registration, declaration or filing with, or notice to, any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, or any third party, except the entry of Interim DIP Order and the Final DIP Order and except such authorizations, consents, approvals, registrations, declarations, filings or notices as has been obtained, accomplished or given prior to the date hereof, (ii) violate any provision of any law, rule or regulation (including Regulation X of the Board of Governors of the Federal Reserve System) or of any order, writ, injunction or decree presently in effect having applicability to such Borrower, (iii) violate such Borrower's Constituent Documents, or (iv) result in, or require, the creation or imposition of any Lien (other than the Security Interest) upon or with respect to any of the properties now owned or hereafter acquired by such Borrower, or (iv) permit any party to a Material Contract to exercise a remedy terminating such Material Contract or against property of the Borrowers.

Section 5.3      <u>Binding Agreement</u>.  This Agreement and each of the Loan Documents to which a Borrower is a party is a legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 5.4      <u>Subsidiaries</u>.  Each Borrower has no Subsidiaries that are not Borrowers themselves.

Section 5.5      <u>Litigation</u>.  Except as set forth in <u>Schedule 5.5</u> attached hereto or as disclosed in the Cases, as of the date of this Agreement, there are no actions, suits or proceedings

pending or, to a Borrower's knowledge, threatened against or affecting a Borrower or the properties of a Borrower before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, if determined adversely, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.6      Regulation U.  No Borrower is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), and no part of the proceeds of any Advance will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock. Taxes.  Except as set forth on Schedule 5.7 attached hereto or as disclosed in the Cases, the Borrowers have (i) paid or caused to be paid to the proper authorities when due all federal, state, provincial, and local taxes required to be withheld by the Borrowers, (ii) filed all federal, provincial, state and local tax returns which, to the Borrowers' knowledge, are required to be filed, and (iii) paid or caused to be paid to the respective taxing authorities all taxes as shown on said returns or on any assessment received by the Borrowers to the extent such taxes have become due, except, in each case, taxes that are being contested in good faith by appropriate proceedings and for which the applicable Borrower has set aside on its books adequate reserves.

Section 5.7      Titles and Liens.  Each Borrower has good and absolute title to all of its tangible personal property free and clear of all Liens other than the Permitted Existing Liens and Permitted Encumbrances.

Section 5.8      Intellectual Property Rights.

(a)      Owned Intellectual Property.  Schedule 5.9 attached hereto is a complete list of all material Intellectual Property Rights for which a Borrower is an owner of record as of the date of this Agreement (the "Owned Intellectual Property").  Except as disclosed on Schedule 5.9, (i) each Borrower owns its material Owned Intellectual Property free and clear of all restrictions (including covenants not to sue a third party), court orders, injunctions, decrees, writs or Liens, whether by written agreement or otherwise, other than Permitted Existing Liens or Permitted Encumbrances, (ii) no Person other than such Borrower owns or, except under content sharing licenses granted in the ordinary course of business or as set forth on Schedule 5.9, has been granted any right in the material Owned Intellectual Property, (iii) all material Owned Intellectual Property is valid, subsisting and enforceable, and (iv) such Borrower has taken all commercially reasonable action necessary to maintain and protect the material Owned Intellectual Property.

(b)      Intellectual Property Rights Licensed from Others.  Schedule 5.9 is a complete list of all agreements under which a Borrower has licensed Intellectual Property Rights from another Person (the "Licensed Intellectual Property") as of the date of this Agreement other than content sharing licenses granted in the ordinary course of business and readily available, non-negotiated licenses of computer software and other intellectual property used solely for performing accounting, word processing, and similar administrative tasks.  Except as disclosed on Schedule 5.9, the Borrower's licenses to use the Licensed Intellectual Property are free and clear of all restrictions, Liens (other than Permitted Existing Liens and Permitted Encumbrances), court orders, injunctions, decrees, or writs, whether by written agreement or otherwise.  Except as disclosed on Schedule 5.9, the Borrower is not obligated or under any liability whatsoever to make any

payments of a material nature by way of royalties, fees or otherwise to any owner of, licensor of, or other claimant to, any Intellectual Property Rights.

(c)     Infringement.   Except as disclosed on Schedule 5.9, no Borrower has knowledge of, or has received any written claim or notice alleging, any Infringement of another Person's Intellectual Property Rights (including any written claim that such Borrower must license or refrain from using the Intellectual Property Rights of any third party) nor, to such Borrower's knowledge, is there any such threatened claim.

Section 5.9     Real Property.   Schedule 5.10 attached hereto sets forth each lease or sublease for real property to which a Borrower is a party (each a "Leased Real Property") and all fee owned real properties owned by a Borrower (each an "Owned Real Property").   Except as described on Schedule 5.10 attached hereto, each lease or sublease for the Leased Real Property is valid and enforceable in accordance with its terms and is in full force and effect, other than as a result of the commencement of the Cases.   Except as described on Schedule 5.10, no default by any Borrower or, to the Borrowers' knowledge, each other Person that is a party to any lease or sublease for the Leased Real Property exists other than as a result of the commencement of the Cases.   No Equipment, Inventory or other tangible personal property included in the Collateral is located at any real estate location other than the Leased Real Property or the Owned Real Property.

Section 5.10     Indebtedness.   Borrowers have no Indebtedness (other than (i) the Prepetition Obligations, (ii) the Indebtedness described on Schedules 6.3(f) and 6.3(i) and (iii) the Indebtedness owing under the Siena Revolving Loan Agreement) outstanding immediately prior to the Closing Date in excess of $50,000 that is to remain outstanding immediately after giving effect to the closing hereunder on the Closing Date.

Section 5.11     Deposit Accounts and Securities Accounts.   Set forth on Schedule 5.12 is a listing of all of the Borrowers' deposit accounts and securities accounts, including, with respect to each bank or securities intermediary (a) the name and address of such Person, and (b) the account numbers of the Deposit Accounts or Securities Accounts maintained with such Person.

Section 5.12     Complete Disclosure.   All financial statements and other factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about the Borrower's industry) furnished on or before the date hereof by or on behalf of the Borrowers in writing to the Lenders or their advisors (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement or the other Loan Documents, and all other such factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about the Borrowers' industry) hereafter furnished by or on behalf of the Borrowers in writing to the Lenders or their advisors has been, is, and will be, true and accurate, in all material respects, on the date as of which such information is dated or certified (and giving effects to all supplements and updates thereto) and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.

Section 5.13     Leases.   Except defaults solely as a result of the filing of the Cases, the Borrowers enjoy peaceful and undisturbed possession under all Material Leases, and all such Material Leases are valid and subsisting and no material default by the Borrowers has occurred after the filing of the Cases under any of them.

Section 5.14    <u>Material Contracts</u>.   Other than arising as a result of the commencement of the Cases, and except for matters which, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, each Material Contract (other than those that have expired at the end of their normal terms) (a) is in full force and effect and is binding upon and enforceable against the Borrowers and, to the Borrowers' knowledge, each other Person that is a party thereto in accordance with its terms, (b) has not been otherwise amended or modified, and (c) is not in default in any material respect due to the action or inaction of the Borrowers occurring after the filing of the Cases except any defaults based on unpaid prepetition obligations.  The Borrowers are not obligated to pay any service or management fee to any Affiliate of any such Borrower that is not a Borrower under this Agreement.

Section 5.15    <u>Environmental Condition</u>.  Except to the extent that any of the matters referred to in clauses (a), (b), and (d) below could not reasonably be expected to result in a Material Adverse Effect, (a) to the Borrowers' knowledge, none of the Borrowers' properties or assets have ever been used by the Borrowers or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such disposal, production, storage, handling, treatment, release or transport was in violation, in any material respect, of any applicable Environmental Law, (b) to the Borrowers' knowledge, none of the Borrowers' properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, (c) the Borrowers have never received notice that a Lien arising under any Environmental Law has attached to any revenues or to any Real Property owned or operated by the Borrowers, and (d) neither the Borrowers nor any of their facilities or operations is subject to any outstanding written order, consent decree, or settlement agreement with any Person relating to any Environmental Law or any material liability or obligation arising from, or in connection with, any Environmental Law.

Section 5.16    <u>Employee Benefits</u>.  <u>Schedule 5.17</u> attached hereto sets forth all Benefit Plans of the Borrowers and their ERISA Affiliates (if any) or for the benefit of the employees of the Borrowers, including a brief description thereof.  The Borrowers are in compliance with, and have performed all obligations under such Benefit Plans, including having made all contributions required in respect of such Benefit Plans, except to the extent that such failure to comply, perform or make required contributions could not reasonably be expected to result in a Material Adverse Effect.

Section 5.17    <u>Fraudulent Transfer</u>.  No transfer of property is being made by the Borrowers and no obligation is being incurred by the Borrowers in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of the Borrowers.

Section 5.18    <u>No Material Adverse Effect</u>.  Other than arising as the result of the commencement of the Cases, since the Petition Date, no event, circumstance, or change has occurred that has or could reasonably be expected to result in a Material Adverse Effect with respect to the Borrowers.

Section 5.19    <u>Compliance with Laws</u>.  The Borrower (a) is not in violation of any applicable laws, rules, regulations, executive orders, or codes (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, and (b) is not subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

Section 5.20    U.S.A. Patriot Act.  To the extent applicable, each Borrower is in compliance, in all material respects, with the (i) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (the "U.S.A. Patriot Act").  No part of the proceeds of the Advances will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

Section 5.21    OFAC.  No Borrower nor any of its Subsidiaries, (i) is a person who is listed under Annex A to, or whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of, Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079(2001)); (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such person in any manner violative of Section 2; (iii) is a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order; (iv) is otherwise blocked, subject to sanctions under or engaged in any activity in violation of any other economic sanctions regulations administered and enforced by the United States or any enabling legislation or executive order relating to any of the foregoing; or (v) is a person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with any entity or person listed in clauses (i) through (iv) of this subsection.

Section 5.22    Approved Budget.  Attached hereto as Exhibit C is a true and complete copy of the Approved Budget, in form and substance satisfactory to the Lenders.  The Approved Budget has been prepared on a reasonable basis and represents (and as of the date on which any other Approved Budget is delivered to Lenders, such additional Approved Budget represents) the Borrowers' good faith estimate, based on diligent investigation, on the date such Approved Budget is delivered, of the Borrowers' future performance for the periods covered thereby based upon the Borrowers' good faith assumptions believed by the Borrowers to be reasonable at the time of the delivery thereof to the Lenders or their advisors.  The Borrowers are not aware of any information that would lead them to believe that such Approved Budget is not attainable.

Section 5.23    Financing Orders.  The Interim DIP Order and, at all times after its entry by the Bankruptcy Court, the Final DIP Order, has been duly entered, is valid, subsisting and continuing (and provides for, among other things, a valid, perfected, continuing, enforceable, non-avoidable first priority priming Lien on the Collateral of each Borrower in favor of the Agent) and except as otherwise expressly consented to by the Lenders, has not been vacated, modified, reversed on appeal, or vacated or modified by any bankruptcy or district court judge and is not subject to any pending stay.  On and after the date any other Financing Order is entered by the Bankruptcy Court, such other Financing Order shall have been duly entered, valid, subsisting and continuing and except as otherwise expressly consented to by the Lenders, shall not have been vacated, modified, reversed on appeal, or vacated or modified by any bankruptcy or district court judge and shall not be subject to any pending stay.

Section 5.24    Super-Priority Claims.  All Obligations of the Debtors incurred during the pendency of the Cases, in addition to being secured by the Collateral, constitute Super-Priority Claims, as more fully set forth in the Financing Orders, subject to the Carve-Out and any other Super-Priority Claims to the extent set forth in the Financing Orders.

## ARTICLE VI

## COVENANTS

The Borrowers will comply with the following requirements, unless the Lenders shall otherwise consent in writing:

Section 6.1     Reporting Requirements.  The Borrowers will (i) hold weekly telephonic conference calls with their advisors, the Lenders and advisors to the Lenders during which the Borrowers and their advisors shall report on, among other things, any material developments in the Cases, and (ii) deliver, or cause to be delivered, to the Agent and the Lenders each of the following:

(a)     Annual Financial Statements.  Within one hundred and twenty (120) days after the end of each fiscal year, commencing with the fiscal year ending December 31, 2019, unaudited financial statements of Holdings and its respective Subsidiaries on a consolidated basis, including, but not limited to, statements of income and cash flows for such fiscal year and the balance sheet as at the end of such fiscal year, all prepared in accordance with GAAP, and in reasonable detail.

(b)     Quarterly Financial Statements.  Within forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year, commencing with the fiscal quarter ending June 30, 2019, an unaudited balance sheet of Holdings and its respective Subsidiaries, on a consolidated basis and unaudited statements of income and cash flows of Holdings and its Subsidiaries on a consolidated basis, reflecting results of operations from the beginning of the fiscal year to the end of such fiscal quarter and for such fiscal quarter, in each case, presenting fairly in all material respects the financial condition and results of operations of Holdings and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes. Each such balance sheet, statement of income and statement of cash flows shall set forth comparisons of the figures for the current fiscal quarter and the current year-to-date with the figures for the same fiscal quarter and year-to-date period of the immediately preceding fiscal year.

(c)     Monthly Reports.  Within fourteen (14) days after the end of each fiscal month, a report, in form and detail reasonably acceptable to the Agent and the Lenders and certified by the Borrowers' chief financial officer, showing Borrowers' management-prepared draft financial statements for such fiscal month, including balance sheet, statement of operations and summary of cash activity for such month.

(d)     Budget.  (i) Prior to 5:00 p.m. (prevailing Eastern time) on the fourth Business Day of the calendar week following the Petition Date and on such Business Day of every calendar week thereafter, an updated cash flow projection covering the next 9-week period, in form and substance reasonably acceptable to the Lenders and (y) prior to 5:00 p.m. (prevailing Eastern time) on the fourth Business Day of every calendar week following the Petition Date, a budget compliance report showing all variances by line-item on a week-by-week and cumulative basis from the amounts set forth in the Approved Budget for such period, together with a certification from the Borrowers' chief

financial officer or chief restructuring officer that no deviation from the Approved Budget for such period in excess of the permitted deviations set forth in Section 6.20 has occurred.  The Approved Budget may be updated, modified or supplemented (with the consent of the Lenders and/or at the reasonable request of the Lenders) from time to time, and each such updated, modified or supplemented budget shall be approved by, and in form and substance satisfactory to, the Lenders and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, that during the fifth (5th) week of the initial Approved Budget (and the fifth (5th) week of each successive Approved Budget thereafter), the Borrowers shall submit a budget for the next successive nine week period to the Lenders, which budget shall be in form and substance acceptable to the Lenders, and approved by the Lenders; provided, further, that in the event that the Lenders cannot, while acting in good faith, agree as to an updated, modified or supplemented budget, the most recent Approved Budget shall remain in effect.

(e)     Litigation.  Immediately after the commencement thereof, notice in writing of all litigation and proceedings against a Borrower before any governmental or regulatory agency, other than claims, litigation or proceedings under the Cases.

(f)     Defaults.  Promptly after a Borrower becomes aware of a Default, an Event of Default or a Material Adverse Effect, notice in writing of such occurrence.

(g)     Collateral.  Promptly upon knowledge thereof, notice in writing of any loss of or material damage to any Collateral with a fair market value in excess of $500,000 or of any substantial adverse change in any Collateral with a fair market value in excess of $500,000.

(h)     Violations of Law.  Promptly upon knowledge thereof, notice in writing of a Borrower's violation in any respect of any law, rule or regulation that has or could reasonably be expected to result in a Material Adverse Effect.

(i)     Chapter 11 Case Pleadings.  Advance copies of all applications, motions, and pleadings of any kind to be filed by a Borrower in the Cases not later than two days prior to the filing thereof (or upon such lesser notice acceptable to the Agent in its sole discretion).

(j)     Committee Reports.  Promptly after sending thereof, copies of all financial reports given by a Borrower to any Committee in the Cases, other than any such reports subject to privilege; provided that such Borrower may redact any confidential information contained in any such report if such Borrower provides to the Agent a summary of the nature of the information so redacted.

(k)     Other Information.  Such other information reasonably related to the Obligations, the Collateral, the Loan Documents or the transactions contemplated hereby or thereby (including access to the Borrowers' books, records, personnel and advisors) as the Agent (acting at the written request of the Lenders) may reasonably request.

Section 6.2     Permitted Existing Liens; Financing Statements.

(a)     The Borrowers will not create, incur or suffer to exist any Lien upon any of their assets, now owned or hereafter acquired, to secure any Indebtedness; excluding, however, from the operation of the foregoing, the following:

(i)     Liens granted in connection with the Siena Revolving Loan Agreement and super-priority adequate protection claims in connection therewith;

(ii)    Liens in favor of the agent and the lenders under the Prepetition Term Loan Agreement, and any replacement Liens and super-priority adequate protection claims in connection therewith;

(iii)   Liens existing as of the Closing Date and described on Schedule 6.2;

(iv)    the Security Interest and Liens created by the Security Documents.

(b)     The Borrowers will not amend any financing statements in favor of the Agent or the Lenders except as permitted by Applicable Law.

Section 6.3     Indebtedness.  The Borrowers will not incur, create, assume or permit to exist any Indebtedness, except for the following:

(a)     Indebtedness of the Borrowers under the Prepetition Term Loan Agreement;

(b)     Indebtedness to trade creditors incurred in the ordinary course of business;

(c)     Indebtedness for deferred taxes, to the extent permitted or required to be accounted for under GAAP;

(d)     Indebtedness incurred pursuant to this Agreement;

(e)     Indebtedness of the Borrowers under Siena Revolving Loan Agreement;

(f)     Indebtedness existing as of the Closing Date, including any Indebtedness of the Borrowers as an account party in respect of trade letters of credit and set forth on Schedule 6.3(f);

(g)     intercompany Indebtedness between the Borrowers;

(h)     Guarantees by the Company of Indebtedness of any Subsidiary if the Company and by any Subsidiary of the Company of Indebtedness of the Company or any other Subsidiary of the Company; and

(i)     obligations in respect of Capital Leases existing as of the Closing Date and set forth on Schedule 6.3(i) and extension, renewals and replacements of any such Capital Leases that do not increase the outstanding principal amount thereof.

Section 6.4       Books and Records; Collateral Examination, Inspection and Appraisals.

(a)       Each Borrower will keep accurate books of record and account pertaining to the Collateral and pertaining to its business and financial condition and such other matters as the Agent or the Lenders may from time to time request in which true and complete entries will be made in accordance with GAAP and, upon the request of the Agent, the Lenders or any individual Lender, will permit any officer, employee, attorney, accountant or other agent of the Agent or Lenders to audit and review copies of any and all Books and Records of such Borrower at all times during ordinary business hours, to send and discuss with account debtors and other obligors requests for verification of amounts owed to the Borrowers, retain electronic copies of any Books and Records provided to the Agent or any Lender, and to discuss the Borrowers' affairs with any of their directors, executive officers or the CRO.

(b)       The Borrowers will permit the Agent, the Lenders and any of their respective employees, accountants, attorneys or agents to examine and inspect any Collateral or any other property of the Borrowers, to conduct appraisals and valuations, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at any time during ordinary business hours.   Notwithstanding the foregoing, the Agent and the Lenders (taken together) may perform an appraisal of the Debtors' Sand Reserves at the expense of the Borrowers only once during any calendar year (or at any time upon the occurrence and during the continuance of an Event of Default).

Section 6.5       Compliance with Laws.

(a)       The Borrowers shall (i) comply in all material respects with the requirements of Applicable Laws and regulations and (ii) comply in all respects with the Financing Orders and (iii) use and keep the Collateral, and require that others use and keep the Collateral, only for lawful purposes, without a material violation of any federal, state, provincial or local law, statute or material ordinance.

(b)       The Borrowers shall (i) not use or permit the use of the proceeds hereof or any other financial accommodation from the Lenders to violate any of the foreign asset control regulations of the Office of Foreign Assets Control ("OFAC"), (ii) comply, and cause each Subsidiary to comply, with all applicable Bank Secrecy Act laws and regulations, as amended from time to time and (iii) otherwise comply with the U.S.A. Patriot Act as required by federal law and the Lender's policies and practices.

Section 6.6       Payment of Taxes and Other Claims.  Each Borrower will pay or discharge, when due, (a) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties belonging to it (including the Collateral) or upon or against the creation, perfection or continuance of the Security Interest, prior to the date on which penalties attach thereto, (b) all federal, state, provincial and local taxes required to be withheld by it and (c) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a Lien upon any properties of such Borrower; provided that no Borrower shall be required to pay any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate

proceedings and for which proper reserves have been made; provided, further, that no Borrower shall be required to make any payments or take any such action that is not permitted by applicable bankruptcy law or by order of the Bankruptcy Court; provided, further that no Borrower shall pay directly, or make any distributions to any of its members on account of, any of its members' tax liability.

Section 6.7     Maintenance of Properties and Intellectual Property.

(a)     Each Borrower will keep and maintain the Collateral and all of its other properties necessary or useful in its business in all material respects in good condition, repair and working order (normal wear and tear excepted); provided that no properties need be so repaired and maintained in working order if the Borrowers reasonably determine that such action is not necessary for the continued efficient and profitable operation of the business of such Borrower; provided that the Borrowers comply with all Applicable Law.  The Borrowers will take all commercially reasonable steps necessary to protect and maintain their respective material Intellectual Property Rights.

(b)     The Borrowers will defend the Collateral against all Liens (other than Permitted Existing Liens and Permitted Encumbrances), claims or demands of all Persons (other than those of the Agent, the Lenders, the holders of Permitted Existing Liens and the holders of Permitted Encumbrances) claiming the Collateral or any interest therein. The Borrowers will keep all Collateral free and clear of all Liens except Permitted Existing Liens and Permitted Encumbrances.  Each Borrower will take all commercially reasonable steps necessary to prosecute any Person Infringing its material Intellectual Property Rights and to defend itself against any Person accusing it of infringing any Person's Intellectual Property Rights that could reasonably be likely to result in a Material Adverse Effect.

Section 6.8     Formation of Subsidiaries.     The Borrowers have no Subsidiaries that are not Borrowers themselves.  The Borrowers may not form a direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Closing Date without the consent of the Agent and the Lenders, in their sole discretion.  Any Subsidiary that is formed after the Closing Date shall be a guarantor of the Obligations hereunder, and shall execute an appropriate agreement in form and substance acceptable to the Lenders.

Section 6.9     Further Assurances.  At any time upon the reasonable request of the Agent or the Lenders, execute or deliver to the Lenders any and all financing statements, control agreements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, mortgages, deeds of trust, and all other documents (collectively, the "Additional Documents") that a Lender may reasonably request in form and substance reasonably satisfactory to the Lenders, to create, perfect, and continue perfected or to better perfect the Lenders' Liens in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens in favor of the Lenders in any Collateral acquired by the Borrowers after the Closing Date, and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents.  To the maximum extent permitted by Applicable Law, the Borrowers authorize the Lenders to execute any such Additional Documents in the Borrowers' names, and authorize the Lenders to file such executed Additional Documents in any appropriate filing office.

Section 6.10     Staffing.  The Borrowers shall maintain at all times an appropriate and necessary staff to carry out their business in compliance with all other Applicable Laws

and with training and experience and in number equal to or greater than would be customarily maintained by businesses engaging in similar activities, except where the failure to maintain such staff could not, after taking into account any formal or informal compliance deadline extensions granted by applicable regulatory authorities in effect, reasonably be expected to result in a Material Adverse Effect.

Section 6.11    Material Contracts.  The Borrowers may not (a) enter into any Material Contracts and Material Leases after the Petition Date without the consent of the Agent and the Lenders in their reasonable discretion, (b) without prior consultation with the Agent and the Lenders, amend or modify a Material Contract or Material Lease after the Petition Date except for ministerial amendments or modifications to existing Material Contracts and Material Leases in the ordinary course of business.

Section 6.12    Insurance.  The Borrowers will keep and at all times maintain the insurance listed on Schedule 6.12 attached hereto, with any loss payable to the Agent to the extent of its interest, and at the Agent's request (acting at the written direction of the Lenders), the Borrowers will use their best efforts to provide that all policies of such insurance shall contain a lender's loss payable endorsement for the Agent's benefit consistent with this Agreement.

Section 6.13    Preservation of Existence.  Each Borrower will preserve and maintain its existence and all of its material rights, privileges and franchises necessary or desirable in the normal conduct of its business and shall conduct its business in all material respects in an orderly, efficient and regular manner.

Section 6.14    Delivery of Instruments.  Upon request by the Agent (acting at the written direction of the Lenders), each Borrower will promptly deliver to the Agent in pledge all instruments, documents and chattel paper constituting Collateral, duly endorsed or assigned by such Borrower.

Section 6.15    Sale or Transfer of Assets.  No Borrower will sell, lease, assign, transfer or otherwise dispose of all or any portion of its assets or property (including any Collateral or any interest therein), whether in one transaction or in a series of transactions, to any other Person, except for sales in the ordinary course of business.  No Borrower will permit any agreement under which it has licensed material Licensed Intellectual Property to lapse.  No Borrower will license any other Person to use any of its Intellectual Property Rights, except under content sharing licenses granted or similar agreements entered into in the ordinary course of business.

Section 6.16    Consolidation and Merger; Asset Acquisitions.    No Borrower will consolidate or amalgamate with or merge into any Person, or permit any other Person to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation, amalgamation or merger) all or substantially all the assets of any other Person, unless prior to or concurrently therewith the Lenders are paid in full for all Obligations (other than contingent indemnification and reimbursement obligations in respect of which no claim for payment has been asserted).

Section 6.17    Place of Business; Name.  No Borrower will transfer its chief executive office or principal place of business, or move, relocate, close or sell any business location.  No Borrower will permit any tangible Collateral or any records pertaining to the Collateral to be located in any state, province or area in which, in the event of such location, a financing statement covering such Collateral would be required to be, but has not in fact been, filed in order to perfect the Security Interest. No Borrower will change its name or jurisdiction of organization.

Section 6.18    <u>Performance by the Agent</u>.  If a Borrower at any time fails to perform or observe any of the foregoing covenants contained in this <u>Article VI</u> or elsewhere herein, immediately upon the occurrence of such failure and during the continuance of an Event of Default, the Agent may, but need not, perform or observe such covenant on behalf and in the name, place and stead of such Borrower (or, at the Agent's option, in the Agent's name) and may, but need not, take any and all other actions that the Agent may reasonably deem necessary to cure or correct such failure (including the payment of taxes, the satisfaction of Liens, the performance of obligations owed to account debtors or other obligors, the procurement and maintenance of insurance, the execution of assignments, security agreements and financing statements, and the endorsement of instruments); and the Borrowers shall thereupon pay to the Agent promptly on demand the amount of all monies expended and all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by the Agent in connection with or as a result of the performance or observance of such agreements or the taking of such action by the Agents, together with interest thereon from the date expended or incurred at the interest rate set forth in <u>Section 2.4(a)</u>.  To facilitate the Agent's performance or observance of such covenants of the Borrowers, each Borrower hereby irrevocably appoints each of the Agent, or its delegate, acting alone or together, as such Borrower's attorney in fact (which appointment is coupled with an interest) with the right (but not the duty) from time to time to create, prepare, complete, execute, deliver, endorse or file in the name and on behalf of such Borrower any and all instruments, documents, assignments, security agreements, financing statements, applications for insurance and other agreements required to be obtained, executed, delivered or endorsed by such Borrower hereunder.

Section 6.19    <u>Financing Orders; Administrative Priority; Lien Priority; Payment of Claims</u>.  No Borrower will:

(a)    at any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any Financing Order, except for modifications and amendments agreed to by the Lenders in their sole discretion in advance and in writing;

(b)    at any time, suffer to exist a priority for any administrative expense or unsecured Claim against a Borrower (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c) 726 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Agents and the Lenders in respect of the Obligations;

(c)    at any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Liens in favor of the Agent for the benefit of the Lenders in respect of the Collateral with respect to the Obligations, except for Permitted Existing Liens; and

(d)    prior to the date on which all Obligations (other than contingent indemnification and reimbursement obligations in respect of which no claim for payment has been asserted) have been fully and indefeasibly paid and satisfied, pay any administrative expense claims except (i) Obligations due and payable hereunder, (ii) administrative expenses incurred in the ordinary course of such Borrower's business as contemplated by this Agreement and the Approved Budget, and (iii) as may otherwise be authorized or ordered by the Bankruptcy Court in accordance with the Approved Budget.

Section 6.20    Budget Compliance.  Beginning the second full calendar week after the Petition Date and as of each Friday thereafter, the Borrowers shall not permit (a) the actual aggregate amount of all cash disbursements (other than cash disbursements for the payment professional fees and expenses) for all line items in the Approved Budget (measured on a cumulative, weekly roll-forward basis not to exceed four (4) calendar weeks) to exceed 115% of the projected aggregate cash disbursements during such period (measured on a cumulative, weekly roll-forward basis not to exceed four (4) calendar weeks) and (ii) the actual aggregate amount of all cash receipts for all line items in the Approved Budget (measured on a cumulative, weekly roll-forward basis not to exceed four (4) calendar weeks) to be less than 75% of the projected aggregate cash receipts during such period (measured on a cumulative, weekly roll-forward basis not to exceed four (4) calendar weeks).

Section 6.21    Milestones.   The Borrowers shall ensure that each of the milestones set forth below (the "Milestones") are achieved in accordance with the applicable timing set forth below (or such later dates as approved by the Lenders):

(a)    On the Petition Date, the Borrowers shall file the DIP Financing Motion, which motion shall be in form and substance reasonably acceptable to the Agent and the Lenders.

(b)    Not later than three (3) Business Days after the Petition Date, the Borrowers shall obtain entry of the Interim DIP Order.

(c)    Not later than thirty-five (35) days after the Petition Date, the Borrowers shall obtain entry of the Final DIP Order.

(d)    Not later than twenty-five (25) days after the Petition Date, the Borrowers shall file with the Bankruptcy Court a chapter 11 plan of reorganization acceptable to the Agent and the Lenders (the "Plan") and an accompanying disclosure statement acceptable to the Agent and the Lenders (the "Disclosure Statement").

(e)    Not later than fifty-five (55) days after the Petition Date, the Bankruptcy Court shall enter an order approving the Disclosure Statement (the "Disclosure Statement Order").

(f)    Not later than eighty-six (86) days after the Petition Date, the Bankruptcy Court shall enter the order confirming the Plan (the "Confirmation Order").

(g)    Not later than ninety-eight (98) days after the Petition Date, the Plan shall become effective.

## ARTICLE VII

## EVENTS OF DEFAULT, RIGHTS AND REMEDIES

Section 7.1    Events of Default. "Event of Default", wherever used herein, means any one of the following events:

(a) The Borrowers shall fail to pay when due and payable, or when declared due and payable, all or any portion of the principal of the Advances or any of the other Obligations (including interest, fees and expenses and any portion thereof);

(b) A Borrower shall default in the performance of any material term, covenant or agreement contained in this Agreement, the other Loan Documents, or the Financing Orders (other than a payment default set forth in clause (a) above), which default is not cured within three (3) Business Days after the earlier of (i) a Borrower becoming aware of such default and (ii) notice thereof from Agent to Borrowers (except to the extent that any other material term, covenant or agreement is expressly and separately addressed in this Section 7.1);

(c) If any warranty, representation, certificate, statement, or record made herein or in any other Loan Document or delivered in writing to the Agent or any Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except, that, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof;

(d) The validity or enforceability of any Loan Document shall at any time for any reason be declared to be null and void, or a proceeding shall be commenced by a Borrower or by any Governmental Authority having jurisdiction over a Borrower, seeking to establish the invalidity or unenforceability thereof, or a Borrower shall deny that such Borrower has any liability or obligation purported to be created under any Loan Document;

(e) The Borrowers shall fail to file the DIP Financing Motion on the Petition Date in form and substance acceptable to the Agent and the Lenders, in their reasonable discretion;

(f) Any of the Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(g) The filing of a proposed plan of reorganization or liquidation by any Borrower, which plan does not provide for the indefeasible payment in full in cash of the Obligations as of the effective date of such plan or which plan is not acceptable to the Agent and the Lenders in their reasonable discretion;

(h) The entry of an order confirming a plan of reorganization that does not require repayment in full of the Obligations in cash as of the effective date of such plan or which plan is not acceptable to the Agent and the Lenders in their reasonable discretion;

(i) The appointment in any of the Cases of a trustee under section 1104 of the Bankruptcy Code or an examiner with enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;

(j)      The Company's termination of the engagement of the CRO of the Company or the material impairment or reduction of the responsibilities and activities of the CRO by the Company;

(k)      The entry of an order amending, supplementing, staying, vacating, revoking, reversing or otherwise modifying this Agreement, the Financing Orders, or any agreement relating to the Loan Documents, without the prior written consent of the Lenders;

(l)      The entry of an order permitting any claim against, or obligation of, any Borrower (now existing or hereafter arising, of any kind or nature whatsoever), to have priority equal or superior to the priority of the Agent or the Lenders in respect of this Agreement and the Security Interest, other than the Carve-Out;

(m)      Any attempt by either a Borrower, or any officer, director or affiliate thereof, or any party related thereto, to invalidate, reduce, or otherwise impair any of the rights, claims, or liens of the Agent or the Lenders under this Agreement, the Financing Orders or other Loan Agreements, or any such rights, claims, or liens shall, for any reason, cease to be valid;

(n)      The assertion by any Borrower of a surcharge right or claim or the entry of an order that subjects the Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code;

(o)      Any material payment (in excess of $250,000) is made on, or application for authority to pay (which is supported, directly or indirectly, by any Borrower, or is not being actively contested by each Borrower in good faith), any material prepetition claim without the Lenders' consent;

(p)      An order is entered granting any creditor relief from the automatic stay to exercise rights with respect to property of the estate having a value of more than $500,000 or which has a material effect on the ability of any Borrower to operate its business consistent with current practice, maintain any material license or privilege, or dispose of the Collateral as an enterprise or going concern;

(q)      Any Advances or any portion of the Carve-Out is utilized to prosecute actions, claims, demands, or causes of action against the Lenders or to object to or contest in any manner or to raise any defense in any pleading to the entry of the Financing Orders, the validity, perfection, priority, or enforceability of this Agreement, or the rights, claims, liens, and security interests granted to the Agent or the Lenders under this Agreement or the Financing Orders;

(r)      The entry of an order authorizing or approving any Borrower's assumption, assignment, and/or rejection of any material executory contract or unexpired lease without the Lenders' prior written consent;

(s)      The sale by any Borrower, or the entry of an order approving the sale by any Borrower, of any material assets outside of the ordinary course of business without the Lender's prior written consent;

(t)      A motion or application for any of the orders or actions described in clauses (b), (f), (i), (j), (k), (l), (m), (n), (o), (q) or (s) shall be made by any person, including any Committee appointed in the Cases, without the Lenders' prior written consent, and such motion or application either is in collusion with or supported, directly or indirectly, by any Borrower, or is not actively contested by each Borrower in good faith within the applicable objection period;

(u)      Without prior written consent of the Lenders, any Borrower shall have failed to satisfy any of the Milestones set forth in Section 6.21 (provided that any such Milestones may be extended upon prior written consent of the Agent and the Lenders in their sole and absolute discretion);

(v)      The occurrence and notice of default of (i) a Material Adverse Effect, recognizing that the Borrowers are filing the Cases, (ii) the material impairment of the ability of any Borrower to meet its obligations substantially as set forth in the Approved Budget or to otherwise perform its obligations in connection with this Agreement, (iii) the imposition of any obligation on the Agent or the Lenders, compliance with which would materially impair the Agent's or the Lenders' ability to receive its contemplated economic benefits hereunder, (iv) the material impairment of the validity or enforceability of, or the rights, claims, liens, remedies, or benefits available to the Agent and the Lenders under the Financing Orders,  or any Loan Document or (v) the material impairment of the validity, perfection, or priority of the Security Interest or any lien granted in favor of the Agent or the Lenders; or

(w)      Without the prior written consent of the Lenders, a Borrower shall have made any disbursement not permitted under Section 2.8 hereof, except for the permitted deviations in amounts set forth in Section 6.20 hereof.

Section 7.2      Rights and Remedies.  Upon an Event of Default:

(a)      during any Default Period:

(i)      the Lender may, by notice to the Borrowers, declare the Obligations to be forthwith due and payable, whereupon all Obligations shall become and be forthwith due and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which the Borrowers hereby expressly waive, and the obligations of the Lender to make any further Advances hereunder shall terminate; and

(ii)      upon five (5) business days' written notice to the Borrowers and any Committee and the filing of such written notice with the Bankruptcy Court, (A) the Agent may exercise any or all of the following rights and remedies and (B) relief from the automatic stay provided under Section 362 of the Bankruptcy Code shall be deemed automatically lifted or modified to the extent necessary to

allow the Lender to take the actions described in this <u>Section 7.2</u>, or under any other Loan Document without further notice or a hearing, (<u>provided</u> that the Borrowers, the United States Trustee and Committee may seek an emergency hearing before the Bankruptcy Court to be heard in connection herewith);

(b)     the Agent shall have, in addition to all other rights provided herein and in each other Loan Document, the rights and remedies of a secured party under the UCC, and under other Applicable Law, all other legal and equitable rights to which the Agent may be entitled, including the right to take immediate possession of the Collateral, to require the Borrowers to assemble the Collateral, at the Borrowers' expense, and to make it available to the Agent at a place designated by the Agent that is reasonably convenient to both parties and to enter any of the premises of a Borrower or wherever the Collateral shall be located, with or without force or process of law, and to keep and store the same on said premises until sold (and if said premises be the property of a Borrower, such Borrower agrees not to charge the Lender for storage thereof).  In addition, the Agent may, at any time or times after the occurrence of an Event of Default that is continuing, sell and deliver all Collateral held by or for the Agent at public or private sale for cash, upon credit bid by the Agent or the Lenders or otherwise, at such prices and upon such terms as the Agent deems advisable or the Agent may otherwise recover upon the Collateral in any commercially reasonable manner.  The requirement of reasonable notice shall be met if such notice is mailed postage prepaid to Borrowers at Borrowers' address as shown in <u>Section 9.3</u>, at least ten (10) calendar days before the time of the event of which notice is being given.  The Agent or the Lenders may be the purchaser at any sale, if it is public.  In connection with the exercise of the foregoing remedies, and not without limitations of any remedies with respect to Intellectual Property Rights Collateral, the Lender may exercise the rights and license granted under <u>Section 3.6</u>.  The proceeds of sale, if any, shall be applied first to all costs and expenses of sale, including reasonable attorneys' fees, and second to the payment (in whatever order the Agent (acting at the written direction of the Lenders) elects) of all Obligations.   After the indefeasible payment and satisfaction in full of all of the Obligations (other than contingent indemnification and reimbursement obligations in respect of which no claim for payment has been asserted), and after the payment by the Agent of any other amount required by any provision of law, including Section 9-608(a)(1) of the UCC (but only after the Agent has received what the Agent considers reasonable proof of a subordinate party's security interest), the surplus, if any, shall be paid to the Borrowers or to whosoever may be lawfully entitled to receive the same, or as a court of competent jurisdiction may direct. The Borrowers shall remain liable to the Agent and the Lenders for any deficiency.  The Parties hereto each hereby agree that the exercise by any Party hereto of any right granted to it or the exercise by any Party hereto of any remedy available to it (including, without limitation, the issuance of a notice of redemption, a borrowing request and/or a notice of default), in each case, hereunder or under any Loan Document shall not constitute confidential information and no party shall have any duty to the other Party to maintain such information as confidential;

(c)     the Agent may exercise and enforce its rights and remedies under the Interim DIP Order, the Final DIP Order and/or the Security Documents;

(d)     the Lenders may exercise any other rights and remedies available to them by Applicable Law or agreement; and

(e)     the Lenders shall be entitled to seek the appointment of a Chapter 11 trustee and have an expedited hearing with respect to such request, subject to the Bankruptcy Court's calendar.

## ARTICLE VIII

## AGENT

Section 8.1     Appointment, Authority and Duties of Agent; Appointment and Authority.  Each Lender appoints and designates BSP as the Agent under all Loan Documents.  The Agent may, and each Lender authorizes Agent to, enter into all Loan Documents to which the Agent is intended to be a party and accept all Security Documents.  Any action taken by the Agent in accordance with the provisions of the Loan Documents, and the exercise by the Agent of any rights or remedies set forth therein, together with all other powers reasonably incidental thereto, shall be authorized by and binding upon all Lenders.  Without limiting the generality of the foregoing, the Agent shall have the sole and exclusive authority to (a) act as the disbursing and collecting agent for Lenders with respect to all payments and collections arising in connection with the Loan Documents; (b) execute and deliver as the Agent each Loan Document, including any intercreditor or subordination agreement, and accept delivery of each Loan Document; (c) act as collateral agent for the Secured Parties for purposes of perfecting and administering Liens under the Loan Documents, and for all other purposes stated therein; (d) manage, supervise or otherwise deal with Collateral; and (e) take any enforcement action or otherwise exercise any rights or remedies with respect to any Collateral or under any Loan Documents, Applicable Law or otherwise.

(b)     Duties.  The title of "Agent" is used solely as a matter of market custom and the duties of the Agent are administrative in nature only.  Agent has no duties except those expressly set forth in the Loan Documents, and in no event does the Agent have any agency, fiduciary or implied duty to or relationship with any Secured Party or other Person by reason of any Loan Document or related transaction.  The conferral upon the Agent of any right shall not imply a duty to exercise such right, unless instructed to do so by the applicable percentage of Lenders in accordance with this Agreement

(c)     Agent Professionals.  The Agent may perform its duties through agents and employees.  The Agent may consult with and employ attorneys, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by the Agent (such professionals, the "Agent Professionals"), and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by an Agent Professional.  Agent shall not be responsible for the negligence or misconduct of any agents, employees or Agent Professionals selected by it with reasonable care.

(d)    <u>Instructions of Lenders</u>.    The rights and remedies conferred upon the Agent under the Loan Documents may be exercised without the necessity of joining any other party, unless required by Applicable Law.    The Agent may request instructions from Lenders with respect to any act (including the failure to act) in connection with any Loan Documents or Collateral, and may seek assurances to its satisfaction from Lenders of their indemnification obligations against Claims that could be incurred by the Agent. The Agent may refrain from any act until it has received such instructions or assurances, and shall not incur liability to any Person by reason of so refraining.    Instructions of the Lenders shall be binding upon all Lenders, and no Lender shall have any right of action whatsoever against the Agent as a result of the Agent acting or refraining from acting pursuant to instructions of the Lenders.    In no event shall the Agent be required to take any action that it determines in its discretion is contrary to Applicable Law or any Loan Documents or could subject any Agent Indemnitee to liability.

(e)    <u>Agreements Regarding Collateral and Borrower Materials; Lien Releases; Care of Collateral</u>.    The Secured Parties authorize the Agent to release any Lien with respect to any Collateral (i) upon the payment in full of the Obligations (other than contingent indemnification and reimbursement obligations in respect of which no claim for payment has been asserted), (ii) that is the subject of a disposition that the Borrowers certify in writing is a disposition permitted hereunder (and the Agent may rely conclusively on any such certificate without further inquiry) or (iii) with the consent of the Lenders.    The Agent has no obligation to assure that any Collateral exists or is owned by a Borrower, or is cared for, protected or insured, nor to assure that the Agent's Liens have been properly created, perfected or enforced, or are entitled to any particular priority, nor to exercise any duty of care with respect to any Collateral.    With respect to any release of Collateral pursuant to this <u>Section 8.1(e)</u>, the Agent shall have the right to seek approval from the Lenders and shall be fully protected in acting or refraining from acting until it receives such direction

(f)    <u>Possession of Collateral</u>.    The Lenders appoint BSP to act as Agent (for the benefit of the Lenders) for the purpose of perfecting Liens in Collateral held or controlled by it, to the extent such Liens are perfected by possession or control.    If any Lender obtains possession or control of any Collateral, it shall notify in writing the Agent thereof and, promptly upon the Agent's request, deliver such Collateral to the Agent or otherwise deal with it in accordance with the Agent's instructions.

(g)    <u>Reliance by Agent</u>.    The Agent shall be entitled to rely, and shall be fully protected in relying, upon any certification, notice or other communication (including those by telephone, telex, telegram, telecopy, e-mail or other electronic means) believed by it to be genuine and correct and to have been signed, sent or made by the proper Person.    The Agent shall have a reasonable and practicable amount of time to act upon any instruction, notice or other communication under any Loan Document, and shall not be liable for any delay in acting.

Section 8.2    <u>Action Upon Default</u>.    The Agent shall not be deemed to have knowledge of any Default or Event of Default, or of any failure to satisfy any conditions in <u>Section 7</u> unless it has received written notice from a Borrower or the Lenders specifying the occurrence and nature

thereof and such writing is conspicuously labeled as a notice of default.  If a Lender acquires knowledge of a Default, Event of Default or failure of such conditions, it shall promptly notify Agent and the other Lenders thereof in writing.  Each Secured Party agrees that, except as otherwise provided in any Loan Documents or with the written consent of the Lenders, it will not accelerate Obligations or assert any rights relating to any Collateral.

Section 8.3    Ratable Sharing.    If any Lender obtains any payment or reduction of any Obligation, whether through set-off or otherwise, in excess of its ratable share of such Obligation, such Lender shall forthwith purchase from Lenders participations in the affected Obligation as are necessary to share the excess payment or reduction on a pro rata basis or in accordance with Section 2.4(d), as applicable.  If any of such payment or reduction is thereafter recovered from the purchasing Lender, the purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

Section 8.4    Indemnification.    EACH LENDER SHALL INDEMNIFY AND HOLD HARMLESS AGENT INDEMNITEES, TO THE EXTENT NOT TIMELY REIMBURSED BY THE BORROWERS, ON A PRO RATA BASIS, AGAINST ALL CLAIMS THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY SUCH INDEMNITEE, PROVIDED THAT ANY CLAIM AGAINST AN AGENT INDEMNITEE RELATES TO OR ARISES FROM ITS ACTING AS OR FOR AGENT (IN THE CAPACITY OF AGENT).  In the Agent's discretion, it may reserve for any Claims made against an Agent Indemnitee, and may satisfy any judgment, order or settlement relating thereto, from proceeds of Collateral prior to making any distribution of Collateral proceeds to the other Secured Parties.  If Agent Indemnitee is sued by any receiver, trustee or other Person for any alleged preference or fraudulent transfer, then any monies paid by such Agent Indemnitee in settlement or satisfaction of such proceeding, together with all interest, costs and expenses (including attorneys' fees) incurred in the defense of same, shall be promptly reimbursed to the Agent by each Secured Party to the extent of its pro rata share.

Section 8.5    Limitation on Responsibilities of Agent.    The Agent shall not be liable for any action taken or omitted to be taken under the Loan Documents, except for losses directly and solely caused by the Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.  The Agent does not assume any responsibility for any failure or delay in performance or any breach by any Borrower, Lender or other Secured Party of any obligations under the Loan Documents.  The Agent does not make any express or implied representation, warranty or guarantee to the Secured Parties with respect to any Obligations, Collateral, Liens, Loan Documents or Borrower.  No Agent Indemnitee shall be responsible to Secured Parties for any recitals, statements, information, representations or warranties contained in any Loan Documents or any materials or information delivered by the Borrowers; the execution, validity, genuineness, effectiveness or enforceability of any Loan Documents; the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, extent, perfection or priority of any Lien therein; the validity, enforceability or collectability of any Obligations; or the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any Borrower.  No Agent Indemnitee shall have any obligation to any Secured Party to ascertain or inquire into the existence of any Default or Event of Default, the observance by any Borrower of any terms of the Loan Documents, or the satisfaction of any conditions precedent contained in any Loan Documents.

Section 8.6     Resignation; Successor Agent.   The Agent may resign at any time by giving at least thirty (30) days written notice thereof to the Lenders and the Company.   The Lenders may, if permitted by Applicable Law, upon fifteen (15) days' written notice, remove the Agent. The Lenders may appoint a successor that is (a) a Lender or affiliate of a Lender or (b) a financial institution.   If no successor is appointed by the effective date of the Agent's resignation or removal, then on such date, the Agent may appoint a successor acceptable to it in its discretion (which shall be a Lender unless no Lender accepts the role) or, in the absence of such appointment, the Lenders shall automatically assume all rights and duties of the Agent.   The successor Agent shall thereupon succeed to and become vested with all the powers and duties of the retiring Agent without further act.   The retiring or removed Agent shall be discharged from its duties hereunder on the effective date of its resignation or removal but shall continue to have all rights and protections available to the Agent under the Loan Documents with respect to actions, omissions, circumstances or Claims relating to or arising while it was acting or transferring responsibilities as the Agent or holding any Collateral on behalf of the Secured Parties, including the indemnification set forth in Sections 8.4 and 9.7, and all rights and protections under this Section 12.   Any successor to BSP by merger or acquisition of stock or the Advances hereunder shall continue to be the Agent hereunder without further act on the part of any Secured Party or Borrower.

Section 8.7     Due Diligence and Non-Reliance.   Each Lender acknowledges and agrees that it has, independently and without reliance upon the Agent or any other Lenders, and based upon such documents, information and analyses as it has deemed appropriate, made its own credit analysis of each Borrower and its own decision to enter into this Agreement and to fund Advances hereunder.   Each Secured Party has made such inquiries as it feels necessary concerning the Loan Documents, Collateral and the Borrowers.   Each Secured Party acknowledges and agrees that the other Secured Parties have made no representations or warranties concerning any Borrower, any Collateral or the legality, validity, sufficiency or enforceability of any Loan Documents or Obligations. Each Secured Party will, independently and without reliance upon any other Secured Party, and based upon such financial statements, documents and information as it deems appropriate at the time, continue to make and rely upon its own credit decisions in making Advances, and in taking or refraining from any action under any Loan Documents.   Except for notices, reports and other information expressly requested by a Lender in writing, the Agent shall have no duty or responsibility to provide any Secured Party with any notices, reports or certificates furnished to the Agent by any Borrower or any credit or other information concerning the affairs, financial condition, business or properties of any Borrower (or any of its affiliates) which may come into possession of the Agent or its affiliates.

Section 8.8     Titles.   Each Lender that is designated in connection with this credit facility as an agent of any kind shall have no right or duty under any Loan Documents other than those applicable to all Lenders, and shall in no event have any fiduciary duty to any Secured Party.

Section 8.9     No Third-Party Beneficiaries.   This Section 8 is an agreement solely among the Secured Parties and Agent, and shall survive the payment in full of the Obligations. This Section 8 does not confer any rights or benefits upon Borrowers or any other Person.   As between Borrowers and the Agent, any action that the Agent may take under any Loan Documents or with respect to any Obligations shall be conclusively presumed to have been authorized and directed by the Secured Parties.

## ARTICLE IX

## MISCELLANEOUS

Section 9.1     No Waiver; Cumulative Remedies; Compliance with Laws. No failure or delay by the Agent in exercising any right, power or remedy under the Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy under the Loan Documents. The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law. The Agent may comply with any applicable state, provincial or federal law requirements in connection with a disposition of the Collateral and such compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

Section 9.2     Amendments, Etc. No amendment, modification, termination or waiver of any provision of any Loan Document or consent to any departure by a Borrower therefrom or any release of a Security Interest shall be effective unless the same shall be in writing and signed by the Lenders and, if such amendment, modification, termination or release affects the rights of the Agent, the Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No notice to or demand on the Borrowers in any case shall entitle the Borrowers to any other or further notice or demand in similar or other circumstances. Notices. Any notice or request hereunder may be given to the Borrowers, the Agent or the Lenders at the respective addresses set forth below or as may hereafter be specified in a notice designated as a change of address under this Section 9.3. Any notice or request hereunder shall be given in writing by registered or certified mail, return receipt requested, hand delivery, overnight mail, facsimile transmission (confirmed by mail) or electronic mail. Notices and requests shall be, (a) in the case of those by hand delivery, deemed to have been given when delivered to any officer of the Party to whom it is addressed, (b) in the case of those by registered or certified mail or overnight mail, deemed to have been given three (3) Business Days after the date when deposited in the mail or with the overnight mail carrier, (c) in the case of a facsimile transmission, when confirmed and (d) in the case of electronic mail, upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or written acknowledgment).

Notices shall be provided as follows:

If to the Agent and the Lenders:

BSP Agency, LLC
9 West 57th Street
New York, New York 10019
Attn: Brent Buckley
Email: b.buckley@benefitstreetpartners.com

-and-

1401 McKinney Street, Suite 1825
Houston, Texas 77010
Attn: Timothy Murray/John Horstman
Email: t.murray@benefitstreetpartners.com
         j.horstman@benefitstreetpartners.com

With a copy to:

    Baker Botts L.L.P.
    30 Rockefeller Plaza
    New York, New York 10112
    Attn: Emanuel C. Grillo, Esq.
    Email: emanuel.grillo@bakerbotts.com


If to any Borrower:

    Shale Support Holdings, LLC
    600 Jefferson Street, Suite 602
    Lafayette, Louisiana 70501
    Attn: [_____]
    Email: [_____]


With a copy to:

    Greenberg Traurig, LLP
    1000 Louisiana Street
    Suite 1700
    Houston, TX 77002
    Attn:  Shari Heyen, Esq.
    Email: HeyenS@gtlaw.com


or such other address as may be designated in writing hereafter in accordance with this Section 8.3 by such Person.

        Section 9.4    <u>Further Documents</u>.  The Borrowers will from time to time execute, deliver, endorse and authorize the filing of any and all instruments, documents, conveyances, assignments, security agreements, financing statements, and other agreements and writings that the Agent or the Lenders may reasonably request in order to secure, protect, perfect or enforce the Security Interest or the Agent's or Lenders' rights under the Loan Documents (but any failure to request or assure that a Borrower executes, delivers, endorses or authorizes the filing of any such item shall not affect or impair the validity, sufficiency or enforceability of the Loan Documents and the Security Interest, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion); <u>provided</u> that same shall not increase the Obligations, representations or warranties of the Borrowers hereunder.  Promptly upon the Agent's or the Lenders' request, each Borrower shall execute and deliver to the Agent a power of attorney authorizing the Agent to execute in the name, and on behalf, of such Borrower any and all documents reasonably necessary to consummate a sale of Collateral after the occurrence and during the continuance of an Event of Default.

        Section 9.5    <u>Costs and Expenses</u>.  Subject to the terms of the Financing Orders, the Borrowers shall pay to the Agent and the Lenders promptly upon receipt of an invoice (subject to the terms of the Financing Orders) all of the Agent's and the Lenders' reasonable costs and expenses, including without limitation, due diligence, transportation, computer, duplication, appraisal,

audit (including per diems), insurance, consultant, search, filing and recording fees, and all other reasonable out-of-pocket expenses incurred by the Agent and the Lenders (including the reasonable fees and expenses of counsel, financial advisors, and other professionals and advisors) and all reasonable expenses of the Agent and the Lenders in connection with the negotiation, administration, monitoring, and enforcement of the Loan Documents, and the creation, perfection, protection, satisfaction, foreclosure or enforcement of the Security Interest.

Section 9.6        Indemnity.  In addition to the payment of expenses pursuant to Section 9.5, the Borrowers shall jointly and severally indemnify, defend and hold harmless the Agent, Lenders and each of their respective partners, members, officers, directors, employees, affiliates, successors, assigns, agents, counsel and other advisors (the "Indemnitees") from and against any of the following (collectively, the "Indemnified Liabilities"):

(a)        Any and all transfer taxes, documentary taxes, assessments or charges made by any Governmental Authority by reason of the execution and delivery of the Loan Documents or the making of the Advances; and

(b)        Any and all other liabilities, losses, damages, penalties, judgments, suits, claims, costs and expenses of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel, financial advisors and other professional and advisors) in connection with the foregoing and any other investigative, administrative or judicial proceedings, whether or not such Indemnitee shall be designated a party thereto, which may be imposed on, incurred by or asserted against any such Indemnitee, in any manner related to, arising out of, by reason of or in connection with the preparation for a defense of, any investigation, litigation or proceeding arising out of, related to or in connection with the making of Advances and the Loan Documents, the use or intended use of the Proceeds of the Advances and the other transactions contemplated hereby or thereby or the Cases.

Notwithstanding the foregoing, the Borrowers shall not be obligated to indemnify any Indemnitee for any Indemnified Liability caused by the gross negligence or willful misconduct of such Indemnitee, as finally determined by a court of competent jurisdiction.

If any investigative, judicial or administrative proceeding arising from any of the foregoing is brought against any Indemnitee, upon such Indemnitee's request, the Borrowers, or counsel designated by the Borrowers and satisfactory to the Indemnitee, will resist and defend such action, suit or proceeding to the extent and in the manner directed by the Indemnitee, at the Borrowers' sole cost and expense.  Each Indemnitee will use its best efforts to cooperate in the defense of any such action, suit or proceeding.  If the foregoing undertaking to indemnify, defend and hold harmless may be held to be unenforceable because it violates any law or public policy, the Borrowers shall nevertheless make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law. The Borrowers' obligations under this Section 9.6 shall survive the Maturity Date.

Section 9.7        Execution in Counterparts; Facsimile and PDF Execution. This Agreement and the other Loan Documents may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same instrument.  Delivery of an executed counterpart of

this Agreement or any other Loan Document by facsimile or pdf shall be equally as effective as delivery of an original executed counterpart of this Agreement or such other Loan Document. Any party delivering an executed counterpart of this Agreement or any other Loan Document by facsimile or pdf also shall deliver an original executed counterpart of this Agreement or such other Loan Document but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement or such other Loan Document.

Section 9.8    Binding Effect; Assignment; Complete Agreement; Sharing Information; Confidentiality.  The Loan Documents shall be binding upon and inure to the benefit of the Borrowers and the Agent, the Lenders and each of their respective successors and assigns, except that no Borrower shall have the right to assign its rights thereunder or any interest therein without the Lenders' prior written consent.  To the extent permitted by law, the Borrowers waive and will not assert against any assignee any claims, defenses or set-offs which the Borrowers could assert against the Agent or any Lender. This Agreement, together with the Loan Documents, comprises the complete and integrated agreement of the Parties on the subject matter hereof and supersedes all prior agreements, written or oral, on the subject matter hereof.  To the extent that any provision of this Agreement contradicts other provisions of the Loan Documents, the provisions of the Financing Orders shall control. Each of the Agent and the Lenders may share information regarding the Borrowers with its accountants, lawyers and other advisors and the Borrowers waive any right of confidentiality it may have with respect to all such sharing of information.  Any other provision of this Agreement or the other Loan Documents notwithstanding, each of the Agent and the Lenders and such other parties shall use reasonable efforts in accordance with their policies and procedures in place from time to time to maintain the confidentiality of the financial and business information they obtain from the Borrowers and to prevent the inappropriate dissemination and disclosure thereof (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential); provided that nothing in this Agreement or the other Loan Documents shall prohibit the Agent or any Lender from providing any information regarding the Borrowers to internal auditors, other operating divisions of the Agent or such Lender, any of their respective affiliates, or in response to a request from a regulatory authority having jurisdiction over the Agent or such Lender.

Section 9.9    Severability of Provisions.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

Section 9.10    Headings.  Article, Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 9.11    Election of Remedies.  If the Agent may, under applicable law, proceed to realize its benefits under any of the Loan Documents giving the Agent a security interest in or Lien upon any Collateral, whether owned by a Borrower, either by judicial foreclosure or by non-judicial sale or enforcement, the Agent may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Section.  If, in the exercise of any of its rights and remedies, the Agent shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against a Borrower, whether because of any applicable laws pertaining to "election of remedies" or the like, such Borrower hereby consents to such action by the Agent and waives any claim based upon such action.  Any election of remedies that results in the denial or impairment of the right of the Agent to seek a deficiency judgment against a Borrower shall not impair such Borrower's obligation to pay the full amount of the Obligations.  In the event the Agent shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Loan Documents, the Agent may bid all or less

than the amount of the Obligations on behalf of the Lenders and the amount of such bid need not be paid by the Agent or the Lenders but shall be credited against the Obligations. The amount of the successful bid at any such sale, whether the Agent or any other party is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations guaranteed under this Section, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which the Agent or the Lenders might otherwise be entitled but for such bidding at any such sale.

Section 9.12    Governing Law; Jurisdiction, Venue.

(a)    The Loan Documents shall be governed by and construed in accordance with the substantive laws (other than conflict laws) of the State of New York, except as governed by the Bankruptcy Code and except that at all times the provisions for the creation, perfection and enforcement of the Liens and Security Interest granted by the Borrowers pursuant to the Loan Documents with respect to the Collateral may be governed by, and construed according to, the laws of the state where such Collateral is located.  The Parties hereto acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over this Agreement and the other Loan Documents and any disputes or matters arising hereunder and thereunder.

(b)    THE PARTIES HERETO DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS.  THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND/OR OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE BETWEEN ANY OF THE AGENT, THE LENDERS AND/OR THE BORROWERS ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATED HERETO OR THERETO.

Section 9.13    Agent and Lenders as Party-in-Interest.  The Borrowers hereby stipulate and agree that the Agent and the Lenders are and shall remain parties in interest in the Cases and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith.  Nothing in this Agreement or any other Loan Document shall be deemed to be a waiver of any of the Agent's or any Lender's rights or remedies under applicable law or documentation. Without limitation of the foregoing, each of the Agent or any Lender shall have the right to make any motion or raise any objection it deems to be in its interests (specifically including but not limited to objections to use of proceeds of the Advances, to payment of professional fees and expenses or the amount thereof (excluding the professional fees and expenses of bankruptcy counsel for the Borrowers), to sales or other transactions outside the ordinary course of business or to the assumption or rejection of any executory contract or lease).

Section 9.14    Waiver of Right to Obtain Alternative Financing.    In consideration of the Advances to be made to the Borrowers by the Lenders, the Borrowers hereby further waive any right they may have to obtain an order by the Bankruptcy Court authorizing the Borrowers to obtain financing pursuant to Section 364 of the Bankruptcy Code from any Person other than the Lenders,

unless such financing would result in all of the Obligations to the Agent and the Lenders (whether arising before, on or after the date of this Agreement) being paid in full, in cash, on or before the expiration of the term of this Agreement.

     Section 9.15  <u>Releases</u>.  In connection with the indefeasible payment in full in cash of the Obligations, and the termination of this Agreement, the Borrowers covenant and agree, jointly and severally, that at such time they shall execute and deliver in favor of the Agent and the Lenders a valid and binding termination and release agreement, in form and substance acceptable to the Agent and the Lenders.

[<i>Remainder of this page intentionally left blank</i>]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the first date set forth in the Preamble.

**BORROWERS:**

**SHALE SUPPORT HOLDINGS, LLC**
By: SHALE SUPPORT GLOBAL HOLDINGS, LLC
Its: Manager

By: _____
Name: Gary Barton
Title: CRO

**STANTON RAIL YARD, LLC**
By: SHALE SUPPORT GLOBAL HOLDINGS, LLC
Its: Manager

By: _____
Name: Gary Barton
Title: CRO

**SHALE SUPPORT GLOBAL HOLDINGS, LLC**

By: _____
Name: Gary Barton
Title: CRO

**WET MINE ASSETS HOLDING, LLC**
By: SHALE SUPPORT HOLDINGS, LLC
Its: Manager
By: SHALE SUPPORT GLOBAL HOLDINGS, LLC
Its: Manager

By: _____
Name: Gary Barton
Title: CRO

**DRYING FACILITY ASSETS HOLDING, LLC**
By: SHALE SUPPORT HOLDINGS, LLC
Its: Manager
By: SHALE SUPPORT GLOBAL HOLDINGS, LLC
Its: Manager

By: _____
Name: Gary Barton
Title: CRO

**SOUTHTON RAIL YARD, L.L.C.**
By: SHALE SUPPORT HOLDINGS, LLC
Its: Manager
By: SHALE SUPPORT GLOBAL HOLDINGS, LLC
Its: Manager

By: _____
Name: Gary Barton
Title: CRO

**MINE ASSETS HOLDING, LLC**
By: SHALE SUPPORT HOLDINGS, LLC
Its: Manager
By: SHALE SUPPORT GLOBAL HOLDINGS, LLC
Its: Manager

By: _____
Name: Gary Barton
Title: CRO

**SHALE ENERGY SUPPORT, LLC**
By: SHALE SUPPORT HOLDINGS, LLC
Its: Manager
By: SHALE SUPPORT GLOBAL HOLDINGS, LLC
Its: Manager

By: _____
Name: Gary Barton
Title: CRO

**AGENT:**

**BSP AGENCY, LLC**,
as the Agent
By: Benefit Street Partners, L.L.C., its sole Member


By: _____
Name: Ira Wishe
Title: Authorized Signatory

**LENDERS:**

**PROVIDENCE DEBT FUND III LP**,
as a Lender
By: Providence Debt Fund III GP L.P., its General Partner
By: Providence Debt Fund III Ultimate GP Ltd., its: General Partner

By: _____
      Name: Ira Wishe
      Title:  Authorized Signatory

**BENEFIT STREET PARTNERS DEBT FUND IV LP**,
as a Lender
By: Benefit Street Partners Debt Fund IV GP LP, its General Partner
By: Benefit Street Partners Debt Fund IV Ultimate GP Ltd., its General Partner

By: _____
      Name: Ira Wishe
      Title:  Authorized Signatory

**BENEFIT STREET PARTNERS SMA LM LP**,
as a Lender
By: Benefit Street Partners SMA LM GP L.P., its General Partner
By: Benefit Street Partners SMA LM Ultimate GP LLC, its General Partner

By: _____
      Name: Ira Wishe
      Title:  Authorized Signatory

**BENEFIT STREET PARTNERS SMA-C LP**,
as a Lender
By: Benefit Street Partners L.L.C., its Investment Advisor

By: _____
Name: Ira Wishe
Title:  Authorized Signatory

**SEI ENERGY DEBT FUND, LP**,
as a Lender
By: Benefit Street Partners L.L.C., its Sub-Advisor

By: _____
Name: Ira Wishe
Title:  Authorized Signatory

**BENEFIT STREET PARTNERS DEBT FUND
IV MASTER (NON-US) L.P.,**
as a Lender
By: Benefit Street Partners Debt Fund IV (Non-US) GP LP,
its general partner
By: Benefit Street Partners Debt Fund IV Ultimate GP Ltd.,
its general partner

By: _____
Name: Ira Wishe
Title:  Authorized Signatory

**PROVIDENCE DEBT FUND III MASTER (NON-US)
LP,**
as a Lender
By: Providence Debt Fund III GP L.P., its general partner
By: Providence Debt Fund III Ultimate GP Ltd., its general
partner

By: _____
Name: Ira Wishe
Title:  Authorized Signatory

3

**LANDMARK WALL SMA L.P.**
as a Lender
By: Benefit Street Partners SMA-LK GP L.P., its general
partner

By:

Name: Ira Wishe
Title:  Authorized Signatory

## **Schedules**

| | |
|---|---|
| Schedule 2.1 | Commitments |
| Schedule 5.5 | Litigation |
| Schedule 5.7 | Taxes |
| Schedule 5.9 | Intellectual Property Rights |
| Schedule 5.10 | Real Property |
| Schedule 5.12 | Deposit Accounts and Securities Accounts |
| Schedule 5.17 | Benefit Plans |
| Schedule 6.2 | Existing Liens |
| Schedule 6.3(f) | Existing Indebtedness |
| Schedule 6.3(i) | Existing Capital Leases |
| Schedule 6.12 | Insurance |

## **Exhibits**

| | |
|---|---|
| Exhibit A | Form of Secured Promissory Note |
| Exhibit B | Form of Notice of Borrowing |
| Exhibit C | Approved Budget |

**SCHEDULE 2.1**

**COMMITMENTS**

| Fund Name | Commitment |
|---|---|
| Landmark Wall SMA L.P. | 668,000.00 |
| Benefit Street Partners SMA-C L.P. | 373,000.00 |
| Benefit Street Partners SMA LM LP | 248,000.00 |
| Benefit Street Partners Debt Fund IV L.P | 2,402,000.00 |
| Providence Debt Fund III Master (Non-US) L.P. | 1,184,000.00 |
| SEI Energy Debt Fund, LP | 570,000.00 |
| Providence Debt Fund III L.P. | 2,308,000.00 |
| Benefit Street Partners Debt Fund IV Master (Non-US) L.P. | 2,247,000.00 |
| **AGGREGATE COMMITMENT** | **$10,000,000.00** |

# SCHEDULE 5.5

## LITIGATION

*Plant Materials, LLC v. Shale Support Holdings, LLC, et al.,* **Arbitration Case No. 01-18-0004-2494, American Arbitration Association, Commercial Arbitration.** In this arbitration proceeding, Plant Materials, LLC ("PM") seeks to recover $2,654,625.60 from two separate construction contracts. PM claims that it is entitled to payment under a Time and Materials Contract between Shale Support Services and PM executed May 9, 2014 (the "Time and Materials Contract"), and has asserted fraud/fraudulent inducement/fraudulent transfer claims against the Company and its officers as the theory of liability. Management vehemently denies allegations of fraud and any obligation arising out of the Time and Materials Contract. In addition, Southton Railyard, LLC ("Southton") and PM entered into a separate construction contract on or around May 20, 2014 (the "Construction Contract"). PM also claims that Southton breached this contract; however, no work was ever performed under this contract. It is management's position that conditions precedent were not met, and also denies any obligation arising out of this contract. This matter is set for a three-day arbitration hearing on July 17, 2019. We are unable to predict the eventual outcome of this matter or the potential loss contingencies, if any, to which the company may be subject.

*Southton Rail Yard, LLC v. Cudd Pumping Services, Inc.,* **Civil Action No. 18:1632, United States District Court for the Southern District of Texas, Houston Division.** Southton Rail Yard, LLC ("SR Y") entered into a supply agreement with Cudd Pumping Services, Inc. ("Cudd") on January 1, 2015, pursuant to which Cudd agreed to purchase frac-sand from Southton in accordance with the terms and conditions of the agreement. In 2015, Cudd ceased purchasing frac-sand, and breached the supply agreement by not purchasing the quantities required by the agreement. On May 18, 2018, SR Y filed suit seeking to recover its actual damages which exceed $5,100,000 and/or its lost profits under the supply agreement. On November 26, 2018, Cudd filed a counterclaim asserting that SR Y breached first by shipping defective sand and by not shipping $1,650,000 in frac-sand that was prepaid. This case is on the Court's docket for a jury trial beginning December 27, 2019. We are unable to predict the eventual outcome of this matter or the potential loss contingencies, if any, to which the company may be subject.

**SCHEDULE 5.7**

**TAXES**

| Taxing Authority Name | Type of Tax | Amount |
|---|---|---|
| Bexar County Tax Assessor | Property Tax | $121,000 |
| Pearl River County Tax Collector | Property Tax | $230,000 |

## SCHEDULE 5.9

## INTELLECTUAL PROPERTY RIGHTS

<u>Patents</u>

None.

<u>Trademarks</u>

Delta Pearl – Not a Registered Trademark

<u>Copyrights</u>

None.

## SCHEDULE 5.10

## REAL PROPERTY

| Owned/ Leased | County/ State | Owner/ Lessor | Lessee | Physical Address | Description | Monthly Rent | Annual Rent |
|---|---|---|---|---|---|---|---|
| Owned | Hancock/ MS | WMAH | n/a | 9001 Hwy 607 Nicholson, MS 39463 | Wet mine located in Hancock County (approx. 1,500 acres) | n/a | n/a |
| Leased | Pearl River/ MS | JT Property Ventures, LLC | DFAH | 130 Street B Picayune, MS 39466 | Land under drying facility in Pearl River County | $32,500.00 | $390,000.00 |
| Leased | Pearl River/ MS | J & L Properties, LLC | SES | 105 Street A Picayune, MS 39466 | Office | $2,750.00 | $33,0000.00 |
| Owned | Bexar/TX | SRY | n/a | 12070 Center Rd. San Antonio, TX 78223 | Rail terminal in Bexar County (approx. 300 acres) | n/a | n/a |
| Leased | Pearl River/ MS | City of Picayune | SSH | Picayune, MS 39466 | Parcel adjacent to Drying Facility | $1,590.46 | $19,085.52 |
| Leased | Pearl River/ MS | Alabama Great Southern Railroad Co. | SES | Rail Spur in Nicholson, MS | NASA Lead Track- 6467 ft. in length | $5,302.94 | $63,635.28 |

**SCHEDULE 5.12**

**DEPOSIT ACCOUNTS AND SECURITIES ACCOUNTS**

| Borrower | Name of Financial Institution | Account Number | Purpose of Account |
|---|---|---|---|
| Shale Energy Support, LLC | Regions Bank | 0218833470 | Operating |
| Southton Rail Yard, LLC | Regions Bank | 0218833462 | Operating |
| Shale Energy Support, LLC Collections | Regions Bank | 0211791047 | Collections |
| Southton Rail Yard, LLC Collections | Regions Bank | 0211791039 | Collections |
| Shale Energy Support, LLC (petty account) | Regions Bank | 0218833500 | Petty Cash and other disbursements |
| Shale Support Holdings, LLC | Regions Bank | 0218833497 | Operating |
| Drying Facility Assets Holding, LLC | Regions Bank | 0218833454 | Operating |
| Wet Mine Assets Holding, LLC | Regions Bank | 0218833446 | Operating |
| Shale Support Global Holdings, LLC | Regions Bank | 0237746391 | Operating |

**SCHEDULE 5.17**

**BENEFITS PLANS**

| Type of Coverage | Insurance Carrier(s) |
| --- | --- |
| Health Insurance | Blue Cross and Blue Shield of Mississippi |
| Dental and Vision Insurance | The Guardian Life Insurance Company of America |
| Short-Term and Long-Term Disability Benefits | Reliance Standard |
| Basic Life Insurance | The Guardian Life Insurance Company of America |
| Supplemental Insurance (Accidental Death and Dismemberment, Cancer, Term Life, and Critical Illness) | Colonial Life |
| 401(k) Plan | John Hancock |

**SCHEDULE 6.2**

**EXISTING LIENS**

All liens and security interests associated with any Existing Indebtedness listed on Schedule 6.3(f).

SSH's interest in that portion of the Collateral which constitutes the leasehold property located at 130 Street B, Picayune, Mississippi 39466 is subject to any rights and interests reserved by the ground lessors –JT Property Ventures, LLC and the City of Picayune –under the terms of SSH's lease agreements for such property, as well as any rights or interests reserved by any mortgagee of such property, including, but not limited to, liens, security interests, easements or other encumbrances of record for such property as of the date hereof

.

## SCHEDULE 6.3(f)

## EXISTING INDEBTEDNESS

| Creditor | Amount | Secured (Y/N) | Maturity Date |
|---|---|---|---|
| BSP Agency, LLC | $116,001,368.20 | Y | 08/15/2021 |
| Siena Lending Group, LLC | $11,600,357.76 | Y | 02/28/2021 |
| First Insurance Financing | $290,125 | Y | 12/25/2018 |
| GM Financial | $72,961 | Y | 9/28/2022 |
| GM Financial | $57,002 | Y | 6/10/2022 |
| Toyota | $5,795 | Y | 01/01/2020 |

**SCHEDULE 6.3(i)**

**EXISTING CAPITAL LEASES**

| Lender | Borrower | Amount | Collateral |
|---|---|---|---|
| Komatsu Financial | SES | $3,121,177 | Grove RT890E Crane (SN 223771)<br>WA500-8 Wheel Loader (SN A96418)<br>D155AX-7 Dozer Crawler (SN 90167)<br>WA470-8 Wheel Loader (SN A49218)<br>WA500-8 Wheel Loader (SN A96711)<br>PC490LC-11 Hydraulic Excavator (SN 85228)<br>WA500-8 Wheel Loader (SN A96258)<br>WA500-8 Wheel Loader (SN 96264)<br>D65WX-18 Dozer Cralwer (SN 90942) |
| CAT Financial | SES | $2,262,445 | D8T Tractor (FMC00742)<br>745C Articulated Dump Truck (TFK01242)<br>336 Excavator (SN BZY00804)<br>966M Loader (1 of 2) (SN 0R8D01203)<br>966M Loader (2 of 2) (SN 0R8D01204)<br>TL 1055D (SN ML501504)<br>745 Articulated Dump Truck (SN 3T600948)<br>981M Loader (SN K1Y01810)<br>Genie S60-X (S60TXH-40008) |

| Lender | Borrower | Amount | Collateral |
|---|---|---|---|
| SQN Asset Income Fund V, LP | SES | $797,780 | NVX6030 Shuttlewagon (SN 603015092)<br><br>NVX6030 Shuttlewagon (SN 603015131) |
| Kubota Credit Corporation | SES | $143,125 | Tractor (SN 10169)<br>Tractor (SN 10249)<br>M660 Tractor (SN 10138) |
| Kinetic Leasing | SES | $110,129 | Gibsland Truck Scale Office trailer<br>Carver Monarch Press Wet Plant Office Trailer<br>2013 Broce Sweeper (SN 304464) |
| Wells Fargo | SES | $95,574 | SWX525 Shuttlewagon (SN 9GD52505) |
| W. S. Tyler | SES | $60,027 | Computerized Particle Analyzer (2) |
| Marlin Business Risk | SES | $44,149 | Wet Plant Truck Scale Sweeper (SN 32832) |
| PNC Equipment Finance | SES | $39,857 | Bobcat T770 Track Loader (SN AT6315207) |
| Marlin Business Risk | SRY | $25,349 | Bobcat T650 Skid Steer (SN A3P112619) |

## SCHEDULE 6.12

## INSURANCE

| Type of Coverage | Insurance Carrier(s) | Policy Number | Policy Term | Total Premium |
|---|---|---|---|---|
| Automobile | Zurich American Insurance Company | BAP 4391278-07 | 7/1/19-7/1/20 | $26,967 |
| Corporate Advantage (Credit Insurance) | Euler Hermes North America | 5109783 | 10/1/2018-9/30/2019 | $40,000 |
| Directors and Officers and Employment Practices Liability Insurance | Axis Surplus Ins. Co. | MHN631776/01/2018 | 7/11/18-7/11/19 | $36,883 |
| Directors and Officers and Employment Practices Liability Insurance | Axis Surplus Ins. Co. | TBD | 7/11/19-7/11/20 | $37,912 |
| General Liability / Umbrella | Crum & Forster | EPK-125694/ EFX-112181 | 1/25/19-1/25/20 | GL - $140,817 UMB - $89,795 |
| Inland Marine | Everest National Insurance Company | IM8ML00110191 | 3/1/19-3/1/20 | $211,500 |
| Umbrella Policy (Auto) | Star Indemnity & Liability Co | TBD | 7/1/19-7/1/20 | $26,850 |
| Workers Compensation | Zurich American Insurance Company | WC 5778465-04 | 7/1/19-7/1/20 | $370,279 |

## Exhibit A

**Form of Secured Promissory Note**

(See Attached)

# FORM OF LOAN NOTE

$[___]                                                   _____, ____

For value received, the undersigned, (i) SHALE SUPPORT GLOBAL HOLDINGS, LLC, a Delaware limited liability company (the "Company"); (ii) SHALE SUPPORT HOLDINGS, LLC, a Delaware limited liability company ("Holdings"); (iii) STANTON RAIL YARD, LLC, a Texas limited liability company; (iv) MINE ASSETS HOLDING, LLC, a Delaware limited liability company; (v) SOUTHTON RAIL YARD, LLC, a Louisiana limited liability company; (vi) DRYING FACILITY ASSETS HOLDING, LLC, a Delaware limited liability company; (vii) WET MINE ASSETS HOLDING, LLC, a Delaware limited liability company; and (viii) SHALE ENERGY SUPPORT, LLC, a Delaware limited liability company (each of the foregoing a "Borrower" and, collectively, the "Borrowers"), hereby promise to pay to the order of [_____] (the "Lender"), on the Maturity Date referenced in the Senior Secured, Super-Priority Debtor-in-Possession Credit and Security Agreement, dated as of July [__], 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), at the principal office of BSP Agency, LLC (the "Agent"), located at [_____] or at any other place designated at any time by the holder hereof, in lawful money of the United States of America and in immediately available funds, the principal sum of [_____] ($[_____]) or the aggregate unpaid principal amount of all Advances made by the Lender to the Borrowers under the Credit Agreement, together with interest on the principal amount hereunder remaining unpaid from time to time, computed on the basis of the actual number of days elapsed and a 360-day year, from the date hereof until this Note is fully paid at the rate from time to time in effect under the DIP Credit Agreement.

This Note is subject to the terms of the DIP Credit Agreement, which provides, among other things, for acceleration hereof.  Principal and interest due hereunder shall be payable as provided in the DIP Credit Agreement.  This Note is secured, among other things, pursuant to the DIP Credit Agreement, the Interim DIP Order, the Final DIP Order and the Security Documents, and may now or hereafter be secured by one or more other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements.

The Borrowers shall pay all actual costs of collection, including reasonable attorneys' fees and legal expenses if this Note is not paid when due, whether or not legal proceedings are commenced.

Unless otherwise defined herein, capitalized terms used in this Note shall have the meaning ascribed to them in the DIP Credit Agreement.

Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

[Signature on next page]

**BORROWERS:**

**SHALE SUPPORT GLOBAL HOLDINGS, LLC**

By: _____
Name:
Title:

**SHALE SUPPORT HOLDINGS, LLC**

By: _____
Name:
Title:

**MINE ASSETS HOLDING, LLC**

By: _____
Name:
Title:

**SOUTHTON RAIL YARD, LLC**

By: _____
Name:
Title:

**DRYING FACILITY ASSETS HOLDING, LLC**

By: _____
Name:
Title:

**WET MINE ASSETS HOLDING, LLC**


By: _____
Name:
Title:

**SHALE ENERGY SUPPORT, LLC**


By: _____
Name:
Title:

**Exhibit B**

**Form of Notice of Borrowing**

_____, _____

BSP Agency, LLC
9 West 57th Street
New York, New York 10019
Attention:  Mr. Brent Buckley

-and-

401 McKinney Street, Suite 1825
Houston, Texas 77010
Attention:  Mr. Timothy Murray
           Mr. John Horstman

Re:     Senior Secured, Super-Priority Debtor-In-Possession Credit and Security Agreement (the
        "DIP Credit Agreement").

Ladies and Gentlemen:

Reference is made to the above referenced DIP Credit Agreement.  Capitalized terms used herein
and not defined herein shall have meanings given to them in the DIP Credit Agreement

Borrowers hereby request an Advance in accordance with the DIP Credit Agreement in the
following amount: $_____.  The proceeds of such Advance will be used in accordance
with Section 2.8 of the DIP Credit Agreement.

Borrower hereby irrevocably authorizes and directs the Lender to disburse the proceeds of such
Advance to the following account in accordance with the following wire instructions:

                [_____]

Upon compliance with the above instructions, the Advance shall constitute an Obligation under
the DIP Credit Agreement.

These instructions are irrevocable unless otherwise agreed by the Lenders.  The person whose
signature appears below represents and warrants that: (i) he or she is duly authorized to execute
these instructions on behalf of the Borrowers; (ii) no Default or Event of Default has occurred
and is continuing; (iii) the representations and warranties of the Borrowers in the DIP Credit
Agreement are true, correct and complete as of the date hereof in all respects as if made on the
date hereof; (iv) the Borrowers are in compliance with each and every one of their respective

covenants in the DIP Credit Agreement and (v) the Borrowers satisfy of each of the conditions set forth in <u>Section 4.2</u> of the DIP Credit Agreement as of the date of the requested Advance.

A facsimile or pdf copy of these instructions shall be deemed valid and may be accepted and relied upon by the Lender as an original.  The Borrowers agree to indemnify and hold you harmless in connection with your compliance with these instructions.  A copy of these instructions has been sent by email to Brent Buckley (b.buckley@benefitstreetpartners.com); Timothy Murray (t.murray@benefitstreetpartners.com); and John Horstman (j.horstman@benefitstreetpartners.com).

Very truly yours,

**SHALE SUPPORT GLOBAL HOLDINGS, LLC**

By: _____
Name:
Title:

**SHALE SUPPORT HOLDINGS, LLC**

By: _____
Name:
Title:

**MINE ASSETS HOLDING, LLC**

By: _____
Name:
Title:

**SOUTHTON RAIL YARD, LLC**

By: _____
Name:
Title:

**DRYING FACILITY ASSETS HOLDING, LLC**

By: _____
Name:
Title:

**WET MINE ASSETS HOLDING, LLC**

By: _____
Name:
Title:

**SHALE ENERGY SUPPORT, LLC**

By: _____
Name:
Title:

**Exhibit C**

**Approved Budget**

**Shale Support - DIP Budget Summary**

| *Week Ending (Friday) -->* | 7/12 | 7/19 | 7/26 | 8/2 | 8/9 | 8/16 | 8/23 | 8/30 | 9/6 | 9/13 | 9/20 | 9/27 | 10/4 | 10/11 | x | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Receipts | $2,637,893 | $2,742,512 | $1,727,562 | $2,462,296 | $2,067,145 | $2,049,539 | $2,073,011 | $1,687,643 | $2,207,624 | $2,459,624 | $2,310,741 | $2,459,869 | $3,165,925 | $3,020,160 | | $33,071,545 |
| *Operating Costs* [1][2][3] | | | | | | | | | | | | | | | | |
|   Current Railcar Lease Payments | $0 | $0 | $0 | ($986,545) | $0 | $0 | $0 | ($986,545) | $0 | $0 | $0 | ($986,545) | $0 | $0 | | ($2,959,636) |
|   Less: Market Adj. to Lease Payments | $0 | $0 | $0 | $780,595 | $0 | $0 | $0 | $780,595 | $0 | $0 | $0 | $780,595 | $0 | $0 | | $2,341,786 |
| Other Operating Costs | ($2,497,731) | ($1,959,276) | ($2,653,807) | ($2,117,991) | ($1,817,759) | ($2,088,278) | ($3,439,101) | ($2,600,621) | ($1,812,073) | ($2,006,623) | ($2,563,135) | ($1,796,540) | ($1,614,478) | ($2,533,957) | | ($31,501,370) |
| Total Disbursements | ($2,497,731) | ($1,959,276) | ($2,653,807) | ($2,323,941) | ($1,817,759) | ($2,088,278) | ($3,439,101) | ($2,806,571) | ($1,812,073) | ($2,006,623) | ($2,563,135) | ($2,002,490) | ($1,614,478) | ($2,533,957) | | ($32,119,220) |
| Pre-Petition Vendor Payments [4] | ($3,000,000) | $0 | $0 | ($2,000,000) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | | ($5,000,000) |
| TSA Remits from SSLA | $82,303 | $27,986 | $0 | $62,292 | $82,303 | $27,986 | $0 | $0 | $144,594 | $27,986 | $0 | $0 | $144,594 | $27,986 | | $628,031 |
| Professional Fees | $0 | $0 | $0 | ($1,472,965) | $0 | $0 | $0 | $0 | ($1,472,965) | $0 | $0 | $0 | ($3,166,049) | $0 | | ($6,111,979) |
| Siena ABL Interest Expense [5] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($289,780) | $0 | | ($289,780) |
| Utility Deposit | ($106,210) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | | ($106,210) |
| Net Cash Flow | ($2,883,746) | $811,223 | ($926,245) | ($3,272,319) | $331,689 | ($10,753) | ($1,366,090) | ($1,118,929) | ($932,820) | $480,987 | ($252,393) | $457,379 | ($1,759,788) | $514,190 | | ($9,927,613) |

(1) Operating Costs include the assumption that railcar leases are terminated and renewed at market rates as of the week ended 7/12/19
(2) Maintenance Capex is included in Operating Costs
(3) The Debtors assume that Vendor Payments will create terms for Shale Support
(4) Prepetition Vendor Payments are anticipated to be made pursuant to a Vendor Order
(5) The Siena ABL Interest Expense anticipates an incremental $1.0 million prepetition draw on 7/9/19