**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SHALE SUPPORT GLOBAL HOLDINGS, LLC, | § | Case No. 19-33884 (DRJ) |
| *et al.*,[1] | § | |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION**
**OF SHALE SUPPORT GLOBAL HOLDINGS, LLC, *ET AL.*, AND BSP AGENCY,**
**LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Shari L. Heyen
Texas Bar No. 09564750
*HeyenS@gtlaw.com*
Karl Burrer
Texas Bar No. 24043584
*Burrerk@gtlaw.com*
David R. Eastlake
Texas Bar No. 24074165
*EastlakeD@gtlaw.com*
1000 Louisiana St., Suite 1700
Houston, Texas 77002
Telephone:     (713) 374-3500
Facsimile:     (713) 374-3505

Counsel to the Debtors
and Debtors in Possession

Dated:  August 19, 2019

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Shale Support Global Holdings, LLC (5328); Shale Support Holdings, LLC (7814); Stanton Rail Yard, LLC (5976); Southton Rail Yard, LLC (8704); Drying Facility Assets Holding, LLC (6424); Shale Energy Support, LLC (8523); Mine Assets Holding, LLC (4401); and Wet Mine Assets Holding, LLC (2879).  The service address for Debtor Stanton Rail Yard, LLC is 32731 Egypt Lane, Magnolia, Texas 77354.  For the remainder of the Debtors, it is 600 Jefferson Street, Suite 602, Lafayette, Louisiana 70501.

### IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[2]

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF SHALE SUPPORT GLOBAL HOLDINGS, LLC, ET AL., AND BSP AGENCY, LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE, SUBMITTED BY THE DEBTORS AND BSP AS PROPONENTS. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS

---

[2] Capitalized terms used but not defined in this disclaimer shall have the meaning ascribed to them elsewhere in this Disclosure Statement.

AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.   ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.   THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS OR INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE VIII HEREIN, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR

COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE. OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS. TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- TECHNOLOGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- OIL AND NATURAL GAS PRICES AND THE OVERALL HEALTH OF THE OIL AND NATURAL GAS INDUSTRY AND EXPLORATION AND PRODUCTION SECTOR;

- FUTURE DEMAND FOR PROPPANTS;

- THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES;

- AVAILABILITY AND TERMS OF CAPITAL;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- COSTS OF CONDUCTING THE DEBTORS' OTHER OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- ENVIRONMENTAL LIABILITIES;

- COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- GOVERNMENTAL REGULATION AND TAXATION OF THE OIL AND NATURAL GAS INDUSTRY;

- DEVELOPMENTS IN OIL-PRODUCING AND NATURAL GAS-PRODUCING COUNTRIES;

- **UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;**

- **PLANS, OBJECTIVES, AND EXPECTATIONS;**

- **THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;**

- **THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS; AND**

- **THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS AND ENVIRONMENTAL COSTS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION OR PRICE PRESSURE BY CUSTOMERS; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.**

# TABLE OF CONTENTS

Page

I.     INTRODUCTION .............................................................................................................. 1

II.     PRELIMINARY STATEMENT ........................................................................................ 1

III.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN .................................................................................................................................. 2

     A.     What is chapter 11? ................................................................................................ 2
     B.     Why are the Debtors sending me this Disclosure Statement? .............................. 3
     C.     Am I entitled to vote on the Plan? ........................................................................ 3
     D.     What will I receive from the Debtors if the Plan is consummated? ...................... 3
     E.     What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Facility Claim, or a Priority Tax Claim? ............................................................... 6
     F.     How do I know if I hold an Unsecured Convenience Class Claim or General Unsecured Claim and what does that mean for my Unsecured Claim if I do? .......................... 7
     G.     Are any regulatory approvals required to consummate the Plan? ........................ 8
     H.     What happens to my recovery if the Plan is not confirmed or does not go effective? ...... 8
     I.     What are the sources of Cash and other consideration required to fund the Plan? .......... 8
     J.     Is there potential litigation related to the Plan? .................................................. 8
     K.     Will the final amount of Allowed Unsecured Claims affect the recovery of holders of Allowed Unsecured Claims under the Plan? .......................................................... 9
     L.     Will there be releases and exculpation granted to parties in interest as part of the Plan? ...... 9
     M.     What is the deadline to vote on the Plan? ............................................................ 13
     N.     How do I vote for or against the Plan? .................................................................. 13
     O.     When is the Confirmation Hearing set to occur? ................................................. 13
     P.     What is the purpose of the Confirmation Hearing? .............................................. 13
     Q.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ............................................................................................................. 14
     R.     Who supports the Plan? ......................................................................................... 14

IV.     THE PLAN ....................................................................................................................... 14

     A.     Issuance of New Membership Interests ................................................................ 14
     B.     Exit Facility ........................................................................................................... 15
     C.     Governance ............................................................................................................ 15
     D.     Recoveries to Certain Holders of Claims .............................................................. 15
     E.     General Settlement of Claims and Interests ........................................................... 16
     F.     Releases ................................................................................................................. 16

V.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ........... 17

     A.     Shale Support's Corporate History, Assets and Operations ................................. 17
     B.     The Debtors' Management Team ........................................................................... 19
     C.     The Debtors' Prepetition Capital Structure .......................................................... 19

VI.     EVENTS LEADING TO THE CHAPTER 11 FILINGS ................................................ 22

     A.     Market Decline and Industry-Specific Challenges ............................................... 22
     B.     The Restructuring Negotiations, Temporary Waiver, and Forbearance Agreement ...... 23
     C.     DIP Facility ............................................................................................................ 24

| VII. | **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** | **24** |
|---|---|---|
| | A. | Corporate Structure upon Emergence | 24 |
| | B. | Expected Timetable of the Chapter 11 Cases | 25 |
| | C. | First Day Relief | 25 |
| | D. | Other Procedural and Administrative Motions | 26 |
| | E. | Approval of the DIP Facility | 26 |
| | F. | Schedules and Statements | 26 |
| | G. | Bar Date Motion and Order | 26 |
| | H. | Appointment of Official Committee | 27 |
| | I. | Litigation Matters | 27 |
| | J. | Rejection and Assumption of Executory Contracts and Unexpired Leases | 30 |

| VIII. | **RISK FACTORS** | **30** |
|---|---|---|
| | A. | Bankruptcy Law Considerations | 30 |
| | B. | Risks Related to Recoveries under the Plan | 33 |
| | C. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses | 35 |
| | D. | Risks Related to the New Membership Interests | 43 |

| IX. | **SOLICITATION AND VOTING PROCEDURES** | **44** |
|---|---|---|
| | A. | Holders of Claims Entitled to Vote on the Plan | 44 |
| | B. | Voting Record Date | 44 |
| | C. | Voting on the Plan | 45 |
| | D. | Ballots Not Counted | 45 |

| X. | **CONFIRMATION OF THE PLAN** | **46** |
|---|---|---|
| | A. | Requirements for Confirmation of the Plan | 46 |
| | B. | Best Interests of Creditors/Liquidation Analysis | 46 |
| | C. | Feasibility | 47 |
| | D. | Acceptance by Impaired Classes | 47 |
| | E. | Confirmation Without Acceptance by All Impaired Classes | 48 |
| | F. | Valuation of the Debtors | 48 |

| XI. | **CERTAIN SECURITIES LAW MATTERS** | **49** |
|---|---|---|

| XII. | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | **49** |
|---|---|---|
| | A. | Introduction | 49 |
| | B. | Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors | 51 |
| | C. | Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims | 51 |
| | D. | Information Reporting and Backup Withholding | 55 |

| XIII. | **RECOMMENDATION** | **56** |
|---|---|---|

**EXHIBITS[3]**

EXHIBIT A       Plan of Reorganization

EXHIBIT B       Corporate Organization Chart

EXHIBIT C       Disclosure Statement Order

EXHIBIT D       Liquidation Analysis

EXHIBIT E       Financial Projections

EXHIBIT F       Valuation Analysis

---

[3] Each Exhibit is incorporated herein by reference.

*ACTIVE 45314459v1*

## I.      INTRODUCTION

Shale Support Global Holdings, LLC ("SSGH"), Shale Support Holdings, LLC ("SSH"), Stanton Rail Yard, LLC ("Stanton"), Southton Rail Yard, LLC ("SRY"), Drying Facility Assets Holding, LLC ("DFAH"), Shale Energy Support, LLC ("SES"), Mine Assets Holding, LLC ("MAH"), and Wet Mine Assets Holding, LLC ("WMAH"), as debtors and debtors in possession (collectively, the "Debtors" or "Shale Support"), and BSP Agency, LLC, in its capacity as administrative agent for the Term Loan Lenders (as defined herein) under that certain Term Loan Agreement (as defined herein) (the "Term Loan Agent" or "BSP"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Plan of Reorganization of Shale Support Global Holdings, LLC, et al., and BSP Agency, LLC Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), dated August 19, 2019.[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors.

## II.     PRELIMINARY STATEMENT

The Debtors are seeking to implement a restructuring through the Plan which contemplates, among other things:

- payment in full of all Administrative Claims and Priority Claims in Cash at emergence;

- distributions to holders of Allowed DIP Facility Claims of a principal portion of the Exit Facility equal to the aggregate principal amount with respect to drawn amounts under the DIP Facility, plus any unpaid accrued interest and unpaid fees, expenses, and other obligations under the DIP Facility Loan Agreement as of the Effective Date;

- distributions to each holder of a Secured Term Loan Claim of its Pro Rata share of the Secured Term Loan Claim Recovery (including New Membership Interests and a portion of the Exit Facility);

- distributions to each holder of an Allowed Unsecured Convenience Class Claim of its Pro Rata share of the Convenience Class Recovery Pool (*i.e.*, Cash in an amount of $250,000);

- distributions to each holder of an Allowed General Unsecured Claim of its Pro Rata share of the GUC Recovery applicable to the Sub-Class for such Allowed General Unsecured Claim (which GUC Recovery, in the aggregate, is comprised of Cash in an amount of $1,000,000 or 50% of the net proceeds of the Cudd Litigation (if any), whichever is greater); and

- an $80 million Exit Facility, to be provided by the Term Loan Lenders, that will, among other things, fund certain payments under the Plan and the Reorganized Debtors' post-emergence operations.

---

[1] Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern**.

The Plan constitutes a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan (collectively, the "Plan Settlement").  In consideration for the foregoing, among other things, the holders of the Secured Term Loan Claims will:

- convert approximately $80 million of funded debt into the New Membership Interests and a portion of the Exit Facility;

- provide funding for the payment in full of priority Claims and Administrative Claims and all cure costs;

- provide funding for the GUC Recovery and Convenience Class Recovery Pool for the benefit of holders of Allowed General Unsecured Claims (other than Deficiency Term Loan Clams) and Allowed Unsecured Convenience Class Claims, respectively;

- forgo any Claim for the diminution in value of their Prepetition Collateral (as defined in the Final DIP Order (as defined herein));

- forgo their right to receive their Pro Rata share of the GUC Recovery; and

- provide the Exit Facility.

The Debtors and BSP (collectively, the "Proponents") strongly believe that the Plan is in the best interests of the Debtors' estates, represents the best available path to restructuring, and significantly deleverages the Debtors' consolidated balance sheet.  Given the Debtors' attractive asset and customer base, an established reputation for the highest level of customer service and operational performance, the Proponents are confident that they can implement this agreed restructuring to ensure the Debtors' long-term viability.

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

*ACTIVE 45314459v1*

**B.        Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.        Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Revolving Credit Facility Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Secured Term Loan Claims | Impaired | Entitled to Vote |
| 5 | Unsecured Convenience Class Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 8 | Interests in the Subsidiary Debtors | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 9 | Interests in SSGH, SSH, MAH and Stanton | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

The Plan constitutes a separate Plan proposed by each Debtor and the classifications set forth above in Classes 1 through 10 shall be deemed to apply to each Debtor.  Each Class shall be deemed to constitute separate Sub-Classes of Claims against and Interests in each of the Debtors, as applicable, and each such Sub-Class shall vote as a single separate Class for, and the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to, each of the Debtors.

**D.        What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery[2] to holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from

---

[2]  The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "Allowed" means, with

the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims/Interests | Projected Recovery Under the Plan |
| 1 | Other Secured Claims | Each holder of an Allowed Class 1 Claim shall receive: (i) payment in full in Cash of its Allowed Class 1 Claim; (ii) the collateral securing its Allowed Class 1 Claim; (iii) Reinstatement of its Allowed Class 1 Claim; or (iv) such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $6.7 million | 100% |
| 2 | Other Priority Claims | Each holder of an Allowed Class 2 Claim shall receive Cash in an amount equal to such Allowed Class 2 Claim. | $22,000 | 100% |

respect to any Claim, except as otherwise *provided* in the Plan:  (a) a Claim that is evidenced by a Proof of Claim Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed by any party in interest within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.  For the avoidance of doubt: (x) a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; (y) notwithstanding anything to the contrary herein, the definition of "Allowed" herein and therein incorporates by reference the terms of paragraph D of the interim DIP Facility Order and any equivalent provision in any subsequent order approving the DIP motion on a final basis, including that there shall be no requirement that the Revolving Lender, Term Loan Agent, or Term Loan Lenders File a Proof of Claim in respect of any Secured Lender Claim in order for such Secured Lender Claims to be allowed; and (z) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law. "Allow" and "Allowing" shall have correlative meanings.

4

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims/Interests | Projected Recovery Under the Plan |
| 3 | Revolving Credit Facility Claims | Allowed Revolving Credit Facility Claims shall be either: (i) if the Debtors obtain a Refinancing Facility, paid in full in Cash from the Refinancing Facility; or (ii) if the Debtors do not obtain a Refinancing Facility, Reinstated and otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $12 million | 100% |
| 4 | Secured Term Loan Claims | Each holder of an Allowed Secured Term Loan Claim shall receive its Pro Rata share of the Secured Term Loan Claim Recovery (including the New Membership Interests and a principal portion of the Exit Facility). | $80 million | [●]% to [●]% |
| 5 | Unsecured Convenience Class Claims | Each holder of an Allowed Class 5 Claim shall receive its Pro Rata share of the Convenience Class Recovery Pool. | $950,000 | 26% |
| 6 | General Unsecured Claims | Each holder of an Allowed Class 6 Claim shall receive its Pro Rata share of the GUC Recovery[3] applicable to the Sub-Class for such Allowed Class 6 Claim, which distributions shall be made in accordance | $15 million to $25 million | 4% to 24% |

---

[3] "GUC Recovery" means, for each Sub-Class of General Unsecured Claims, (x) the greater of (a) $1,000,000 (*i.e.*, the Minimum GUC Recovery) or (b) 50% of the net proceeds of the Cudd Litigation (if any), multiplied by (y) the Sub-Class Allocation Percentage applicable to such Sub-Class. "Sub-Class Allocation Percentage" means the percentage of the aggregate GUC Recovery (taking into account all Sub-Classes of Class 6) allocated to each Sub-Class in Class 6, which percentage for each Sub-Class (by Debtor) is as follows:

| Debtor | Sub-Class Allocation Percentage |
|---|---|
| Shale Support Global Holdings, LLC | 0% |
| Shale Support Holdings, LLC | 0% |
| Stanton Rail Yard, LLC | 0% |
| Southton Rail Yard, LLC | 30% |
| Drying Facility Assets Holding, LLC | 12% |
| Shale Energy Support, LLC | 52% |
| Mine Assets Holding, LLC | 0% |
| Wet Mine Assets Holding, LLC | 6% |

*ACTIVE 45314459v1*

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims/Interests | Projected Recovery Under the Plan |
| | | with Article VI.F of the Plan. | | |
| 7 | Intercompany Claims | Class 7 Claims shall either be Reinstated or cancelled and released without any distribution. | N/A | 100% / 0% |
| 8 | Interests in the Subsidiary Debtors | Class 8 Interests shall either be Reinstated or cancelled and released without any distribution. | N/A | 0% |
| 9 | Interests in SSGH, SSH, MAH and Stanton | Class 9 Interests shall be cancelled, released and extinguished as of the Effective Date, and each of SSGH, Stanton, and MAH shall be dissolved. | $0 | 0% |
| 10 | Subordinated Claims | Allowed Subordinated Claims, if any, shall be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution of account of such Allowed Subordinated Claims. | $0 | 0% |

### E.   What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Facility Claim, or a Priority Tax Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article III of the Plan.

#### 1.   Administrative Claims

Administrative Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein. Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such holder and the

6

Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except for Professional Fee Claims and DIP Facility Claims, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the occurrence of the Effective Date. Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 180 days after the Effective Date and (b) 180 days after the Filing of the applicable request for payment of the Administrative Claims, if applicable. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for such payment of such Administrative Claims that do not file and serve such a request by the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any action by the Bankruptcy Court.

## 2. DIP Facility Claims

DIP Facility Claims will be satisfied as set forth in Article II.B of the Plan, as summarized herein. Except to the extent that a holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed DIP Facility Claim, each holder of an Allowed DIP Facility Claim shall receive a principal portion of the Exit Facility equal to the DIP Facility Claim Amount, and all commitments under the DIP Facility Loan Agreement shall terminate. For the avoidance of doubt, the DIP Facility Claims shall be Allowed in an aggregate principal amount with respect to drawn amounts under the DIP Facility (plus any unpaid accrued interest and unpaid fees, expenses and other obligations under the DIP Facility Loan Agreement as of the Effective Date). Upon the satisfaction of the DIP Facility Claims in accordance with the terms of this Plan, on the Effective Date all liens and security interests granted to secure such obligations shall be terminated and of no further force and effect.

## 3. Priority Tax Claims

Priority Tax Claims will be satisfied as set forth in Article II.E of the Plan, as summarized herein. Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## F. How do I know if I hold an Unsecured Convenience Class Claim or General Unsecured Claim and what does that mean for my Unsecured Claim if I do?

Under the Plan, an Unsecured Convenience Class Claim is (a) any Unsecured Claim (including prepetition accrued interest) in the amount of $30,000 or less for which the holder thereof does not elect on its ballot to be treated as a Class 6 General Unsecured Claim; or (b) any General Unsecured Claim (including prepetition accrued interest) in an amount in excess of $30,000 for which the holder thereof, pursuant to such holder's ballot or such other election accepted by the Debtors, elects to have reduced to the amount of $30,000 and to be treated as a Class 5 Unsecured Convenience Class Claim. As set forth

above, Holders of Allowed Unsecured Convenience Class Claims will each receive their Pro Rata Share of the Convenience Class Recovery Pool (*i.e.*, Cash in an amount not to exceed $250,000).

Each holder of an Allowed General Unsecured Claim that does not qualify as an Unsecured Convenience Class Claim (as set forth above) and that does not elect to be treated as an Unsecured Convenience Class Claim, will receive its Pro Rata share of the GUC Recovery applicable to the Sub-Class for such Allowed General Unsecured Claim. As described above, the aggregate GUC Recovery (taking into account all Sub-Classes of Class 6) is made up of $1,000,000 (i.e., the Minimum GUC Recovery) or 50% of the net proceeds of the Cudd Litigation (which litigation is discussed in greater detail in Article VII.H of this Disclosure Statement), whichever is greater.

### G. Are any regulatory approvals required to consummate the Plan?

There are no known regulatory approvals that are required to consummate the Plan. However, to the extent such any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

### H. What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," and the Liquidation Analysis attached hereto as **Exhibit D**.

### I. What are the sources of Cash and other consideration required to fund the Plan?

The Plan will be funded by the following sources of consideration: (a) Cash on hand, including proceeds of the DIP Facility; (b) the New Membership Interests; (c) the Cudd Litigation Proceeds; and (d) the proceeds from the Exit Facility, as applicable.

All distributions of the New Membership Interests, Cash, and Cudd Litigation Proceeds, as applicable, to holders of Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Reorganized Debtors. At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

### J. Is there potential litigation related to the Plan?

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation. *See* Article VIII.C.14 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes or Sub-Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes or Sub-Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class or Sub-Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article VIII.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be

8

Able to Secure Confirmation of the Plan," and Article X.E of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes."

### K.    Will the final amount of Allowed Unsecured Claims affect the recovery of holders of Allowed Unsecured Claims under the Plan?

The Debtors' estimate of aggregate Allowed General Unsecured Claims and Allowed Unsecured Convenience Class Claims is approximately $16 million to $26 million.  Each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the GUC Recovery.  Each holder of an Allowed Unsecured Convenience Class Claim shall receive its Pro Rata share of the Convenience Class Recovery Pool.  Although the Debtors' estimate of Allowed General Unsecured Claims and Allowed Unsecured Convenience Class Claims is generally the result of the Debtors' and their advisors' careful analysis of available information, General Unsecured Claims and Unsecured Convenience Class Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material.

The projected amount of General Unsecured Claims and Unsecured Convenience Class Claims set forth herein is subject to change and reflects the Debtors' current view on potential rejection damages.  Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of General Unsecured Claims and Unsecured Convenience Class Claims.  To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to holders of General Unsecured Claims and Unsecured Convenience Class Claims could change as well, and such changes could be material.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to holders of General Unsecured Claims and Unsecured Convenience Class Claims could change as well, and such changes could be material.

Finally, the Debtors or any official committees appointed in the Chapter 11 Cases may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims and Allowed Unsecured Convenience Class Claims to change.  These changes could affect recoveries to holders of General Unsecured Claims and Unsecured Convenience Class Claims, and such changes could be material.

### L.    Will there be releases and exculpation granted to parties in interest as part of the Plan?

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and BSP in obtaining its support for the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

9

**IMPORTANTLY, ALL HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT OPT OUT OF THE THIRD PARTY RELEASES ON A TIMELY SUBMITTED BALLOT OR OPT OUT FORM (AS APPLICABLE), OR BY TIMELY FILING AN OBJECTION THAT EXPRESSLY OBJECTS TO THEIR INCLUSION AS A "RELEASING PARTY" UNDER ARTICLE VIII.D OF THE PLAN, SHALL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in Article VIII of the Plan are copied in full below:

**B.      Release of Liens.**

**Except as otherwise provided in the Exit Facility Documents, the Plan, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**C.      Releases by the Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in**

10

part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the Disclosure Statement, the DIP Facility, the Exit Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, the Plan, or the Plan Settlement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing;  and (5) a bar to any of the Debtors or Reorganized Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

D.      Releases by Holders of Claims and Interests.

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the DIP Facility, the Exit Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement and the Plan Settlement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, or the Plan Settlement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article

11

VIII.D, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.D is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors or Reorganized Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

E.      Exculpation.

        Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Plan Settlement, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.      Injunction.

        Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to

12

any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F of the Plan.

**M. What is the deadline to vote on the Plan?**

The Voting Deadline is October 21, 2019, at 4:00 p.m. (prevailing Central Time).

**N. How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot including your vote is **actually received** by the Debtors' notice and claims agent, Donlin, Recano & Company, Inc. (the "Notice and Claims Agent") **on or before the Voting Deadline, *i.e.* October 21, 2019, at 4:00 p.m., prevailing Central Time**. *See* Article IX of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

**O. When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for October 29, 2019, at 9:00 a.m. (prevailing Central Time). The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than **October 21, 2019, at 4:00 p.m.** (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit C** and incorporated herein by reference.

**P. What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**Q.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent, Donlin, Recano & Company, Inc., via one of the following methods:

| | |
|---|---|
| *By regular mail at:* | *By hand delivery or overnight mail at:* |
| Donlin, Recano & Company, Inc. | Donlin, Recano & Company, Inc. |
| Re: Shale Support Global Holdings, LLC, et al. | Re: Shale Support Global Holdings, LLC, et al. |
| P.O. Box 199043 | 6201 15th Avenue |
| Blythebourne Station | Brooklyn, NY 11219 |
| Brooklyn, NY 11219 | |

*By telephone at:* (866) 296-8019          *By facsimile at:* (212) 709-3348

*By electronic mail at:*
SSGHBallots@donlinrecano.com

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Notice and Claims Agent at the addresses above or by downloading the exhibits and documents from the website of the Notice and Claims Agent at https://www.donlinrecano.com/ssgh (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy/ (for a fee).

**R.    Who supports the Plan?**

The Plan is supported by the Debtors and BSP, as Term Loan Agent for the Term Loan Lenders under that certain Term Loan Agreement, who submit the Plan as co-proponents. The Proponents believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## IV.    THE PLAN

As discussed in Article III herein, the Plan contemplates, among other things, a substantial deleveraging through the conversion of approximately $80 million of the Secured Term Loan Claims into New Membership Interests and a portion of the Exit Facility. The Plan contemplates the following key terms, among others described herein and therein:

**A.    Issuance of New Membership Interests**

All existing Interests in SSGH, SSH, Stanton, and MAH will be cancelled as of the Effective Date; each of SSGH, Stanton, and MAH shall be dissolved; and the reorganized SSH (the "Reorganized SSH") will issue the New Membership Interests to holders of Allowed Secured Term Loan Claims. The New Membership Interests will constitute 100% of the membership interests in Reorganized SSH issued and outstanding as of the Effective Date.

Reorganized SSH shall be authorized without the need for any further corporate action, and without any further action by the Bankruptcy Court or by the holders of Claims or Interests or any other Person, to issue the number of New Membership Interests contemplated by the Plan. On the Effective Date, the New

14

Organizational Documents with respect to Reorganized SSH shall provide for a certain number of authorized New Membership Interests at least equal to the number of such New Membership Interests contemplated by the Plan.

All of the New Membership Interests issued pursuant to the Plan shall be duly authorized and, when issued, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### B.    Exit Facility

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facility, which shall be a senior secured term loan facility to be arranged and provided by the Term Loan Lenders (the "Exit Facility Lenders") in a minimum amount of $80 million, on the terms set forth in the Exit Facility Documents. The Exit Facility Lenders are affiliates of the Term Loan Agent.

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents necessary or appropriate to obtain the Exit Facility and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as (A) the Debtors, with the consent of the Term Loan Lenders or (B) the Reorganized Debtors (the foregoing (A) or (B) as applicable) may deem to be necessary to consummate the Exit Facility.

Proceeds from the DIP Facility and Exit Facility, as applicable, will be used, among other things, to fund certain distributions under the Plan, the Debtors' operations, and administration of the Chapter 11 Cases, as well as for general corporate purposes.

### C.    Governance

In accordance with Article IV.J of the Plan, the initial boards of directors (including the New Board) and the officers of each of the Reorganized Debtors shall be appointed by the Term Loan Agent (in consultation with the Reorganized Debtors' management) in accordance with the respective New Organizational Documents. Forms of the New Organizational Documents will be included in the Plan Supplement.

### D.    Recoveries to Certain Holders of Claims

As described in greater detail in Article III of this Disclosure Statement, the DIP Facility Lenders will receive a principal portion of the Exit Facility equal to the DIP Facility Claim Amount. Each holder of an Allowed Secured Term Loan Claim will receive its Pro Rata share of the Secured Term Loan Claim Recovery (i.e., New Membership Interests and a principal portion of the Exit Facility). Additionally, each holder of an (x) Allowed Unsecured Convenience Class Claim will receive its Pro Rata share of the Convenience Class Recovery Pool and (y) Allowed General Unsecured Claim will receive its Pro Rata share of the GUC Recovery, each in accordance with Article VI.F of the Plan.

15

### E.      General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan (including (1) the Term Loan Lenders' and/or the DIP Lenders' agreement to (a) convert approximately $80 million of funded debt into New Membership Interests and a portion of the Exit Facility, (b) waive the Deficiency Term Loan Claims in the approximate amount of $30 million, (c) pay in full priority Claims and certain unsecured trade Claims, including all Claims that the Debtors were authorized to pay under any prior orders entered by the Bankruptcy Court in the Chapter 11 Cases, (d) fund the GUC Recovery and the Convenience Class Recovery Pool for the benefit of Allowed General Unsecured Claims (other than Deficiency Term Loan Claims) and Allowed Unsecured Convenience Class Claims, and (e) forgo any claim for the diminution in value of their Prepetition Collateral (as defined in the DIP Facility Order), and (2) the Exit Facility to provide the Debtors with a flexible and sustainable capital structure), upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the Term Loan Claims and (2) any claim to avoid, subordinate, or disallow any Term Loan Claim, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.  The Plan shall be deemed a motion to approve the Plan Settlement pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court the Plan Settlement is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to holders of Allowed Claims in any Class are intended to be and shall be final.

Pursuant to Rule 408 of the Federal Rules of Evidence, the Plan, this Disclosure Statement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto will not be admissible into evidence in any proceeding unless and until the Plan is consummated, and then only in accordance with the Plan.  In the event the Plan is not consummated, provisions of the Plan, this Disclosure Statement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto will not be binding or probative.

### F.      Releases

**THE PLAN CONTAINS CERTAIN CUSTOMARY DEBTOR AND THIRD-PARTY RELEASES (THE "<u>THIRD PARTY RELEASES</u>"), AS DESCRIBED MORE FULLY IN ARTICLE VIII.D. OF THE PLAN AND ARTICLE III.L OF THIS DISCLOSURE STATEMENT.  THE "RELEASED PARTIES" UNDER THE PLAN ARE EACH OF (I) THE DIP FACILITY LENDERS; (II) THE DIP FACILITY AGENT; (III) THE TERM LOAN AGENT; (IV) THE TERM LOAN LENDERS; (V) THE EXIT FACILITY LENDERS; (VI) THE EXIT FACILITY AGENT; AND (VII) WITH RESPECT TO EACH OF THE DEBTORS, THE REORGANIZED DEBTORS, AND EACH OF THE FOREGOING ENTITIES IN CLAUSES (I) THROUGH (VII), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES AND SUBSIDIARIES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' AND SUBSIDIARIES' CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS, AND ASSIGNS, SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER**

16

**PROFESSIONALS;** *PROVIDED* **THAT ANY HOLDER OF A CLAIM OR INTEREST THAT (X) VALIDLY OPTS OUT OF THE RELEASES CONTAINED IN THE PLAN OR (Y) FILES AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN SHALL NOT BE A "RELEASED PARTY."**

**THE "RELEASING PARTIES" UNDER THE PLAN ARE, COLLECTIVELY, (A) THE DIP FACILITY LENDERS, (B) THE DIP FACILITY AGENT, (C) THE TERM LOAN AGENT, (D) THE TERM LOAN LENDERS, (E) THE EXIT FACILITY LENDERS, (F) THE EXIT FACILITY AGENT, (G) THE COMMITTEE AND ITS MEMBERS (H) ALL HOLDERS OF CLAIMS, (I) ALL HOLDERS OF INTERESTS, AND (J) EACH OF THE DEBTORS, THE REORGANIZED DEBTORS, AND WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (J), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES AND SUBSIDIARIES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' AND SUBSIDIARIES' CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS, AND ASSIGNS, SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH COLLECTIVELY;** *PROVIDED* **THAT ANY HOLDER OF A CLAIM OR INTEREST THAT (X) VALIDLY OPTS OUT OF THE RELEASES CONTAINED IN THE PLAN OR (Y) FILES AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN SHALL NOT BE A "RELEASING PARTY."**

*ALL HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT OPT OUT OF THE THIRD PARTY RELEASES ON A TIMELY SUBMITTED BALLOT OR OPT OUT FORM (AS APPLICABLE), OR BY TIMELY FILING AN OBJECTION THAT EXPRESSLY OBJECTS TO THEIR INCLUSION AS A "RELEASING PARTY" UNDER ARTICLE VIII.D OF THE PLAN, SHALL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.*

## V.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.   Shale Support's Corporate History, Assets and Operations

Shale Support primarily serves the "upstream" sector of the oil and gas industry.  This sector is comprised primarily of exploration and production ("E&P") companies that focus on locating and extracting crude oil and natural gas from the ground.  Many upstream E&P companies do not complete the labor-intensive tasks of drilling and completing oil and natural gas wells themselves – instead opting to contract with oilfield services ("OFS") companies for the provision of such services. The Debtors provide services to OFS and E&P companies engaged in hydraulic fracturing of operations to stimulate oil and natural gas wells in unconventional shale plays.

*Frac Sand and Its Use in the Oil and Gas Industry.* The subsurface rock in unconventional shale plays contain oil, natural gas, and/or natural gas liquids that cannot flow freely to a well because the rock is impermeable.  Hydraulic fracturing resolves this issue by creating fractures in the rock.  This is accomplished by drilling a well into the rock and sealing the portion of the well in the petroleum-bearing zone.  Water and a proppant (i.e., frac sand) are then pumped into that portion of the well using a high-

pressure process.  Large pumps at the surface increase water pressure in the sealed portion of the well until pressure is sufficient to fracture surrounding rocks.  Water rushes rapidly through the fractures, making them larger and pushing them deeper into the rock.  Because billions of sand grains are pushed deep into the fractures, it can take several thousand tons of frac sand to stimulate a single well.

After the surface pumps are turned off, the fractures contract but do not close completely because they are propped open by billions of grains of frac sand.  Frac sand is known as a "proppant" because it props the fractures open by forming a network of pore spaces that allow the hydrocarbons to flow out of the rock and into the well.  The Debtors' proppants are comprised of monocrystalline sand designed to keep an induced hydraulic fracture open to enhance oil and gas product recovery in unconventional shale deposits.

Frac sand is a high-purity quartz sand with rounded grains. It is very durable and provides a crush-resistant material used in the oil and gas industry for hydraulic fracturing. Rock units composed of quartz grains that have gone through multiple cycles of weathering and erosion are potential sources of frac sand material.

Producers of frac sand must account for two primary costs in their per-ton cost of sand: production and logistics.  The logistical costs of frac sand are driven by rail or barge access or close delivery endpoint truck transport proximity.  In many cases, the costs of delivery of the frac sand to the well exceed the costs of production.  As such, each frac sand producer is dependent upon its logistics capabilities to economically deliver the frac sand to the well site.

***Formation of Shale Support Holdings, LLC and Operations.***  SSH was formed in 2014 to consolidate ownership of a sand mine (the "Mine"), a drying facility (the "Drying Facility") and a transload facility (the "Southton Facility") that would allow SSH to integrate the production of frac sand with the logistics of delivery.  Shortly after SSH was formed, it quickly began expanding its facilities to obtain economies of scale.  Shale Support's Mine and Drying Facility are operated through SES.  The Southton Facility is operated by an unaffiliated third-party operator.

The Debtors' mining and processing operations are conducted in and around Picayune, Mississippi at the Mine owned by WMAH and the Drying Facility owned by DFAH.  The Mine consists of approximately 1,100 acres of reserves area, containing approximately 98 million tons of proven recoverable frac sand.  After acquiring the Mine, the Debtors expanded operations to encompass five fully-operational "wet plants."  At the Mine, sand and aggregate are mined, separated and processed at Shale Support's wet plants.  The aggregate is then sold to the local construction industry and the sand is transported by truck to the Drying Facility.

Since acquiring the Drying Facility, the Debtors have expanded operations, doubled production capacity and added a rail spur connecting the facility to the Norfolk Southern Railway.  The Drying Facility is utilized to dry, process and segregate the raw sand into specific frac sand products.  Thereafter, the frac sand is shipped by rail to transload facilities where the sand is sold to E&P companies for use in hydraulic fracturing and to completion service companies that provide hydraulic fracturing services to the industry.

The Debtors' Southton Facility is located south of San Antonio, Texas and is a 300-acre transload facility owned by SRY.  The Southton Facility permits Shale Support to transload daily 100 railcars of frac sand into 160 trucks for transport to specific wells for incorporation into hydraulic fracturing operations in the Eagle Ford basin. In addition to the Southton Facility, the Debtors have access to a strategically aligned transload network (the "Transload Facilities") with key destination terminals that serve the Austin Chalk, Marcellus, Utica, Haynesville, Tuscaloosa, Mid-Con, and Permian shale plays.  As part of Shale Support's expansion of its logistic reach, Stanton was formed in 2017 to acquire certain real property in Stanton,

18

Texas and develop the property into a Permian basin centric transload facility. While Stanton secured an option to acquire the property, it has not been able to obtain an anchor tenant or sufficient funding to close and develop the property.

### B.    The Debtors' Management Team

As of the date of this Disclosure Statement, the Debtors' senior management includes: (a) Kevin Bowen, Chief Executive Officer and Co-Founder; (b) Jeff Bartlam, President and Co-Founder; (c) Charles R. Caswell, Chief Financial Officer; (d) Shane Summers, Vice President of Logistics; (e) Lee Hullman, Vice President of Business Development; (f) Scottie Bayman, Director of Quality Control; and (g) Keith Tubandt, Vice President of Production Management.

### C.    The Debtors' Prepetition Capital Structure

As of the Petition Date, Shale Support and certain of its subsidiaries, including the other Debtors, were liable for approximately $130 million in principal amount of aggregate debt obligations. Shale Support's prepetition capital structure is summarized as follows:[4]

| Debt | Maturity | Principal Amount |
|---|---|---|
| Revolver | 2/28/21 | $12 million |
| Term Loan | 8/15/21 | $116 million |
| Capital Leases | Variable | $6.7 million |
| | **Total:** | $135.7 million |

***The Term Loan Agreement.*** In August 2017, Debtors SSH and Stanton, as borrowers, Debtors SSGH, SES, WMAH, DFAH, SRY, and MAH, as guarantors, the lender parties thereto (the "Term Loan Lenders"), and BSP, as Term Loan Agent for the Term Loan Lenders, entered into that certain Amended and Restated Credit Agreement, dated as of August 15, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "Term Loan Agreement"). The Term Loan Agreement provided the Debtors with a secured term loan credit facility in an amount of $100 million (the "Term Loan"). The Term Loan has a maturity date of August 15, 2021, and accrues interest at a rate per annum equal to (a) a fixed rate of 10%; or (b) at the borrowers' election pursuant to the Term Loan Agreement, a fixed rate of 12% with respect to payment-in-kind, or "PIK," interest. Following the occurrence of an Event of Default (as defined in the Term Loan Agreement), an additional 3% is added to the applicable rate of interest.

The Term Loan Agreement was further amended on October 12, 2018, pursuant to the Second Amendment to Amended and Restated Credit Agreement (the "Second Amendment"). The Second Amendment included provisions that (i) permitted SSH and Stanton to borrow $5,000,000 in additional term loans from the Term Loan Lenders and (ii) provided for a financial covenant recess period during which SSH and Stanton were not required to comply with the Total Leverage Ratio, the Interest Coverage Ratio and the ratio of Current Assets to Current Liabilities (each such ratio as defined in the Term Loan Agreement and hereinafter, the "Financial Covenants") for the fiscal quarter period ending September 30, 2018.

The Debtors, the Term Loan Agent and the Term Loan Lenders entered into a Limited Consent and Waiver to Amended and Restated Credit Agreement dated December 31, 2018 (the "December 31 Waiver"), pursuant to which the Term Loan Agent and the Term Loan Lenders (collectively, the "Lender Parties") agreed to waive the requirement that SSH and Stanton pay accrued interest on each outstanding term loan on December 31, 2018, and consented to payment of such interest on January 10, 2019. Pursuant

---

[4] The following does not include accrued but unpaid interest or fees under the agreements as of the Petition Date.

to a Waiver and Third Amendment to Amended and Restated Credit Agreement dated January 10, 2019 (the "Third Amendment"), the Lender Parties and the Debtors agreed to amend the Term Loan Agreement so that the accrued interest that was payable on January 10, 2019 and March 31, 2019 were payable 50% as cash and 50% as PIK interest.  Under the terms of such Third Amendment, the Lender Parties also agreed to waive compliance with the Financial Covenants for the fiscal quarter period ending December 31, 2018. Thereafter, the Lender Parties and the Debtors entered into another Limited Waiver to Amended and Restated Credit Agreement dated April 4, 2019 (the "April 4 Waiver"), whereby the Lender Parties waived SSH's and Stanton's default for failure to timely pay accrued cash interest during a Waiver Period beginning on April 4, 2019, and ending on April 19, 2019 (the "Waiver Period").

Pursuant to a Limited Waiver and Fourth Amendment to Amended and Restated Credit Agreement dated April 19, 2019 (the "Fourth Amendment"), the Lender Parties and the Debtors agreed to amend the Term Loan Agreement to permit SSH and Stanton to borrow from the Term Loan Lenders additional term loans in an aggregate amount of $4,000,000.  The Lender Parties also agreed to (a) waive compliance with the Financial Covenants for the period from January 1, 2019, through March 31, 2019, and waive delivery of the compliance certificate for that period due April 30, 2019, and (b) extend the Waiver Period from April 19, 2019, until May 15, 2019.  In addition, the Debtors agreed in the Fourth Amendment to use their reasonable best efforts to negotiate a restructuring of their indebtedness and liabilities in a manner acceptable to the Lender Parties.  As the parties continued to negotiate a restructuring of the Debtors' indebtedness, the Waiver Period was further extended to July 1, 2019, pursuant to another limited waiver.

Finally, pursuant to a Limited Waiver and Fifth Amendment to Amended and Restated Credit Agreement dated July 2, 2019 (the "Fifth Amendment"), the Lender Parties and the Debtors agreed to amend the Term Loan Agreement to permit SSH and Stanton to borrow $2,610,000 in additional term loans from the Term Loan Lenders.  Under the terms of the Fifth Amendment, the Lender Parties also agreed to (a) waive delivery of the compliance certificate due April 30, 2019, and (b) extend the Waiver Period until July 8, 2019, during which time it agreed to waive the Event of Default arising from SSH's and Stanton's failure to timely pay accrued cash interest.

As of the Petition Date, the Debtors' had outstanding funded debt obligations in the aggregate amount of approximately $116,001,368.20 in principal and prepetition interest, not including fees, expenses, or any other amounts due in accordance with the Term Loan (the "Term Loan Obligations").[5] The Debtors have granted first-priority security interests in and liens on all or substantially all of their assets (the "Term Loan Collateral") to secure their Term Loan Obligations (the "Term Loan Liens").

***Revolving Credit Agreement.*** In February 2018, Debtors SES and SRY, as borrowers, Debtors SSH, WMAH, DFAH, and MAH, as guarantors, and Siena Lending Group LLC, as lender ("Siena," or the "Revolving Lender," and together with the Term Loan Agent and Term Loan Lenders, the "Prepetition Secured Parties"), entered into that certain Loan and Security Agreement, dated as of February 28, 2018 (as amended, restated, supplemented, or otherwise modified from time to time, the "Revolving Credit Agreement"). The Revolving Credit Agreement provided the Debtors with a secured asset-based revolving credit facility in an amount up to $10 million (the "Revolving Credit Facility"), and is subject to periodic borrowing base redeterminations by Siena. The Revolving Credit Facility has a maturity date of February 28, 2021, and accrues interest at a rate per annum equal to a base rate indexed to the prime rate plus an applicable margin of 3.5%. Following the occurrence of an Event of Default (as defined in the Revolving Credit Agreement), an additional 5% is added to the applicable rate of interest.

---

[5] Pursuant to the terms of the DIP Facility Loan Agreement, and as authorized in the Final DIP Order, $6.6 million of the Term Loan Obligations have been rolled up and converted into the DIP Facility.

On August 2, 2018, SES and SRY, as borrowers, and Siena executed a letter agreement which amended the Revolving Credit Agreement to reduce the Availability Block (as defined therein) from $1,000,000 to $850,000. The Revolving Credit Agreement was also amended, pursuant to a First Amendment to Loan and Security Agreement dated December 12, 2018, to, among other things, change the borrowing base calculations by increasing the concentration limits for certain account debtors. Thereafter, on February 20, 2019, the Revolving Credit Agreement was further amended to, among other things, (i) modify the limitations for the eligible inventory component of the borrowing base and increase certain concentration limits, (ii) institute a reserve for certain railroad accounts payable, (iii) temporarily reduce the amount of the Availability Block, (iv) extend the maturity date for another year, (v) modify the prepayment fee provisions and (vi) add a success fee. On February 28, 2019, SES and SRY requested a facility increase to the Revolving Credit Agreement and, on that same date, SES, SRY and Siena entered into a Third Amendment to Loan and Security Agreement which increased the Maximum Revolving Facility Amount (as defined therein) to $15,000,000.

As of the Petition Date, the Debtors' had outstanding funded debt obligations in the aggregate amount of approximately $11,600,357.76 in principal and prepetition interest, not including fees, expenses, or any other amounts due in accordance with the Revolving Credit Facility (the "Revolving Credit Obligations"). Debtors SES and SRY have granted security interests and liens on certain of their assets, including, without limitation, their accounts and inventory (the "Siena Priority Collateral," and together with the Term Loan Collateral, the "Prepetition Collateral") to secure their Revolving Credit Obligations (the "Siena Liens").

The relative priorities of the Term Loan Liens and Siena Liens are set forth in that certain Intercreditor Agreement, dated as of February 28, 2018 (as amended, restated, supplemented, or otherwise modified from time to time, the "Intercreditor Agreement"). Pursuant to the Intercreditor Agreement, the Term Loan Obligations are collateralized by the first-priority Term Loan Liens on Term Loan Collateral; provided that the Revolving Credit Obligations up to the Maximum Revolving Lender Debt (as defined in the Intercreditor Agreement) are collateralized by the first-priority Siena Liens on the Siena Priority Collateral.

*Capital Leases.* Shale Support, through SES and SRY, are borrowers under 11 separate capital leases for equipment in the aggregate amount of approximately $6.7 million.

*Corporate Structure.* Debtor SSGH is the direct corporate parent of Debtors SSH and Stanton. SSH, in turn, is the direct corporate parent of Debtors MAH, SES, SRY, WMAH, and DFAH.[6] SSGH was formed to facilitate the closing of the Term Loan Agreement. SSGH is directly owned by non-debtors MOR Bison, LLC (69.24%) and BBR Holdings, LLC (29.67%), and various non-debtor minority investors (collectively, 1.19%). Shale Support Master US Holdings, LLC ("Hold Co.") is SSGH's ultimate corporate parent, but it is not a debtor in these Chapter 11 Cases. Hold Co. is also the direct corporate parent of non-debtor Shale Support Louisiana Holdings, LLC ("Shale Support Louisiana"), which in turn is the direct corporate parent of non-debtors Kinder Mine Asset Holdings, LLC ("KMAH") and SFM Mine Asset Holdings, LLC ("SMAH"). Hold Co. was formed in May 2018 to facilitate the acquisition of mines located in Kinder and Baywood, Louisiana by KMAH and SMAH, respectively. A depiction of the corporate structure of the Debtors and their non-debtor affiliates is attached hereto as **Exhibit B**.

*Shale Support Louisiana Marketing Agreement.* Pursuant to the terms of a Marketing, Sales and Management Agreement (the "Marketing Agreement"), the Debtors assisted Shale Support Louisiana with respect to marketing, sales, and distribution, and the Debtors and Shale Support Louisiana shared certain services and costs. The Debtors and Shale Support Louisiana share (a) a small number of employees,

---

[6] MAH has no material assets or operations.

(b) certain employee benefit plans that cover both the Debtors' and Shale Support Louisiana's employees, and (c) certain corporate insurance policies that cover both the Debtors and Shale Support Louisiana.[7] Generally, the Debtors have paid the full costs of the shared employee benefit plans and corporate insurance policies and then invoiced Shale Support Louisiana for its portion of those costs. In addition, pursuant to the Marketing Agreement, the Debtors purchased frac sand from Shale Support Louisiana and Shale Support Louisiana invoiced the Debtors for these purchases.[8]

Prior to the Petition Date, the Debtors determined that it was in their best interests to transition towards a separation from Shale Support Louisiana. To that end, the Debtors approached Shale Support Louisiana about entering into a transition services agreement that would replace the Marketing Agreement and provide for a short-term transition period in which the parties would continue to share certain services and costs while Shale Support Louisiana seeks to obtain its own benefit plans and insurance policies. While the parties were unable to enter into such an agreement prior to the Petition Date, the parties have taken steps and are working to separate the existing benefit plans and policies so that the Debtors are no longer funding costs allocated to Shale Support Louisiana. As of August 5, 2019, (i) there are only three employees who still perform work for both the Debtors and Shale Support Louisiana and (ii) the Debtors estimate that within 45 days the Debtors and Shale Support Louisiana will no longer share benefit plans and insurance policies.

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Market Decline and Industry-Specific Challenges

Demand for frac sand is significantly influenced by the level of well completions by E&P and OFS companies, which depends largely on the current and anticipated profitability of developing oil and natural gas reserves. As such, Shale Support's business is highly correlated with well completions, which is, in-turn, dependent on both commodity prices and producers' ability to deliver oil to the market. Over the past five years, commodity prices have been highly volatile resulting in an unpredictable demand curve and a significant amount of OFS and E&P bankruptcies. Compounding these demand issues, Shale Support operates in a highly-competitive industry that has seen a dramatic increase in supply. This new supply has come from basin-specific regional frac sand producers (that have dramatically lower logistic costs) as well as larger, often better-capitalized, competitors. Regional suppliers and Shale Support's larger competitors are both in a position to exert significant, downward pressure on pricing for proppants.

As a result of these new sources of supply and sequentially lower demand, supply for proppants exceeded demand in the second half of 2018, driving down prices for frac sand. While prices were declining through the fourth quarter of 2018, Shale Support believed that demand would increase in early 2019 on an expectation of increased drilling and completion activity. While demand for frac sand did increase

---

[7]  More details regarding the shared employees and employee benefit plans are set forth in the *Emergency Motion of the Debtors for Entry of Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimburseable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* [Docket No. 8], filed with the Bankruptcy Court on July 11, 2019. More details regarding the shared insurance policies are set forth in the *Emergency Motion of Debtors for Entry of Order (I) Authorizing the Debtors to (A) Maintain Existing Insurance Policies and Pay All Policy Premiums and Brokers' Fees Arising Thereunder, (B) Continue Insurance Premium Financing Programs and Pay Insurance Premium Financing Obligations Arising in Connection Therewith, and (C) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (II) Granting Related Relief* [Docket No. 10], also filed with the Bankruptcy Court on July 11, 2019.

[8]  After netting the amounts that Shale Support Louisiana owes the Debtors on account of shared services and costs against the amounts that the Debtors owe Shale Support Louisiana for frac sand purchases, the Debtors estimate that, as of the Petition Date, they owe Shale Support Louisiana approximately $600,000.

*ACTIVE 45314459v1*

substantially in the first quarter of 2019, Shale Support lacked the liquidity to finance the costs necessary to capture its forecasted share of the increased demand.  Further, the increased demand did not result in the higher prices Shale Support had projected.  As a result, Shale Support's net revenue per ton fell over 40% in 2018.

In contrast to the volatile nature of proppant pricing, Shale Support's costs are largely fixed.  A significant fixed cost is the cost of leasing railcars utilized to transport frac sand.  Shale Support leases approximately 1,373 railcars from various lessors to transport sand from the Drying Facility to its transload facilities network.  Due to an overall decrease in industry demand for railcars, Shale Support believes that its railcar leases are at prices significantly above current market rates.  In addition, Shale Support's mining and production operations are capital intensive endeavors that require consistent capital expenditures to maintain the underlying assets.

The foregoing circumstances have significantly strained Shale Support's enterprise-wide liquidity and caused Shale Support's capital structure to become unsustainable.

### A.    The Prepetition M&A and Financing Alternatives

Prior to the rapid price drop in proppants, in early 2018, Shale Support retained Simmons Energy, a division of Piper Jaffrey & Co. ("PJC"), as its investment banker to pursue a sale of the company.  Since being retained, PJC contacted all significant strategic buyers about a potential acquisition of Shale Support and various private equity firms with an expressed-interest in the proppants sector.

While no formal sale process was commenced, PJC engaged in discussions with each group throughout the summer of 2018.  In the midst of these efforts, the price of frac sand began its steep decline.  Unsurprisingly, no party submitted an indicative expression of interest, a non-binding offer or a valuation of Shale Support.  The stated justification from these parties centered around market conditions, location of the reserves, quality of sand, availability of buyer cash, and consistent underperformance of business relative to forecasts.

Based on the lack of market interest in an acquisition, in October 2018, Shale Support expanded PJC's mandate to obtain replacement financing.  In response, PJC contacted over 40 lenders to provide new revolver and term loan products to Shale Support.  This process yielded one asset based lending indication of interest and two term loan indications of interest. While the parties conducted diligence, none of the potential lenders pursued a transaction as both the commodities' and proppant's market – as well as Shale Support's liquidity – began to deteriorate.

Concurrent with PJC's process, the price of oil and Shale Support's net revenue per ton of frac sand fell substantially.  This decline in revenue rendered Shale Support incapable of (a) complying with various financial covenants under the Term Loan Agreement, and (b) maintaining payments on its railcar leases and obligations to vendors.

### B.    The Restructuring Negotiations, Temporary Waiver, and Forbearance Agreement

In December 2019, the Debtors and the Lender Parties entered into the December 31 Waiver and shortly thereafter, the Third Amendment.  In connection with these waivers and amendments, Shale Support began discussions with its key stakeholders – including the Term Loan Lenders – regarding comprehensive restructuring alternatives that would strengthen Shale Support's balance sheet and provide near-term liquidity support.  While Shale Support was ultimately able to secure several months' worth of forbearance from the Term Loan Lenders, Shale Support was unable to secure a viable restructuring solution prior to its April 2019 interest payment or obtain additional near-term liquidity to continue operations.  Accordingly, on April 19, 2019, Shale Support and the Term Loan Lenders entered into the Waiver and Fourth

23

Amendment.  Pursuant to the Waiver and Fourth Amendment, the Term Loan Lenders waived the Debtors' defaults under the Term Loan Agreement and advanced an additional $4 million to Shale Support to meet critical obligations to sustain operations while the parties evaluated restructuring options.  Subsequently, on July 2, 2019, Shale Support entered into the Fifth Amendment under which the Term Loan Lenders advanced another $2.61 million to Shale Support to pay additional critical costs that Shale Support was unable to otherwise fund prior to the Petition Date.

Shale Support's discussions with its stakeholders have focused on building consensus around a de-leveraging transaction.  These discussions have included, among other things: (a) the provision of a substantial amount of diligence to the Term Loan Lenders and their advisors; (b) ongoing dialogue and communication around the Shale Support enterprise, its operations, and its prospects; and (c) regular meetings to discuss Shale Support's potential restructuring path.

After further analysis and discussions with Shale Support's management team and advisors, Shale Support's full Board ultimately approved the Debtors' chapter 11 filings and the Debtors commenced the Chapter 11 Cases on July 11, 2019.

### C.       DIP Facility

The Term Loan Lenders (in their capacity as DIP Facility Lenders) agreed to fund the DIP Facility and provide the Debtors with postpetition financing in the form of a senior secured, superpriority delayed-draw term loan credit facility in the aggregate principal amount of $16.6 million.  The DIP Facility also contemplates consensual use of the Prepetition Secured Parties' cash collateral.  Based on the analysis by Shale Support's management team and advisors, the DIP Facility is on the most favorable terms available in light of the circumstances of the Chapter 11 Cases and the current market for such financing.  The DIP Facility provides the Debtors with sufficient liquidity to stabilize their operations and fund the administration of the Chapter 11 Cases as the Debtors seek to implement the restructuring contemplated by the Plan.  On July 12, 2019, the Bankruptcy Court entered an interim DIP order (the "Interim DIP Order") [Docket No. 36], approving the DIP Facility on an interim basis.  The DIP Facility closed on July 12, 2019 and the Debtors made an initial draw of $3 million thereunder.  On August 19, 2019, the Bankruptcy Court approved the DIP Facility on a final basis (the "Final DIP Order") [Docket No. 194].

The Debtors filed the Chapter 11 Cases to restructure their businesses, enhance liquidity, and bolster their long-term growth prospects and operating performance.  The Plan represents the successful culmination of months of restructuring efforts and numerous compromises and concessions by the Term Loan Lenders, and gives the Debtors the best opportunity to withstand current adverse market conditions, generate sufficient liquidity to fund their operations, and maximize value for the benefit of their stakeholders.  The cornerstone of the reorganization contemplated by the Plan is the conversion of approximately $80 million of existing obligations under the Term Loan Agreement into New Membership Interests and a portion of the Exit Facility.  Further, the liquidity contemplated by the Plan – including the proposed $80 million Exit Facility – will be sufficient to fund payments under the Plan and the Reorganized Debtors' post-emergence operations.

### VII.     MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.       Corporate Structure upon Emergence

Except with respect to SSGH, Stanton and MAH, each of which will be dissolved under applicable law as of the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may

be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### B.        Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly.  Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 in just a few months after the Petition Date.  Under the terms of the DIP Facility, the Debtors are required to administer the Chapter 11 Cases in accordance with certain milestones, including exiting the Chapter 11 Cases.  **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

### C.        First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Gary Barton, Chief Restructuring Officer of Shale Support Global Holdings, LLC, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 16], filed on July 11, 2019.

Significantly, to prevent the imposition of the automatic stay from disrupting the Debtors' businesses and to ensure continued deliveries and services on favorable credit terms, the Debtors sought and were granted the authority to pay prepetition Claims of certain vendors and third-party service providers.[9]  The Debtors' ability to pay the claims of these vendors and third-party service providers was and remains critical to the Debtors' ongoing business operations due to the Debtors' inability to acquire essential replacement goods and services of the same quality, reliability, cost or availability from other sources. The Debtors' ability to pay the claims of these vendors and service providers, therefore, was and remains critical to the success of the Debtors' Chapter 11 Cases.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://www.donlinrecano.com/ssgh.

---

[9]  For more detail, see that certain *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay (A) 503(b)(9) Claims, (B) Shipping, Warehousing, and Other Lien Claims, and Certain Vendor Claims, and (II) Granting Related Relief* [Docket No. 12], filed by the Debtors with the Bankruptcy Court on July 11, 2019, and that certain   *Final Order (I) Authorizing the Debtors to Pay (A) 503(b)(9) Claims, (B) Shipping, Warehousing, and Other Lien Claims, and Certain Vendor Claims, and (II) Granting Related Relief* [Docket No. 35], entered by the Bankruptcy Court on July 12, 2019.

#### D.    Other Procedural and Administrative Motions

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Ordinary Course Professionals Motion.  On July 17, 2019, the Debtors filed the *Motion of debtors for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 66] (the "OCP Motion").  The OCP Motion seeks to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses.  On August 8, 2019, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. 141].

- Retention Applications.  On July 17 and 19, 2019, the Debtors filed a number of applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including Greenberg Traurig, LLP, McGlinchey Stafford PLLC, and Okin Adams LLP, as legal counsel, PJC, as investment banking financial advisor, and Alvarez & Marsal North America, LLC ("Alvarez & Marsal"), to provide Gary Barton as the Debtors' chief restructuring officer and certain additional personnel (collectively, the "Retention Applications").  Between August 7, 2019 and [●], 2019, the Bankruptcy Court approved each of the Retention Applications.  The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases.  The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

#### E.    Approval of the DIP Facility

Based on the Debtors' need for debtor-in-possession financing and their conclusion that the DIP Facility represents the best terms available, on the Petition Date, the Debtors filed a motion seek authorization to enter into the DIP Facility on an interim and final basis (the "DIP Facility Motion").  As discussed above, on July 12, 2019, the Bankruptcy Court entered the Interim DIP Order, and on August 19, 2019, the Bankruptcy Court entered the Final DIP Order, approving the DIP Facility on a final basis.

On August 6, 2019, prior to the entry of the Final DIP Order, the Committee (as defined below) filed an objection to the DIP Facility Motion, raising a number of purported issues with the terms of the DIP Facility [Docket No. 125].  The Debtors, the Committee, and the DIP Facility Lenders ultimately negotiated and agreed to a number of modifications to the Final DIP Order and the DIP Facility Loan Agreement to resolve the Committee's objection.

#### F.    Schedules and Statements

On August 15, 2019, the Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket Nos. 165-180].

#### G.    Bar Date Motion and Order

On July 18, 2019, Debtors filed a motion in the Chapter 11 Cases requesting, among other things, that the Bankruptcy Court set certain deadlines for non-governmental claimants to file proofs of claim and approve certain notice procedures regarding such deadlines [Docket No. 70].  The Bankruptcy Court

26

granted this motion on July 29, 2019, and set the Bar Date as August 30, 2019, at 5:00 p.m. (prevailing Central Time) [Docket No. 92].

## H.    Appointment of Official Committee

On July 29, 2019, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 88], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases.  The Committee is currently composed of the following members: Coyote Logistics, LLC; Trinity Industries Leasing Company; J. Patrick Lee Construction; Retif Oil & Fuel, LLC; and Tidewater Logistics Operating, LLC. The Committee has retained Foley Gardere, Foley & Lardner LLC as its legal counsel and GlassRatner Advisory & Capital Group, LLC as its financial advisors.

## I.    Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

***Southton Rail Yard, LLC v. Cudd Pumping Services, Inc.***, Civil Action No. 18:1632, United States District Court for the Southern District of Texas, Houston Division (the "District Court").  Southton Rail Yard, LLC ("SRY") entered into a supply agreement with Cudd Pumping Services, Inc. ("Cudd") on January 1, 2015, pursuant to which Cudd agreed to purchase 15,000 tons of frac sand from SRY over a 2-3 year period in accordance with the terms and conditions of the agreement (the "Supply Agreement"). In 2015, Cudd ceased purchasing frac sand, and breached the Supply Agreement by not purchasing the quantities required by the agreement.

On May 18, 2018, SRY filed suit seeking to recover its lost profits or actual damages arising out of Cudd's failure to meet the terms of the Supply Agreement. SRY asserted claims for breach of contract, anticipatory repudiation, promissory estoppel, unjust enrichment and open or sworn account.   On November 26, 2018, Cudd filed a counterclaim asserting that SRY breached the Supply Agreement first by shipping defective (frozen) sand and by not shipping $1,650,000 in frac sand that was prepaid.

The following is a brief synopsis of SRY's claims and Cudd's defenses and counterclaims:

- **Breach of Contract.**  SRY asserts that Cudd materially breached the Supply Agreement when it failed to take delivery of and pay for the frac sand in accordance with the terms of the Supply Agreement.   SRY further contends that it complied with all obligations under the Supply Agreement and, therefore, there was no prior material breach of contract by SRY.

- **Anticipatory Repudiation.**  SRY asserts that Cudd's failure to take delivery and pay for the frac sand prevented SRY from further performance under the Supply Agreement.  Cudd

27

announced as early as March 2015 that it intended to stop purchasing frac sand due to the cessation of drilling activities by its customers, despite mechanisms in the Supply Agreement to address anticipated decreases in demand.   SRY alleges that it was the innocent party to this anticipatory repudiation of the Supply Agreement and was damaged by not being allowed adequate time to mitigate.

- **Alternative Causes of Promissory Estoppel, Unjust Enrichment and Sworn Account.** Should it be determined that Cudd did not breach the Supply Agreement, SRY alleges that Cudd knew or should have known that its failure to purchase frac sand per the Supply Agreement terms would cause substantial injury to SRY.   Cudd knew that SRY relied on its promises to contract with Coyote (as defined below) for the necessary rail cars to meet Cudd's needs.   Moreover, SRY's charges for goods and services (the demurrage costs) provided to Cudd were usual, customary and reasonable.   These goods and services were provided on an open account under the Supply Agreement for shipping and storage of frac sand after title and risk were transferred to Cudd.

- **Cudd's Counterclaims.**  Cudd asserts counterclaims for breaches of contract, breaches of express warranties, breaches of implied warranties, and money had and received.   These counterclaims largely arise out of an allegation that SRY delivered "frozen sand." The "frozen sand" issue is a red herring.   Specifically, and without limitation, SRY alleges that:

  o  SRY provided frac sand in compliance with the one requirement of the Supply Agreement, that the sand meet the quality requirements of the American Petroleum Institute (API). The fact that a delivery of sand in January had some ice on it does not affect or change the API standards, the only specification to which SRY was bound.

  o  The frac sand delivered to Cudd was merchantable, as evidenced by the fact that Cudd actually used it and tried to resell it to other customers.

  o  Cudd failed to reject the sand, revoke its acceptance or terminate the Supply Agreement.   In fact, as late as the Fall of 2016, Cudd sought to renegotiate the payment terms of the Supply Agreement.

SRY believes it has strong claims against Cudd and its damages analysis is conservative and takes into account any offset Cudd might have for prepaid undelivered sand and for the minimal damages suffered by Cudd as a result of the delivery of a small amount of sand in January with ice on it. It is possible, however, that if Cudd establishes that SRY breached the Supply Agreement first by delivering frozen (defective) sand, SRY could be barred from recovery as the first breaching party to the agreement (it must be noted that to the extent "defective" sand was delivered, Cudd did not comply with the terms of the Supply Agreement or the UCC in addressing the delivery of said defective product).

As of the Petition Date, the parties had begun fact discovery by exchanging initial written discovery and document production. Shortly before the Petition Date, Cudd issued additional discovery to SRY and SRY was working towards a motion to compel Cudd to fully answer written discovery.   Some third-party discovery had also taken place.    The parties were in the process of scheduling depositions (to date, no deposition have been taken).  In addition, the parties exchanged initial expert reports and were working on rebuttal expert reports.  SRY's expert, Carmen Eggleston of Whitney Penn LLP, opined that SRY suffered damages between $5.93-$7.93 million dollars (which takes into account $1.6 million in frac sand prepaid and not delivered to Cudd). It is important to note that a large part of SRY's asserted damages are expenses associated with obtaining rail cars from Coyote. SRY and Coyote reached a settlement agreement regarding the expenses associated with the rail cars and Coyote is one of the largest unsecured creditors in these Chapter 11 Cases (thus a resolution of claims against Cudd would involve resolving the claim of Coyote).

28

Cudd's expert, on the other hand, has opined that Cudd suffered damages in the amount of $2.8 million (which adds the $1.6 million in frac sand prepaid and not delivered).

On March 19, 2019, before the parties conducted significant discovery, the parties participated in mediation with Magistrate Judge Nancy K. Johnson. The parties were unable to reach a settlement during this mediation conference. However, the parties have expressed a continuing desire to attempt to reach a settlement.

On July 16, 2019, the District Court entered an order administratively closing the litigation pending bankruptcy. Prior to the Petition Date, the case was set to go to trial in January 2020. It is anticipated that should the stay be lifted, the parties could proceed to trial in 6-9 months. Trial could last 4-5 days. Given the nature of the dispute over the interpretation of the language of the Supply Agreement, it could be anticipated that following trial, there will be issues appropriate for an appeal. Both parties, however, have expressed continued interest in trying to resolve the case short of litigation (despite the lack of success during the first mediation). To date, SRY is not aware of any circumstances that would hinder recovery of any judgment it may recover from Cudd other than the generally known economic stresses on the frac industry as a whole.

SRY estimates that it would cost approximately $600,000 to litigate its claims to judgment (this does not include any costs and fees associated with an appeal). As expert discovery is largely complete (with the exception of rebuttal reports and depositions), one of the significant costs of litigation was incurred prepetition. Similarly, SRY has already produced 1,000's of pages of documents. It is anticipated that a number of depositions will be taken (at least 10-15) and that additional third-party discovery will be needed. Additionally, Cudd has not fully responded to discovery and unless Cudd supplements its discovery responses, it is anticipated a motion to compel will be necessary. Finally, it is anticipated that dispositive motions will be filed by either SRY or Cudd to address the issue of whether the Supply Agreement provided for Cudd to buy the fixed amount of sand over a 2-3 year period. Following the mediation described above, SRY feels encouraged it will prevail on any such a motion.

***Plant Materials, LLC v. Shale Support Holdings, LLC***, et al., Arbitration Case No. 01-18-0004-2494, American Arbitration Association, Commercial Arbitration. In this arbitration proceeding, Plant Materials, LLC ("PM") seeks to recover $2,654,625.60 from two separate construction contracts. PM claims that it is entitled to payment under a Time and Materials Contract between Shale Support Services, LLC and PM executed May 9, 2014 (the "Time and Materials Contract"), and has asserted fraud/fraudulent inducement/fraudulent transfer claims against the company and its officers as the theory of liability. Management vehemently denies allegations of fraud and any obligation arising out of the Time and Materials Contract. In addition, SRY and PM entered into a separate construction contract on or around May 20, 2014 (the "Construction Contract"). PM claims that SRY breached the Construction Contract; however, no work was ever performed under the contract. SRY also contends that conditions precedent were not met, and denies any obligation arising out of the contract. This matter was set for a three-day arbitration hearing on July 17, 2019, but the hearing was stayed because of these Chapter 11 Cases. The Debtors are unable to predict the eventual outcome of this matter or the potential loss contingencies, if any, to which the applicable Debtors may be subject.

***Coyote Logistics LLC v. Southton Rail Yard, LLC***, Cause No. 2019-CI-13492, District Court of Bexar County, Texas, 285th Judicial District. Coyote Logistics LLC ("Coyote") seeks damages of approximately $3,600,000 against SRY for the breach of a settlement agreement resolving SRY's alleged defaults under an Agreement for Railcar Services.

### J.    Rejection and Assumption of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors entered into numerous Executory Contracts and Unexpired Leases.  The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code.  The Debtors intend to include information in the Plan Supplement regarding the assumption or rejection of the remainder of their Executory Contracts and Unexpired Leases to be carried out as of the Effective Date, but may also elect to file additional discrete motions seeking to assume or reject various of the Debtors' Executory Contracts and Unexpired Leases before such time.

Although their analysis is ongoing, the Debtors currently estimate that the aggregate amount of Claims on account of rejection of Executory Contracts and Unexpired Leases may be significant.

On August 5 and 13, 2019, the Debtors filed motions in the Chapter 11 Cases to reject certain of their existing railcar leases [Docket Nos. 116, 160].  If the motions are granted, the Debtors anticipate reducing their leased current inventory of roughly 1,373 railcars to roughly 1000 leased railcars.

## VIII.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

#### 3.    The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the

event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the estates than the Plan.

### 4.   The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan (including the requirement that the Plan be in form and substance acceptable to the Term Loan Lenders), reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.   Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6. Continued Risk upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for oil and natural gas (and thus demand for the services the Debtors provide), and increasing expenses. *See* Article VIII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

32

### 10. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes entitled to vote to accept or reject the Plan or require any sort of revote by such Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 11. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. Discussions and summaries of these provisions can be found in Articles III.L and IV.F of this Disclosure Statement. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan and the Plan may no longer be confirmable.

### B. Risks Related to Recoveries under the Plan

#### 1. The Total Amount of Allowed General Unsecured Claims May Be Higher Than Anticipated By the Debtors

With respect to holders of Allowed General Unsecured Claims and Unsecured Convenience Class Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

#### 2. The Reorganized Debtors May Not Be Able to Achieve their Projected Financial Results

The Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the value of the New Membership Interests may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

33

3. **The Reorganized Debtors May Not Be Able to Prevail or Recover Proceeds from the Cudd Litigation**

While the Debtors assert that the merits of their case in the Cudd Litigation are strong, Cudd vehemently denies any liability. The Debtor's success largely hinges on whether the Supply Agreement is interpreted as an agreement by Cudd to purchase a fixed amount of frac sand over a 2-3 year period (as SRY alleges) or whether the Supply Agreement merely allowed Cudd to order "up to" 15,000 tons of sand per month upon the issuance of a purchase order and at the complete discretion of Cudd (as alleged by Cudd). It is SRY's position that the language of the Supply Agreement, as well as emails surrounding the Supply Agreement's negotiation, supports its position.

4. **Certain Tax Implications of the Plan**

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and holders of Claims and Interests.

5. **The Debtors May Not Be Able to Accurately Report Their Financial Results**

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time period required and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

6. **The Debtors May Not Be Able to Obtain Incremental Funding Under the DIP Facility**

Under the terms of the DIP Facility Loan Agreement, the $16.6 million DIP Facility is available in multiple draws. Upon the Bankruptcy Court's entry of the Interim DIP Order, the Debtors were able to access $3 million under the DIP Facility. Upon the Bankruptcy Court's entry of the Final DIP Order, the Debtors are able to access the entire $16.6 million DIP Facility. However, availability of further incremental funding under the DIP Facility is subject to a number of conditions precedent, not all of which may occur. If the Debtors do not obtain the incremental funding under the DIP Facility, they may lack sufficient liquidity to continue operating in the ordinary course, may be unable to the consummate the Plan or any other plan of reorganization, or may be forced to seek alternative sources of financing, which may not be available on terms as favorable as those provided under the DIP Facility.

7. **The Debtors May Not Be Able to Obtain Funding Under the Exit Facility**

The Plan contemplates that the Debtors will enter into an Exit Facility in a minimum amount of $80 million on the Effective Date, to be arranged and provided by the Exit Facility Lenders, the proceeds of which will be used to fund the Plan and the Reorganized Debtors' post-emergence business operations. However, it is possible that the Debtors may not be able to consummate the Exit Facility. If the Debtors

34

do not obtain funding under the Exit Facility, they may lack sufficient liquidity to continue operating in the ordinary course post-emergence, may be unable to the consummate the Plan or any other plan of reorganization, or may be forced to seek alternative sources of financing on less advantageous terms.

### C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses

#### 1. The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Facility upon emergence.

#### 2. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

#### 3. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection

35

also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. The chapter 11 proceedings also require debtor-in-possession financing to fund the Debtors' operations. If the Debtors are unable to fully draw on the availability under the DIP Facility or are unable to consummate the Exit Facility, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4. The Debtors' Substantial Liquidity Needs May Impact Revenue

The Debtors operate in a capital-intensive industry. The Debtors' principal sources of liquidity historically have been cash flow from operations, borrowings under the Term Loan Agreement and Revolving Credit Agreement, and issuances of equity securities. If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices, decreased E&P sector capital expenditures, or otherwise, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand, cash flow from operations, and cash provided by the DIP Facility will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to comply with the terms and condition of any debtor-in-possession financing and/or cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; (e) the availability of incremental draws under the DIP Facility; (f) their ability to consummate the Exit Facility; and (g) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand, cash flow from operations, and cash provided under the DIP Facility and an Exit Facility are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The

Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

     **5.    Oil and Natural Gas Prices Are Volatile, and Continued Low Oil or Natural Gas Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition**

The Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on the willingness of their E&P customer base to make operating and capital expenditures to explore for, develop, and produce oil and natural gas. E&P companies' willingness to conduct such drilling, completion, and production activities are in turn dependent on prevailing oil and natural gas prices. Further, since E&P companies are reluctant to increase drilling activities in a high-volatility commodities pricing environment, demand for the Debtors' services is affected as much by oil and natural gas price expectations as actual pricing. In short, the Debtors face a high level of exposure to oil and natural gas price swings. Oil and natural gas are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand and are subject to both short- and long-term cyclical trends. Oil and natural gas prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions. The Debtors expect such volatility to continue in the future. The prices for oil and natural gas are subject to a variety of factors beyond the Debtors' control, such as:

- the current uncertainty in the global economy;

- changes in global supply and demand for oil and natural gas;

- the condition of the United States and global economies;

- the actions of certain foreign countries;

- the price and quantity of imports of foreign oil and natural gas;

- political conditions, including embargoes, war or civil unrest in or affecting other oil producing activities of certain countries;

- the level of global oil and natural gas exploration and production activity;

- the level of global oil and natural gas inventories;

- production or pricing decisions made by the Organization of Petroleum Exporting Countries ("OPEC");

- weather conditions;

- technological advances affecting energy consumption; and

- the price and availability of alternative fuels.

Continued volatility or weakness in oil and natural gas prices (or the perception that oil and natural gas prices will remain depressed) generally leads to decreased upstream spending, which in turn negatively affects demand to the Debtors' services. A sustained decline in oil or natural gas prices may materially and adversely affect the Debtors' or Reorganized Debtors' future business, financial condition, results of operations, liquidity or ability to finance planned capital expenditures. As a result, if there is a further

decline or sustained depression in commodity prices, the Debtors or Reorganized Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments, or obtain additional capital, all of which could materially adversely affect the Debtors' or Reorganized Debtors' businesses, results of operations, and financial condition.

### 6. The Debtors' Operations Are Subject to Operating Risks that Are Often Beyond the Debtors' Control and Could Adversely Affect Production Levels and Costs

The Debtors' mining, processing and production facilities are subject to risks normally encountered in the frac sand industry. These risks include:

- changes in the price and availability of transportation;

- inability to obtain necessary production equipment or replacement parts;

- inclement or hazardous weather conditions, including flooding, and the physical impacts of climate change;

- unusual or unexpected geological formations;

- unanticipated ground, grade or water conditions;

- inability to acquire or maintain necessary permits or mining or water rights;

- labor disputes and disputes with the Debtors' contractors;

- late delivery of supplies;

- changes in the price and availability of natural gas, diesel or electricity that the Debtors' use as fuel sources for the Debtors' frac sand plants and equipment; and

- facility shutdowns in response to environmental regulatory actions.

Any of these risks could result in damage to, or destruction of, the Debtors' mining properties or production facilities, personal injury, environmental damage, delays in mining or processing, losses or possible legal liability. Any prolonged downtime or shutdowns at the Debtors' mining properties or production facilities could have a material adverse effect on the Debtors and/or Reorganized Debtors.

Not all of these risks are reasonably insurable, and the Debtors' insurance coverage contains limits, deductibles, exclusions and endorsements. The Debtors' insurance coverage may not be sufficient to meet their needs in the event of loss, and any such loss may have a material adverse effect on the Debtors and/or the Reorganized Debtors.

### 7. Inaccuracies in the Debtors' Estimates of Mineral Reserves Could Result in Lower than Expected Sales and Higher than Expected Costs

The Debtors base their mineral reserve estimates on engineering, economic, and geological data assembled and analyzed by their engineers and geologists, which are reviewed by outside firms. However, sand reserve estimates are necessarily imprecise and depend to some extent on statistical inferences drawn from available drilling data, which may prove unreliable. There are numerous uncertainties inherent in estimating quantities and qualities of mineral reserves and in estimating costs to mine recoverable reserves,

including many factors beyond their control. Estimates of recoverable mineral reserves necessarily depend on a number of factors and assumptions, all of which may vary considerably from actual results, such as:

- geological and mining conditions and/or effects from prior mining that may not be fully identified;

- available data that may differ from experience;

- assumptions concerning future prices of frac sand products, operating costs, mining technology improvements, development costs and reclamation costs; and

- assumptions concerning future effects of regulation, including the Debtors' ability to obtain required permits and the imposition of taxes by governmental agencies.

Any inaccuracy by the Debtors or the Reorganized Debtors in their estimates related to their mineral reserves could result in lower than expected sales and higher than expected costs and have an adverse effect on their cash reserves and business.

8. **A Large Portion of the Debtors' Sales Is Generated by a Few Large Customers, and the Loss of the Debtors' Largest Customers or a Significant Reduction in Purchases by Those Customers Could Adversely Affect Operations**

During the trailing twelve months before the Petition Date, the Debtors' top five customers represented approximately 80% of sales from their continuing operations. The Debtors' customers who are not subject to firm contractual commitments may not continue to purchase the same levels of the Debtors' products in the future due to a variety of reasons. For example, some of the Debtors' top customers could go out of business or, alternatively, be acquired by other companies that purchase the same products and services provided by the Debtors from other third-party providers. The Debtors' customers could also seek to capture and develop their own sources of frac sand.

In addition, some of the Debtors' customers may be highly leveraged and subject to their own operating and regulatory risks. If any of the Debtors' major customers substantially reduces or altogether ceases purchasing the Debtors' products, the Debtors could suffer a material adverse effect on their business, financial condition, results of operations, cash flows, and prospects. In addition, upon the expiration or termination of the Debtors' existing contracts, the Debtors or Reorganized Debtors may not be able to enter into new contracts at all or on terms as favorable as their existing contracts.

The Debtors and/or Reorganized Debtors may also choose to renegotiate their existing customer contracts on less favorable terms (including with respect to price and volumes) in order to preserve relationships with such customers. Any material nonpayment or nonperformance by any key customers could have a material adverse effect on the Debtors' and/or the Reorganized Debtors' revenue, cash flows and ability to satisfy chapter 11 and post-emergence obligations.

9. **The Debtors' Operations are Subject to Hazards Inherent in the Proppants Industry**

Risks inherent the proppants industry, such as equipment defects, vehicle accidents and explosions can cause personal injury, loss of life, suspension of operations, damage to formations, damage to facilities, business interruption and damage to, or destruction of property, equipment and the environment. These risks could expose the Debtors to substantial liability for personal injury, wrongful death, property damage, pollution and other environmental damages and could result in a variety of claims, losses and remedial

39

obligations that could have an adverse effect on the Debtors' and/or the Reorganized Debtors' business and results of operations. The existence, frequency and severity of such incidents will affect operating costs, insurability and relationships with customers, employees and regulators. In particular, customers may elect not to purchase the Debtors' or the Reorganized Debtors' services if they view the safety record as unacceptable, which could cause the Debtors' and/or the Reorganized Debtors to lose customers and substantial revenue.

### 10. The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business

The Debtors' operations are subject to extensive federal, state and local laws and regulations, including complex environmental laws and occupational health and safety laws. The Debtors and/or Reorganized Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension, limitation, or termination of operations and subject the Debtors and/or the Reorganized Debtors to administrative, civil and criminal penalties.

Additionally, in recent years, the practice of hydraulic fracturing has come under increased scrutiny by the environmental community. The Debtors' operations create the risk of environmental liabilities to the government or third parties for any unlawful discharge of pollutant or hazardous substances into the air, soil or water. In the event of environmental violations, the Debtors and/or the Reorganized Debtors may be charged with remedial costs and land owners may file claims for alternative water supplies, property damage or bodily injury. Laws and regulations protecting the environment have become more stringent in recent years, and may, in some circumstances, result in liability for environmental damage regardless of negligence or fault. In addition, changes in environmental laws and regulations occur frequently, and any such changes that result in more stringent and costly waste handling, storage, transport, disposal or remediation requirements with respect to the Debtors' operations or more stringent or costly well drilling, construction, completion or water management activities with respect to their customers' operations could adversely affect their operations and financial results. Pollution and similar environmental risks generally are not fully insurable, and therefore such liabilities and costs could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

In particular, the Debtors' operations are subject to the Federal Mine Safety and Health Act of 1977, as amended by the Mine Improvement and New Emergency Response Act of 2006 (the "MSHA"), which imposes stringent health and safety standards on numerous aspects of mineral extraction and processing operations, including the training of personnel, operating procedures and operating equipment. The Debtors are also subject to standards imposed by MSHA and other federal and state agencies relating to workplace exposure to crystalline silica. The Debtors' and/or the Reorganized Debtors' failure to comply with such standards, or changes in such standards or the interpretation or enforcement thereof, could have a material adverse effect on the Debtors' and/or the Reorganized Debtors' business and financial condition or otherwise impose significant restrictions on their ability to conduct mineral extraction and processing operations.

The Debtors' Mississippi mining operations are also subject to increasingly stringent and complex federal, state and local environmental laws, regulations and standards governing the discharge of materials into the environment or otherwise relating to environmental protection. These laws, regulations and standards impose numerous obligations that are applicable to the Debtors' operations, including the acquisition of permits to conduct regulated activities; the incurrence of significant capital expenditures to limit or prevent releases of materials from the Debtors' processors, terminals, and related facilities; and the imposition of remedial actions or other liabilities for pollution conditions caused by the Debtors' operations or attributable to former operations. Numerous governmental authorities, such as the EPA, Mississippi

40

Department of Environmental Quality and similar state agencies, have the power to enforce compliance with these laws, regulations and standards and the permits issued under them, often requiring difficult and costly actions.

### 11. The Debtors' Operations Are Dependent on the Debtors' Rights and Ability to Mine Their Properties and on Their Having Renewed or Received the Required Permits and Approvals from Governmental Authorities and Other Third Parties

The Debtors hold numerous governmental, environmental, mining, and other permits and approvals authorizing operations at each of the Debtors' facilities. A decision by a governmental agency or other third party to deny or delay issuing a new or renewed permit, or approval, or to revoke or substantially modify an existing permit, approval, could have a material adverse effect on the Debtors' and/or the Reorganized Debtors' ability to continue operations at the affected facility. Expansion of existing mining operations is also predicated on securing the necessary environmental or other permits or approvals, which the Debtors' and/or the Reorganized Debtors' may not receive in a timely manner or at all. As noted above, the Debtors are subject to compliance with stringent environmental laws and regulations that may expose them to substantial costs and liabilities.

### 12. Debtor WMAH Is Subject to a Pending EPA Enforcement Action that Could Delay or Prohibit the Expansion of Certain Mining Operations and Result in Mitigation Costs, Fines, and Penalties

Debtor WMAH holds various governmental, environmental, mining, and other permits and approvals authorizing operations at its mining operation in Hancock County, Mississippi (the "Hancock Facility"). On April 10, 2017, WMAH submitted a permit to the Mississippi Department of Environmental Quality to expand its mining area at the "Middle Pit Mine." As a result of this permit submission, numerous federal and state governmental agencies voiced concern that the proposed expansion would impact "Waters of the United States" and, therefore, required certain wetland permits under Section 404 of the Clean Water Act (the "404 Permits"). WMAH submitted the appropriate 404 Permits in 2018. After review by the U.S. Army Corps of Engineers ("USACE"), it was determined that activities at the Hancock Facility may have already impacted other wetlands areas at the site, in excess of existing permits. On December 10, 2018, USACE issued a Cease and Desist letter to WMAH to cease operations in any areas not currently permitted. On May 20, 2019, the U.S. Environmental Protection Agency Region 4 ("EPA Region 4") notified WMAH that it was becoming the lead enforcement agency for WMAH's 404 Permits concerning expansion of the Middle Pit Mine mining area. In addition, EPA Region 4 will be taking the lead on enforcement action involving other alleged violations of the Clean Water Act at the Hancock Facility. As a result, WMAH's permit expansion is being delayed until EPA Region 4 issues a final decision on the enforcement action. This delay could significantly impact WMAH's ability to continue mining operations at the Hancock Facility. In addition, the enforcement action could result in substantial mitigation costs, fines, and penalties. At this time, it is difficult to determine the time frame to resolve the enforcement action, although it could take from three (3) to nine (9) months to complete. Once EPA Region 4 has completed the enforcement action, then USACE may proceed with WMAH's expansion application, which could take an additional six (6) to twelve (12) months to complete. The outcome of the enforcement action and the expansion application could have a material impact on the Reorganized Debtors' business, operations, and financial condition.

### 13. The Debtors Operate in a Highly-Competitive Industry with Significant Potential for Excess Capacity

The proppants industry in which the Debtors operate is highly competitive. The principal competitive factors in the proppants industry are generally the costs of mining and processing of sand and

the costs of dependable delivery of the sand to the well site. The Debtors compete with large companies that have longer operating histories, greater financial resources, and greater name recognition than the Debtors and who can operate at a loss in the regions in which the Debtors operate. Additionally, some of the Debtors' competitors are located in the relevant shale basins that the Debtors serve.  For these regional in-basin competitors, the costs to deliver sand are much lower than the Debtors' delivery costs, thereby permitting these competitors to offer lower prices.  As a result of such competition, the Debtors and/or the Reorganized Debtors may lose market share or be unable to maintain or increase prices for their present services or to acquire additional business opportunities, which could have a material adverse effect on the Debtors' and/or the Reorganized Debtors' business, financial condition, results of operations and cash flows.

**14.  The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

In the future, the Reorganized Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

**15.  The Loss of Key Personnel Could Adversely Affect the Debtors' Operations**

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition.  Because competition for experienced personnel in the oilfield services industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' and/or the Reorganized Debtors' businesses and the results of operations.

**16.  Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

42

### D.     Risks Related to the New Membership Interests

#### 1.   Lack of a Liquid Public Market for New Membership Interests

The future liquidity of the trading markets for the New Membership Interests will depend, among other things, upon the number of holders of such securities, whether such securities become listed for trading on an exchange or trading system at some future time, Reorganized SSH's operating performance and financial condition and Reorganized SSH's credit rating. If an active market for the New Membership Interests does not develop or is not sustained, the market price and liquidity of the New Membership Interests may be adversely affected.  Reorganized SSH and the other Reorganized Debtors are under no obligation to list the New Membership Interests on any securities exchange and can provide no assurance that such listing will occur.

#### 2.   Restrictions on Transfer

As discussed in Article IX of this Disclosure Statement, the Debtors believe that the New Membership Interests are exempt from any securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code.  However, any recipients of New Membership Interests who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code will be restricted in their ability to transfer or sell their securities. These persons will be permitted to transfer or sell such securities only pursuant to the provisions of Rule 144 under the Securities Act, if available, or another available exemption from the registration requirements of the Securities Act. These restrictions may make it more difficult for such persons to dispose of their securities or to realize value on the securities, at a time when they may choose to do so, and therefore adversely impact the value of, their New Membership Interests. *See* Article XI, entitled "Certain Securities Law Matters" for additional information regarding restrictions on resale of the New Membership Interests.

#### 3.   Potential for Dilution

In the future, Reorganized SSH may issue equity securities to its officers, directors and employees. Furthermore, Reorganized SSH may issue equity securities in connection with future investments, acquisitions or capital raising transactions. Such grants or issuances could constitute a substantial portion of the then-outstanding common stock, which may result in substantial dilution in ownership to holders of New Membership Interests.

#### 4.   Distributions Not Expected in Foreseeable Future

Reorganized SSH does not anticipate that cash distributions or other distributions will be paid with respect to the New Membership Interests in the foreseeable future and there can be no assurance that such distributions or other distributions will be paid at any time in the future or at all. In addition, restrictive covenants in the Exit Facility and/or certain debt instruments to which Reorganized SSH will, or may, be a party, may limit the ability of Reorganized SSH to pay distributions or for Reorganized SSH to receive distributions from its subsidiaries. As a result, holders of the New Membership Interests likely will not be able to realize a return on their investment, if any, until the New Membership Interests are sold.

#### 5.   Risks Related to the Value of New Membership Interests

The Plan provides that the Debtors' Allowed Secured Term Loan Claims will, among other things, be converted into equity of Reorganized SSH and that existing interests in SSH will be extinguished upon the Debtors' emergence from the Chapter 11 Cases.  Even if the Plan is confirmed as currently outlined, the value of the New Membership Interests that are issued thereunder is highly speculative. In addition, the

43

value of New Membership Interests may be adversely affected by a number of factors, including many of the risks described in this Disclosure Statement. If, for example, Reorganized SSH fails to comply with the covenants in the Exit Facility or other debt instrument to which it is a party, resulting in an event of default thereunder, certain of Reorganized SSH's outstanding indebtedness could be accelerated, which could have a material adverse effect on the value of the New Membership Interests.

## IX. SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit C**.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.*

> ### THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A. Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes 4, 5, and 6 (collectively, the "Voting Classes"). The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from holders of Claims or Interests in Classes 1, 2, 3, 7, 8, 9, and 10. Additionally, the Disclosure Statement Order provides that certain holders of Claims in the Voting Classes, such as those holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B. Voting Record Date

**The Voting Record Date is September 16, 2019**. The Voting Record Date is the date on which it will be determined which holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim or Interest.

44

C.     **Voting on the Plan**

**The Voting Deadline is October 21, 2019, at 4:00 p.m. (prevailing Central Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Notice and Claims Agent on or before the Voting Deadline.

To vote, complete, sign, and date your ballot and return it (with an original signature) *promptly* to one of the below addresses:

| **If sent by first-class mail** | **If sent by hand delivery or overnight mail:** |
|---|---|
| **Donlin, Recano & Company, Inc.** <br> **Re: Shale Support Global Holdings, LLC., et al.** <br> **P.O. Box 199043** <br> **Blythebourne Station** <br> **Brooklyn, NY 11219** | **Donlin, Recano & Company, Inc.** <br> **Re: Shale Support Global Holdings, LLC, et al** <br> **6201 15th Avenue** <br> **Brooklyn, NY 11219** |

**PLEASE SELECT JUST ONE OPTION TO VOTE.**
**EITHER RETURN PROPERLY EXECUTED PAPER BALLOT WITH YOUR VOTE**
**OR**
**VOTE VIA ELECTRONIC MAIL TO SSGHBALLOTS@DONLINRECANO.COM**

**Holders of Claims who cast a ballot via electronic mail to SSGHBALLOTS@DONLINRECANO.COM with "SSGH BALLOTS" in the subject line should NOT also submit a paper Ballot.**

**FOR ANY BALLOT CAST VIA ELECTRONIC MAIL, A FORMAT OF THE ATTACHMENT MUST BE FOUND IN THE COMMON WORKPLACE AND INDUSTRY STANDARD FORMAT (*I.E.*, INDUSTRY-STANDARD PDF FILE) AND THE RECEIVED DATE AND TIME IN THE NOTICE AND CLAIMS AGENT'S INBOX WILL BE USED AS A TIMESTAMP FOR RECEIPT.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT TOLL FREE AT (866) 296-8019 OR VIA ELECTRONIC MAIL TO SSGHBALLOTS@DONLINRECANO.COM.**

D.     **Ballots Not Counted**

**No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Notice and Claims Agent) or the Debtors' financial or legal advisors instead of the Notice and Claims Agent; (7) it is unsigned; or (8) it is not clearly marked to either

accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED.**

## X.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to holders of Claims or Interests (to the extent holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Membership Interests to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C.  Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of PJC and Alvarez & Marsal, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections").  Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit E** and incorporated herein by reference.  Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.  Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[10]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class or Sub-Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class or Sub-Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class or Sub-Class shall be deemed to have accepted the Plan.

---

[10] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

E.     **Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class or Sub-Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class or Sub-Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

1.     **No Unfair Discrimination**

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

2.     **Fair and Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes and Sub-Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes and Sub-Classes that have equal rank.  With respect to the fair and equitable requirement, no Class or Sub-Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class or Sub-Class.  The Debtors believe that the Plan and the treatment of all Classes and Sub-Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

F.     **Valuation of the Debtors**

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors.  Accordingly, the Debtors, with the assistance of PJC and Alvarez & Marsal, produced the Valuation Analysis that is set forth in **Exhibit F** attached hereto and incorporated herein by

48

reference.  As set forth in the Valuation Analysis, the Debtors' going concern value is substantially less than the aggregate amount of its funded-debt obligations.  Accordingly, the Valuation Analysis further supports the Debtors conclusion that the treatment of Classes and Sub-Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

## XI.    CERTAIN SECURITIES LAW MATTERS

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution of New Membership Interests in the Reorganized SSH to holders of Allowed Secured Term Loan Claims.  The Debtors believe that this offer, sale, issuance, and distribution is exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state securities law (a "Blue Sky Law").

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state securities laws if three principal requirements are satisfied:   (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.

Here, the New Membership Interests are being offered and sold under the Plan and are securities of the Reorganized SSH.  Moreover, the recipients of the New Membership Interests will be holders of Allowed prepetition Secured Term Loan Claims against the Debtors.  Finally, because the total value of the Allowed Secured Term Loan Claims, as implied by the value of distributions under the Plan, significantly exceeds the cash value payable on account of such Allowed Secured Term Loan Claims, the Debtors submit that all New Membership Interests issued pursuant to the Plan will be issued principally in exchange for the corresponding Allowed Secured Term Loan Claims.  Accordingly, the New Membership Interests satisfy all the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

Recipients of any New Membership Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law.

## XII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and beneficial owners of Claims (each, a "Holder").  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No

assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the New Membership Interests as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder holds only Claims in a single Class or Sub-Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class or Sub-Class, and the tax consequences for such Holders may differ materially from that described below.

The U.S. federal income tax consequences of the implementation of the Plan will depend on, among other things, whether the Restructuring Transactions are structured as a taxable sale of the Debtors' assets and/or stock (such a structure, a "Taxable Transaction"). While a Taxable Transaction potentially offers the Reorganized Debtors certain tax advantages in periods following the Effective Date, the availability of these tax advantages depends on numerous considerations that cannot be known with certainty at this time. These considerations include the value and tax basis of the Debtors' assets on the Effective Date, and whether the Debtors have sufficient net operating loss carry forwards to offset any taxable gain arising from a Taxable Transaction. As a result, the Debtors have not yet determined whether they intend to structure the Restructuring Transactions as a Taxable Transaction, and the following discussion assumes that the implementation of the Plan will not be structured as a Taxable Transaction. Moreover, if the Debtors pursue a Taxable Transaction, the U.S. federal income tax consequences of the implementation of the Plan to Holders of Claims may differ materially from the tax consequences described below.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

50

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

B.      **Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income"), for U.S. federal income tax purposes, upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor or a party related to the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not required to include COD Income in gross income (a) if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "Bankruptcy Exception") or (b) to the extent that the taxpayer is insolvent immediately before the discharge (the "Insolvency Exception"). Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule discussed in the preceding sentence. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets; (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. The Debtors have not yet determined whether this election will be made. Whether or not an election is made pursuant to section 108(b)(5) of the Tax Code, the reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and generally has no other U.S. federal income tax impact.

Under section 108(d)(6) of the Tax Code, when an entity that is a flow-through entity realizes COD Income, its partners are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception and the Insolvency Exception (and related attribute reduction) are applied at the partner level rather than at the entity level. Accordingly, the Holders of equity in Reorganized SSH will be treated as receiving their allocable share, if any, of the COD Income realized by Reorganized SSH.

C.      **Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims or Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

1.      **U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 4 Claims**

Pursuant to the Plan, except to the extent that a U.S. Holder of an Allowed Secured Term Loan Claim agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and

51

discharge of such Claim, each U.S. Holder of an Allowed Secured Term Loan Claim shall receive a Pro Rata distribution of the Secured Term Loan Claim Recovery.  Such U.S. Holders will be treated as exchanging such Allowed Secured Term Loan Claims for Secured Term Loan Claim Recovery, in a taxable exchange under section 1001 of the Tax Code.  In that case, each U.S. Holder of an Allowed Secured Term Loan Claim should recognize gain or loss equal to the difference between (1) the fair market value of the Secured Term Loan Claim Recovery received in exchange for its Allowed Secured Term Loan Claim; and (2) such U.S. Holder's adjusted basis in its Allowed Secured Term Loan Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Allowed Secured Term Loan Claim in such U.S. Holder's hands, whether the Allowed Secured Term Loan Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Allowed Secured Term Loan Claim.  The deductibility of capital losses is subject to certain limitations as discussed below.  A U.S. Holder's combined tax basis in any Secured Term Loan Claim Recovery received should equal the fair market value of such Secured Term Loan Claim Recovery as of the date such Secured Term Loan Claim Recovery is distributed to the holder.  A U.S. Holder's holding period for the Secured Term Loan Claim Recovery received should begin on the day following the Effective Date.

### 2.   U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 5 Claims

Pursuant to the Plan, each U.S. Holder of an Allowed Unsecured Convenience Class Claim will receive its Pro Rata share of Cash from the Convenience Class Recovery Pool in full and final satisfaction of such Claim. A U.S. Holder of an Unsecured Convenience Class Claim should be treated as exchanging such Unsecured Convenience Class Claim for Cash in a taxable exchange under section 1001 of the Tax Code.  In that case, a U.S. Holder would recognize gain or loss equal to the difference between (1) the amount of Cash received in satisfaction of such U.S. Holder's Unsecured Convenience Class Claim and (2) the U.S Holder's adjusted tax basis in its Unsecured Convenience Class Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Unsecured Convenience Class Claim in such U.S. Holder's hands, whether the Unsecured Convenience Class Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Unsecured Convenience Class Claim.  The deductibility of capital losses is subject to certain limitations as discussed below.

### 3.   U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 6 Claims

Pursuant to the Plan, each U.S. Holder of an Allowed General Unsecured Claim other than a Deficiency Term Loan Claim will receive, in full and final satisfaction of such Claim, its Pro Rata share of the GUC Recovery. A U.S. Holder of a General Unsecured Claim should be treated as exchanging such General Unsecured Claim for the GUC Recovery in a taxable exchange under section 1001 of the Tax Code. In that case, a U.S. Holder would recognize gain or loss in an amount equal to the difference between the amount of Cash received in satisfaction of such U.S. Holder's General Unsecured Claim and the U.S. Holder's adjusted tax basis in its General Unsecured Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the General Unsecured Claim in such U.S. Holder's hands, whether the General Unsecured Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its General Unsecured Claim.  The deductibility of capital losses is subject to certain limitations as discussed below.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR U.S. FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS OR INTERESTS.**

### 4. Accrued Interest

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but unpaid interest on the debt instrument constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest for U.S. federal income tax purposes is unclear. Under the Plan, the aggregate consideration to be distributed to holders of Allowed Claims in each Class or Sub-Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 5. Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (*i.e.*, up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale,

53

exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### 6. Limitation on Use of Capital Losses

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of all the U.S. Holder's capital losses over all the U.S. Holder's capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 7. Taxation of Reorganized Debtors and U.S. Holders

To the extent Reorganized SSH remains a partnership for U.S. Federal income tax purposes, Reorganized SSH will not be subject to U.S. federal income tax. Instead, Reorganized SSH will file an annual partnership information return with the IRS which will report the results of Reorganized SSH. Each U.S. Holder receiving New Membership Interests will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of Reorganized SSH's income, gain, loss, deduction and credit for each taxable year of Reorganized SSH ending with or within the U.S. Holder's taxable year. Each item generally will have the same character as if the U.S. Holder had realized the item directly. U.S. Holders will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from Reorganized SSH for such taxable year, and thus may incur income tax liabilities in excess of any cash distributions from Reorganized SSH.

A U.S. Holder receiving New Membership Interests generally will not recognize gain or loss on the receipt of a distribution of cash or property from Reorganized SSH (provided that the U.S. Holder is not treated as exchanging such U.S. Holder's share of Reorganized SSH's "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the Tax Code, and together "ordinary income items") for other partnership property). A U.S. Holder, however, will recognize gain on the receipt of a distribution of cash and, in some cases, marketable securities, from Reorganized SSH (including any constructive distribution of money resulting from a reduction of the U.S. Holder's share of Reorganized SSH's indebtedness) to the extent such distribution or the fair market value of such marketable securities distributed exceeds such U.S. Holder's adjusted tax basis in its New Membership Interests. Such distribution would be treated as gain from the sale or exchange of the New Membership Interests, which is described above.

To the extent Reorganized SSH becomes taxable as a corporation for U.S. Federal income tax purposes, any distributions made on account of the New Membership Interests will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized SSH as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the U.S. Holder's basis in its membership interests generally will be treated as capital gain.

54

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

### D.    Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan.  In addition, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.   ALL HOLDERS OF CLAIMS OR INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS**.

*[Remainder of page intentionally left blank]*

## XIII.   RECOMMENDATION

The Proponents believe that the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Proponents recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  August 19, 2019

Shale Support Global Holdings, LLC,
on behalf of itself and all other Debtors

*/s/ Gary Barton*
Gary Barton
Chief Restructuring Officer

56