## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>SHALE SUPPORT GLOBAL HOLDINGS, LLC, *et al.*,[1]<br><br>Debtors. | Bankruptcy Case No.  19-33884<br><br>Chapter 11<br><br>(Jointly Administered) |
| SHALE SUPPORT HOLDINGS, LLC and DRYING FACILITY ASSETS HOLDING, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>INDUSTRIAL ACCESSORIES COMPANY and PAUL D. STARK AND ASSOCIATES, INC. *D/B/A* STARKAIRE,<br><br>Defendants. | Adversary No.  19-_____ |

**COMPLAINT FOR (I) AVOIDANCE OF PREFERENCE PERIOD TRANSFERS; (II) AVOIDANCE OF FRAUDULENT TRANSFERS; (III) RECOVERY OF PREFERENCE TRANSFERS AND FRAUDULENT TRANSFER; (IV) BREACH OF CONTRACT; (V) BREACH OF EXPRESS WARRANTY; (VI) BREACH OF IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE; AND (VII) OBJECTION TO PROOF OF CLAIM NO. 4 FILED BY <u>INDUSTRIAL ACCESSORIES COMPANY</u>**

COMES NOW, Debtors Shale Support Holdings, LLC ("<u>SSH</u>") and Drying Facility Assets

Holding, LLC ("<u>DFAH</u>," and together with SSH, "<u>Plaintiffs</u>"), by and through their undersigned

counsel, file this *Complaint for (I) Avoidance of Preference Period Transfers; (II) Avoidance of*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Shale Support Global Holdings, LLC (5328); Shale Support Holdings, LLC (7814); Stanton Rail Yard, LLC (5976); Southton Rail Yard, LLC (8704); Drying Facility Assets Holding, LLC (6424); Shale Energy Support, LLC (8523); Mine Assets Holding, LLC (4401); and Wet Mine Assets Holding, LLC (2879).  The service address for Debtor Stanton Rail Yard, LLC is 32781 Egypt Lane, Magnolia, Texas 77354.  For the remainder of the Debtors, it is 600 Jefferson Street, Suite 602, Lafayette, Louisiana 70501.

*Fraudulent Transfers; (III) Recovery of Preference Transfers and Fraudulent Transfers; (IV) Breach of Contract; (V) Breach of Express Warranty; (VI) Breach of Implied Warranties of Merchantability and Fitness for a Particular Purpose; and (VII) Objection to Proof of Claim No. 4 Filed by Industrial Accessories Company* (the "Complaint") against Defendants Industrial Accessories Company ("IAC") and Paul D. Stark and Associates, Inc. *d/b/a* Starkaire ("Starkaire," and together with IAC, the "Defendants").  In support of this Complaint, Plaintiffs allege as follows:

## JURISDICTION AND VENUE

1.　　The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b), which adversary proceeding arises under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and arises in and relates to the above-captioned jointly-administered chapter 11 cases pending in this Court.

2.　　This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (C), (F), (H), and (O).  Pursuant to Rule 7008-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of Texas, Plaintiffs consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter finals orders or judgments consistent with Article III of the United States Constitution.

3.　　Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.　　The statutory bases for the relief requested in this Complaint are sections 502(a), 544, 547, 548 and 550 of the Bankruptcy Code and MISS. CODE §§ 15-3-107, 75-2-313, 75-2-314 and 75-2-315.

2

## PARTIES

5.      SSH is a Delaware limited liability company headquartered in Lafayette, Louisiana and, together with its subsidiaries and affiliates, transacts business in the State of Texas.

6.      DFAH is a Delaware limited liability company headquartered in Lafayette, Louisana and, together with its subsidiaries and affiliates, transacts business in the State of Mississippi.

7.      IAC is a Kansas for-profit corporation with its principal place of business located at 4800 Lamar, Suite 203, Mission, Kansas 66202.  IAC can be served through its registered agent for service of process, Glenn A. Smith, Jr., at 4800 Lamar, Suite 203, Mission, Kansas 66202, or wherever else he may be located.

8.      Starkaire is an Illinois corporation with its principal place of business located at 509 Blackburn Court, Downers Grove, Illinois 60516.   Starkaire can be served through its registered agent for service of process Paul D. Stark, at 509 Blackburn Court, Downers Grove, Illinois 60516, or wherever else he may be located.

## BACKGROUND

A.      **IAC Sold and Installed a Frac Sand Dryer Designed and Manufactured by Starkaire that Never Functioned Within Normal Use**

9.      The Debtors operate businesses that are primarily engaged in mining, processing and distributing high-quality monocrystalline sand (otherwise known as "frac sand")—a key input for the hydraulic fracturing of oil and natural gas wells.  The Debtors' ordinary course operations generally involve mining of frac sand from open pit environments, processing of frac sand at wet and dry plant facilities designed to separate the sand from unusable materials and distribution of frac sand to customers.

3

10.     To increase SSH's frac sand processing capabilities, SSH contracted with IAC as the general contractor to construct a new dry plant at SSH's operations in Picayune, Mississippi, known as 200 TPH Unit 2 Dry Sand Processing Plant ("Plant Two").  The total cost of the project was over $18 million and construction started in the spring of 2017.  SSH made IAC aware of its operational needs for Plant Two such as the processing capacity of 200 tons per hour of frac sand and the type of sand that would be processed.

11.     IAC made arrangements with Starkaire to design and manufacture what is known as a fluidized bed dryer that is a highly specialized piece of equipment which is critical to SSH's frac sand processing operations that was then installed during construction of Plant Two.  Starkaire holds itself out as experts in the design and manufacture of fluid bed dryer systems for use in operations like those of SSH.[1]

12.     To that end, pursuant to that certain *Purchase Order Terms and Conditions*, dated October 10, 2017, entered into by and between SSH, as buyer, and IAC, as seller (together with all amendments, supplements or modifications, the "Purchase Order"), IAC agreed to, among other things, sell a Starkaire fluidized bed dryer (the "Dryer") to SSH and install such Dryer at the Debtors' operations located in Picayune, Mississippi.

13.     The Dryer was identified in the IAC Proposal Cost Breakdown for 200TPH Unit by IAC as "Basic Starkaire Model No. OD-1126; 11' W x 26' L Footprint x 33' OAH; 50 HP combustion air blower and ductwork; 400HP Fluidizing; Fluid Bed Dryer with Cooling Zone (Tag: DR-200A); Moisture <0.3% at max. 200º F; 200 TPH@ 6% max. H2O."  The cost associated with the Dryer which was invoiced to SSH was $1,156,889.00, which did not include engineering required for installation, site management general site work, rental equipment, and commercial

---

[1] *See* http://www.starkaire.com, last visited November 4, 2019 (stating Starkaire has manufactured frac sand / fluid bed dryer systems for over 40 years).

4

overhead and profit, for which IAC charged additional amounts to SSH.  IAC also charged five percent for profit on equipment costs, which totaled $57,844.45 for the Dryer.

14.     At all times SSH followed the instructions for operating the Dryer which were provided by IAC and Starkaire.  SSH also implemented recommendations and changes by Starkaire, but the Dryer failed to perform as expected.

15.     Plant Two was initially started up on December 23, 2017, and issues were almost immediately encountered with the operation of the Dryer.  The gas regulator that had been installed was improperly sized and did not allow for sufficient heating to reach the appropriate temperature required for the process of 1100 degrees Fahrenheit.  Additionally, sand would back up in the inlet of the Dryer, which was addressed with the installation of a vibrator in improve sand flow.  Moreover, IAC was unaware that an 8" bypass line needed to be installed to the outlet ducts when the Dryer was installed which was subsequently addressed.

16.     Under its terms, the Purchase Order shall be governed by and interpreted in accordance with the laws of the State of Mississippi.  Purchase Order, at ¶ 19.

17.     Among other things, IAC contracted to, following notice from Plaintiffs, replace or repair the Dryer as soon as possible in a manner that causes as little inconvenience to Plaintiffs as reasonably possible.  Purchase Order, at § 9.

18.     Pursuant to the Pursuant Order,

[IAC further] represent[ed], warrant[ed] and guarantee[d] that the Goods shall be free from all defects of any kind (including but not limited to defects in workmanship or materials), shall comply with the terms and conditions of this Purchase Order (including but not limited to all specifications and drawings contained herein), shall be fit for express and intended purposes, of merchantable quality and use new materials / components (unless specified to the contrary) . . . . To the extent assignable, [IAC] will assign to [Plaintiffs] any manufacturer(s)' warranties, and will provide all reasonable assistance to [Plaintiffs] in enforcing such warranties.

5

Purchase Order, at § 10.

19.     SSH notified IAC and Starkaire of the issues it encountered, and SSH shut down Plant Two so that these and other issues related to the Dryer could be addressed.

20.     After the problems at startup were addressed, in early April of 2018, SSH noticed that around the plenum inlet the internal refractory bricks were worn and abraded, numerous refractory bricks were missing at the hot air bypass outlet and the floor of the Dryer had gouges throughout it.

21.     SSH notified IAC and Starkaire of these problems.  Plant Two was taken out of service while Starkaire rebricked the Dryer, which was completed on April 13, 2018, and which Starkaire stated would resolve the problems with the Dryer.

22.     During these repairs, Plant Two was out of service for 114.5 hours of operational time, which resulted in 22,900 tons of lost production.

23.     A few months later, SSH observed scorching around the combustion chamber exit and manway door.  SSH notified IAC and Starkaire of these problems.  Plant Two was taken out of service, and Starkaire installed refractory at the plenum inlet and hot air bypass outlet and made some other changes that they stated would resolve the problems with the Dryer.

24.     During these repairs, Plant Two was out of service for 71.75 hours of operational time, which resulted in 14,350 tons of lost production.

25.     Over the ensuing months, SSH noticed some scorching around the hot air bypass outlet and combustion chamber exit and further observed the bricks inside the Dryer being eroded.

26.     On or about November 23, 2018, bricks started falling out of the wall of the Dryer and plastic was separating from the combustion chamber outlet.  SSH notified IAC and Starkaire of these problems.  Plant Two was taken out of service while Starkaire rebricked the entire dryer

6

with a harder type of brick.  Starkaire also made additional modifications to its Dryer to address the issues that had occurred and stated that these repairs would resolve the problems with the Dryer.

27.     During these repairs, Plant Two was out of service for 176.5 hours of operational time, which resulted in 35,300 tons of lost production.

28.     The Dryer continued to exhibit extreme scorching around the hot air bypass outlet and manway door, hold down plates separated from their support beams, and support beams were starting to fail.  The bricks and plastic installed by Starkaire continued to show excessive wear amongst other problems with the Dryer.

29.     On or about May 21, 2019, Plant Two was taken out of service because of these and other issues.  SSH notified IAC and Starkaire about these issues.  Repairs were subsequently made to the Dryer.

30.     During these repairs, Plant Two was out of service for 62.5 hours of operational time, which resulted in 12,500 tons of lost production.

31.     In June of 2019, SSH again encountered scorching issues on the outside surface of the Dryer.  An internal inspection in August 2019 again revealed plastic failures in the plenum inlet area.  In addition, the 400-horsepower fluidizing fan on the Dryer failed.  SSH notified IAC and Starkaire about these issues.  The Plant continued to operate to allow Starkaire time to formulate a repair plan to address these issues.

32.     Rather than make any repairs, SSH was informed during a phone conference on August 14, 2019 with Don Barr (a technical representative of Starkaire), that while Starkaire had made prior repairs under its warranty, Starkaire would not support any further efforts to ensure

7

that their Dryer functioned as intended or repair the damages to the Dryer that occurred during SSH's ordinary and normal operations.

33.     The Plant remains operational while repair options are being explored.

34.     During the time referenced above that repairs were made, Plant Two was out of service for a total of 425 hours of operational time, which resulted in over 85,000 tons of lost production at a value of $2,551,500.

**B.     IAC Filed a Lien Claim Against DFAH and JT Property Ventures, LLC**

35.     On March 29, 2018, IAC filed a lien claim (the "Lien Claim") in the amount of $1,249,084.00 against DFAH and JT Property Ventures, LLC ("JT Property") on the real property located at 130 Street B, Picayune, Mississippi 39466 (the "Property").  In the Lien Claim, IAC asserted a lien in the Property, including any leasehold interests therein and all improvements, buildings, structures and fixtures thereon, based on the amount allegedly due and owing IAC for its furnishing of materials and labor pursuant to the Purchase Order.  JT Property owns the Property, and DFAH has a leasehold interest therein.

36.     On September 10, 2018, IAC executed an *Interim Waiver and Release Upon Payment*, wherein IAC agreed to waive and release $1,056,279.86 of its Lien Claim in exchange for and upon receipt of payment by DFAH in the same amount.

37.     On April 12, 2019, SSH paid $5,000.00 to IAC.

38.     On April 26, 2019, SSH paid $5,000.00 to IAC.

39.     On May 3, 2019, SSH paid $5,000.00 to IAC.

40.     On May 10, 2019, SSH paid $5,000.00 to IAC.

41.     On May 22, 2019, IAC executed a *Release of Lien*, wherein IAC fully released and discharged its Lien Claim.

8

42.     Because of the continuing issues with the Dryer, SSH withheld payments to IAC in the amount of $8,866.32.

**C.     The Debtors' Bankruptcy Filing**

43.     On July 11, 2019 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 12, 2019, the Court entered an order authorizing the joint administration of the Debtors' chapter 11 cases for procedural purposes only.

44.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee or examiner has been appointed in the Debtors' chapter 11 cases.  An official committee of unsecured creditors was appointed on July 29, 2019.

45.     On July 25, 2019, IAC filed proof of claim no. 4 ("Claim No. 4") in the amount of $132,804.14 against DFAH on account of "Goods sold and services performed" pursuant to the Purchase Order.

## CAUSES OF ACTION

### Count 1 — Against IAC and Starkaire
### (Avoidance of Preference Period Transfers – 11 U.S.C. § 547(b))

46.     Plaintiffs re-allege the allegations made in paragraphs 1 through 44 as if fully set forth herein.

47.     Plaintiffs' records reflect that IAC received payments in the aggregate amount of $20,000.00 from Plaintiffs in the form of cash, check, cashier's check, credits or wire transfer on or within the ninety (90) days immediately preceding the Petition Date (together with any and all additional payments that were made by Plaintiffs to IAC within the ninety (90) days immediately preceding the Petition Date, the "Preference Transfers").  The Preference Transfers constitute

9

avoidable preferential transfers pursuant to 11 U.S.C. § 547(b).  All known avoidable Preferential Transfers are listed on **Exhibit A** hereto.

48.     The Preference Transfers were made to or for the benefit of IAC.

49.     The Preference Transfers were made for or on account of an antecedent debt or debts owed, either respectively or collectively, by Plaintiffs to IAC before the Preference Transfers were made.

50.     The Preference Transfers were made while Plaintiffs were insolvent.

51.     The Preference Transfers were made on or within the ninety (90) days immediately preceding the Petition Date.

52.     The Preference Transfers enabled IAC to receive more than it would have received if: (i) Plaintiffs' cases were cases under chapter 7 of the Bankruptcy Code; (ii) the Preference Transfers had not been made; and (iii) IAC received payment on the subject antecedent debt or debts in accordance with the applicable provisions of the Bankruptcy Code.

53.     During the course of this adversary proceeding, Plaintiffs may learn (through discovery or otherwise) of, among other things, additional transfers made to Defendants during the Preference Period.  It is Plaintiffs' intention to avoid and recover all voidable transfers of an interest of the Debtors in property and/or property of the estates that were made by the Debtors to or for the benefit of Defendants or any other person or entity for whose benefit such transfers were made.  Plaintiffs reserve their right to amend this original Complaint to include: (i) further information regarding the Preference Transfers, (ii) additional avoidable transfers, (iii) modifications of and/or revisions to Defendants' names, (iv) additional defendants, and/or (v) additional causes of action, including without limitation, actions under 11 U.S.C. §§ 510, 542, 544, 545, 547, 548, 552 and/or 553, if applicable (collectively, the "Amendments"), that may

10

become known to Plaintiffs at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to the date of the filing of this original Complaint.

54.     Based upon the foregoing, the Preference Transfers constitute avoidable preferential transfers pursuant to 11 U.S.C. § 547(b).

### Count 2 — Against IAC and Starkaire
### (Avoidance of Fraudulent Transfers – 11 U.S.C. § 548(a)(1)(B))

55.     Plaintiffs re-allege the allegations made in paragraphs 1 through 45 as if fully set forth herein.

56.     Payments in the aggregate amount of $1,205,867.13[1] (collectively, the "<u>Fraudulent Transfers</u>") that Plaintiffs made to IAC with respect to the acquisition, installation and/or maintenance of the Dryer were made on or within two (2) years before the Petition Date.

57.     Plaintiffs did not receive reasonably equivalent value in exchange for the Fraudulent Transfers.

58.     Plaintiffs were insolvent on the date Plaintiffs made each of the payments constituting the Fraudulent Transfers or became insolvent as a result of such transfers.

59.     IAC is the initial transferee of the Fraudulent Transfers.

60.     On information and belief, IAC paid to Starkaire at least $1,205,867.13 of the Fraudulent Transfers it had received from Plaintiffs, thereby making Starkaire the immediate transferee of the Fraudulent Transfers.

61.     During the course of this adversary proceeding, Plaintiffs may learn (through discovery or otherwise) of, among other things, additional fraudulent transfers made to Defendants

---

[1] The aggregate amount of the payments by SSH for the Dryer is calculated by starting with the line item charged for the Dryer of $1,156,889.00, then adding $57,844.45 for the five percent profit charged SSH by IAC, and deducting $8,866.32, which was withheld by SSH because of the continued failure of the Dryer.

on or within the two (2) years before the Petition Date.  It is Plaintiffs' intention to avoid and recover all voidable transfers of an interest of the Debtors in property and/or property of the estates that were made by the Debtors to or for the benefit of Defendants or any other person or entity for whose benefit such transfers were made.  Plaintiffs reserve their right to amend this original Complaint to include: (i) further information regarding the Fraudulent Transfers, (ii) additional avoidable transfers, (iii) modifications of and/or revisions to Defendants' names, (iv) additional defendants, and/or (v) additional causes of action, including without limitation, actions under the Amendments, that may become known to Plaintiffs at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to the date of the filing of this original Complaint.

62.     Based upon the foregoing, the Fraudulent Transfers constitute avoidable transfers under 11 U.S.C. § 548(a)(1)(B).

<u>**Count 3 — Against IAC and Starkaire**</u>
**(Recovery of Transfers – 11 U.S.C. § 550)**

63.     Plaintiffs re-allege the allegations made in paragraphs 1 through 62 as if fully set forth herein.

64.     Plaintiffs are entitled to avoid the Preference Transfers pursuant to 11 U.S.C. § 547(b).

65.     IAC is the initial transferee of the Preference Transfers, and on information and belief, Starkaire is the immediate transferee of the Preference Transfers made to IAC.

66.     Plaintiffs are entitled to avoid the Fraudulent Transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

67.     IAC is the initial transferee of the Fraudulent Transfers, and on information and belief, Starkaire is the immediate transferee of the Fraudulent Transfers made to IAC.

12

68.     Based upon the foregoing, Plaintiffs are entitled to recover the Preference Transfers and the Fraudulent Transfers, or the value thereof, from Defendants under 11 U.S.C. § 550(a), plus interest and the costs of this action.

### Count 4 — Against IAC
### (Breach of Contract)

69.     Plaintiffs re-allege the allegations made in paragraphs 1 through 45 as if fully set forth herein.

70.     A valid and binding contract, in the form of the Purchase Order (including all amendments, supplements and modifications thereto and all documents referenced therein), exists by and between SSH and IAC.  SSH has fully performed its obligations under the Purchase Order.

71.     IAC's failure to deliver, install and/or maintain a usable and operational Dryer constitutes a breach of the Purchase Order.

72.     Plaintiffs have suffered monetary damages in the amount of at least $3,783,092.13 to date on account of IAC's breach of the Purchase Order as failures with the Dryer continue to this day.

### Count 5 — Against IAC
### (Breach of Express Warranty – MISS. CODE § 75-2-313)

73.     Plaintiffs re-allege the allegations made in paragraphs 1 through 45 as if fully set forth herein.

74.     IAC represented, warranted and guaranteed that the Dryer shall be free from all defects of any kind, including, without limitation, defects in workmanship or materials, shall comply with the terms and conditions of the Purchase Order and shall be fit for express and intended purposes of merchantable quality.

13

75.     IAC is obligated under the terms of its express warranty to repair and/or replace the Dryer sold to Plaintiffs.

76.     IAC has breached its express warranty by supplying the Dryer in a condition which does not meet the warranty obligations undertaken by IAC and by failing to repair or replace the defect and/or defective parts inherent in the Dryer.

77.     IAC has received sufficient and timely notice of the breaches of warranty alleged herein.  Despite this notice and IAC's knowledge of the defects in the Dryer, IAC refuses to honor its warranty.

78.     Plaintiffs have performed each and every duty required under the terms of IAC's express warranties, except as may have been excused or prevented by the conduct of IAC or by operation of law in light of IAC's unconscionable conduct.

79.     Plaintiffs gave IAC a reasonable opportunity to cure its failures with respect to its warranties, and IAC refused to do so.

80.     IAC has failed to provide to Plaintiffs, as a warranty replacement, a Dryer that conforms to the qualities and characteristics that IAC expressly warranted when it sold the Dyer to Plaintiffs.

81.     As a result of IAC's breach of express warranty, Plaintiffs have suffered monetary damages including, but not limited to, the purchase price of the Dryer, the cost to repair or replace the device, loss of production and other associated costs.

82.     Pursuant to MISS. CODE § 75-2-313, Plaintiffs are entitled to recover a monetary judgment against IAC in an amount to be determined at trial.

### Count 6 — Against IAC and Starkaire
**(Breach of Implied Warranty of Merchantability – MISS. CODE § 75-2-314)**

83.     Plaintiffs re-allege the allegations made in paragraphs 1 through 45 as if fully set forth herein.

84.     Starkaire's implied warranty of merchantability accompanied the sale of the Dryer to IAC.

85.     IAC's implied warranty of merchantability accompanied the sale of the Dryer to Plaintiffs.

86.     Pursuant to the Purchase Order, IAC assigned to Plaintiffs any manufacturer warranties, including without limitation, warranties made by Starkaire.

87.     Both Starkaire and IAC are merchants in the sale of frac sand dryers.  Starkaire and IAC manufacture, market and sell frac sand dryers.  Starkaire and IAC provided Plaintiffs with an implied warranty that the Dryer was merchantable and fit for the ordinary purposes for which such frac sand dryers are sold.

88.     The Dryer is not fit for the ordinary purpose of drying frac sand because the Dryer's plenum and bed plate shows excessive wear, and the bricks fail during routine and ordinary drying operations.  The main rotor driving the fluidizing action of the Dryer failed internally, resulting in $25,725 in replacement costs to SSH.  The floor of the Dryer eroded away during normal operations. Excessive backpressure of the entire Dryer system will not allow the dust collection system to operate properly.  The piping added by IAC for the hot air bypass continues to erode due to internal brick failure and associated particle velocity traversing the piping.

89.     Starkaire and IAC knew or had reason to know that Plaintiffs purchased the Dryer for use in their frac sand drying operations.

15

90.     The Dryer does not conform to the promises and affirmations issued by Starkaire and IAC.

91.     Plaintiffs have used the Dryer for its intended and ordinary purposes.

92.     Plaintiffs have performed every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Starkaire or IAC (as applicable) or by operation of law in light of Starkaire's or IAC's (as applicable) unconscionable conduct.

93.     Plaintiffs have provided sufficient and timely notice to Defendants regarding the problems Plaintiffs experienced with the Dryer and, despite such notice and Defendants' knowledge of those problems, Starkaire and IAC have not only failed but also refused to offer Plaintiffs an effective remedy.

94.     As a proximate result of Starkaire's and IAC's breach of the implied warranty of merchantability, Plaintiffs sustained monetary damages including, but not limited to, the purchase price of the Dryer, the cost to repair or replace the device, loss of production and lost revenues associated therewith and other associated costs.

95.     Pursuant to MISS. CODE § 75-2-314, Plaintiffs are entitled to recover a monetary judgment against IAC and Starkaire in an amount to be determined at trial.

### Count 7 — Against IAC and Starkaire
### (Breach of Implied Warranty of Fitness for a Particular Purpose – MISS. CODE § 75-2-315)

96.     Plaintiffs re-allege the allegations made in paragraphs 1 through 45 as if fully set forth herein.

97.     IAC and Starkaire's implied warranty of fitness for a particular purpose accompanied the sale of the Dryer.

16

98.     IAC and Starkaire knew or had reason to know at the time of the sale of the Dryer of the particular purpose for which Plaintiffs required the Dryer, which was for frac sand drying operations.

99.     Plaintiffs relied on IAC and Starkaire's skill or judgment to select or furnish a suitable Dryer.

100.    Plaintiffs have performed every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of IAC or Starkaire (as applicable) or by operation of law in light of IAC and Starkaire's (as applicable) unconscionable conduct.

101.    Plaintiffs have provided sufficient and timely notice to IAC and Starkaire regarding the problems they experienced with the Dryer and, despite such notice and Defendants' knowledge of those problems, IAC and Starkaire have not only failed but also refused to offer Plaintiffs an effective remedy.

102.    As a proximate result of IAC and Starkaire's breach of the implied warranty of fitness for a particular purpose, Plaintiffs sustained monetary damages including, but not limited to, the purchase price of the Dryer, the cost to repair or replace the device, loss of production and lost revenues associated therewith and other associated costs.

103.    Pursuant to MISS. CODE § 75-2-315, Plaintiffs are entitled to recover a monetary judgment against IAC and Starkaire in an amount to be determined at trial.

### <u>Count 8 — Against IAC</u>
**(Objection to Proof of Claim No. 4 Filed by IAC)**

104.    Plaintiffs re-allege the allegations made in paragraphs 1 through 103 as if fully set forth herein.

105.    By this Complaint, the Debtors hereby object to and seek disallowance of Proof of Claim No. 4 filed by IAC for the reasons set forth herein.

17

106.    As alleged in Counts 4 through 7 of this Complaint, IAC has breached the Purchase Order, including the express warranty contained therein, and implied warranties of merchantability and fitness for a particular purpose, and Plaintiffs have suffered monetary damages as a result of IAC's breaches.

107.    The monetary damages sustained by Plaintiffs as a result of IAC's breaches alleged in Counts 4 through 7 hereof, *i.e.*, $3,783,092.13, exceeds the amount of IAC's alleged claims against the Debtors' estates (as set forth in Claim No. 4), *i.e.*, $132,804.14.  Consequently, no amount is due or owing by the Debtors to IAC on account of its Claim No. 4.  Accordingly, Claim No. 4 filed by IAC should be disallowed and expunged in its entirety.

108.    In addition, IAC is a transferee of transfers avoidable under sections 544, 547, and 548 of the Bankruptcy Code, which property or its value is recoverable under section 550 of the Bankruptcy Code.

109.    IAC has not satisfied its liability for the Preference Transfers or the Fraudulent Transfers.

110.    Pursuant to section 502(d) of the Bankruptcy Code, any and all claims of IAC and/or its assignee against the Debtors or their estates must be disallowed until such time as IAC pays to Plaintiffs an amount equal to the Preference Transfers and/or Fraudulent Transfers, plus interest thereon and costs.

*[Remainder of Page Intentionally Left Blank]*

*ACTIVE 46650069*

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(a)     avoid and recover the Preference Transfers and enter judgment in Plaintiffs' favor and against IAC and Starkaire in an amount not less than $20,000.00, plus interest and the costs of this action;

(b)     avoid and recover the fraudulent transfers under the Bankruptcy Code and Mississippi law and enter judgment in Plaintiffs' favor and against IAC and Starkaire in an amount not less than $1,205,867.13, plus interest and the costs of this action;

(c)     enter judgment in Plaintiffs' favor and against IAC and Starkaire in an amount not less than $3,783,092.13, plus prejudgment interest, and reasonable and necessary attorneys' fees;

(d)     disallow and expunge Claim No. 4 in its entirety; and

(e)     award Plaintiffs such other and further relief to which they may be justly entitled.

Date: November 5, 2019                     Respectfully Submitted,

                                           **GREENBERG TRAURIG, LLP**


                                           By:     */s/   Karl D. Burrer*
                                                   Karl D. Burrer
                                                   Texas State Bar No. 24043584
                                                   Paul B. Kerlin
                                                   Texas State Bar No. 24044480
                                                   Shari L. Heyen
                                                   Texas State Bar No. 09564750
                                                   David R. Eastlake
                                                   Texas State Bar No. 24074165
                                                   1000 Louisiana Street, Suite 1700
                                                   Houston, TX 77002
                                                   Telephone:    (713) 374-3500
                                                   Facsimile:    (713) 754-7598
                                                   kerlinp@gtlaw.com
                                                   heyens@gtlaw.com
                                                   burrerk@gtlaw.com
                                                   eastlaked@gtlaw.com

                                                   **COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION**

*ACTIVE 46650069*